# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| LETICIA LEE,<br><br>        Plaintiff,<br><br>  v.<br><br>WARNER MEDIA, LLC; HBO HOME ENTERTAINMENT, INC.; WARNER BROS. WORLDWIDE TELEVISION DISTRIBUTION INC.; NBC UNIVERSAL TELEVISION STUDIO DIGITAL DEVELOPMENT LLC; CBS BROADCASTING INC.; GRAMMNET NH PRODUCTIONS,<br><br>        Defendants. | Case No. 6:23-cv-06025-FPG<br><br>Removed From:<br>Supreme Court of the State of New York, County of Ontario<br>Index No.: 134539-2022 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Elizabeth A. McNamara (N.Y. Bar No. 1930643)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 603-6437
Email: lizmcnamara@dwt.com

Meenakshi Krishnan (*pro hac vice* application forthcoming)
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C. 20005
Telephone: (202) 510-5204
Email: meenakshikrishnan@dwt.com

*Attorneys for Defendants Warner Media, LLC; HBO Home Entertainment, Inc.; Warner Bros. Worldwide Television Distribution Inc.; NBC Universal Television Studio Digital Development*

*LLC; CBS Broadcasting Inc.; and Grammnet NH Productions*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

FACTS ............................................................................................................................... 2

    A.    The Parties ................................................................................................... 2

    B.    The Works .................................................................................................... 3

            1.    Defendants' Television Shows .......................................................... 4

            2.    Plaintiff's Treatment: "Girlfriends" ................................................ 8

    C.    The Amended Complaint ............................................................................ 11

ARGUMENT ..................................................................................................................... 13

I.    DISMISSAL IS REQUIRED WHERE THE PARTIES' WORKS ARE NOT
    SUBSTANTIALLY SIMILAR ..................................................................................... 13

    A.    Copyright Infringement Requires Substantial Similarity of Protectible Expression and
         Cannot Be Premised on Similar Ideas or Stock Elements ............................... 13

    B.    The Court May Dismiss Plaintiff's Claim as a Matter of Law Without Discovery Based
         on the Lack of Substantial Similarity of the Works ........................................ 16

II.    THE WORKS ARE COMPLETELY DISSIMILAR ......................................................... 18

    A.    The Plots of the Works Are Not Similar ...................................................... 19

    B.    The Characters in the Works Are Not Similar .............................................. 21

    C.    The Settings of the Works Are Not Similar .................................................. 23

    D.    The Total Concept and Feel of the Works Are Not Similar ............................ 24

CONCLUSION ................................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*A Slice of Pie Prods., LLC v. Wayans Bros. Entm't,*
  487 F. Supp. 2d 41 (D. Conn. 2007)........................................................................22

*Abdin v. CBS Broad. Inc.,*
  971 F.3d 57 (2d Cir. 2020)......................................................................................17

*Adams v. Musk,*
  2016 WL 2757392 (E.D.N.Y. May 11, 2016) ........................................................14

*Adsani v. Miller,*
  1996 WL 194326 (S.D.N.Y. Apr. 22, 1996)...........................................................16

*Alexander v. Murdoch,*
  2011 WL 2802923 (S.D.N.Y. July 14, 2011), *aff'd*, 502 F. App'x 107 (2d Cir. 2012), *as amended* (Nov. 16, 2012)........................................................................................23

*Allen v. Scholastic, Inc.,*
  739 F. Supp. 2d 642 (S.D.N.Y. 2011)......................................................................22

*Arica Inst., Inc. v. Palmer,*
  970 F.2d 1067 (2d Cir. 1992)...................................................................................16

*Benay v. Warner Bros. Entm't.,*
  607 F.3d 620 (9th Cir. 2010) ...................................................................................20

*Brown v. Perdue,*
  2005 WL 1863673 (S.D.N.Y. Aug. 4, 2005), *aff'd*, 177 F. App'x 121 (2d Cir. 2006)...........20

*Castle Rock Entm't v. Carol Publ'g Grp.,*
  150 F.3d 132 (2d Cir. 1998).............................................................................13, 14

*Chambers v. Time Warner, Inc.,*
  282 F.3d 147 (2d Cir. 2002)......................................................................................3

*Dellar v. Samuel Goldwyn, Inc.,*
  150 F.2d 612 (2d Cir. 1945)......................................................................................1

*Est. of Burne Hogarth v. Edgar Rice Burroughs, Inc.,*
  342 F.3d 149 (2d Cir. 2003)....................................................................................12

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991).................................................................................................13

*Feldman v. Twentieth Century Fox Film Corp.*,
  723 F. Supp. 2d 357 (D. Mass. 2010) .................................................................18

*Gal v. Viacom Int'l, Inc.*,
  403 F. Supp. 2d 294 (S.D.N.Y. 2005) ...............................................................1, 17

*Hoehling v. Universal City Studios, Inc.*,
  618 F.2d 972 (2d Cir. 1980) ...............................................................................15

*Hogan v. DC Comics*,
  48 F. Supp. 2d 298 (S.D.N.Y. 1999) ...............................................................14, 22

*Hord v. Jackson*,
  281 F. Supp. 3d 417 (S.D.N.Y. 2017) ..................................................................18

*In re Jackson*,
  972 F.3d 25 (2d Cir. 2020) ..................................................................................19

*Jones v. CBS, Inc.*,
  733 F. Supp. 748 (S.D.N.Y. 1990) ..................................................................14, 24

*Jorgensen v. Epic/Sony Records*,
  351 F.3d 46 (2d Cir. 2003) ..................................................................................14

*Mallery v. NBC Universal, Inc.*,
  2007 WL 4258196 (S.D.N.Y. Dec. 3, 2007) ....................................................21, 22

*McDonald v. West*,
  138 F. Supp. 3d 448 (S.D.N.Y. 2015), *aff'd,* 669 F. App'x 59 (2d Cir. 2016) .......19

*Melendez v. Sirius XM Radio, Inc.*,
  50 F.4th 294 (2d Cir. 2022) ................................................................................13

*Monbo v. Nathan*,
  2022 WL 4591905 (E.D.N.Y. Aug. 26, 2022) ..................................................13, 15

*Montgomery v. NBC Television*,
  833 F. App'x 361 (2d Cir. 2020) ...............................................................13, 17, 24

*Nichols v. Universal Pictures Corp.*,
  45 F.2d 119 (2d Cir. 1930) ..................................................................................15

*Nobile v. Watts*,
  289 F. Supp. 3d 527 (S.D.N.Y. 2017), *aff'd,* 747 F. App'x 879 (2d Cir. 2018) .......17

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
  602 F.3d 57 (2d Cir. 2010) ............................................................................16, 17

*Polsby v. St. Martin's Press, Inc.*,
   8 F. App'x 90 (2d Cir. 2001) ........................................................................16

*Repp v. Webber*,
   132 F.3d 882 (2d Cir. 1997) .......................................................................13

*Reyher v. Children's Television Workshop*,
   533 F.2d 87 (2d Cir. 1976) ..............................................................15, 16, 24

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013) .........................................................................13

*Sheldon Abend Revocable Tr. v. Spielberg*,
   748 F. Supp. 2d 200 (S.D.N.Y. 2010) ......................................................21, 22

*Shull v. TBTF Prods., Inc.*,
   2021 WL 3027181 (2d Cir. July 19, 2021) ....................................................17

*Sinicola v. Warner Bros.*,
   948 F. Supp. 1176 (E.D.N.Y. 1996) ............................................................23

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ................................................................................11

*Turner v. Temptu Inc.*,
   586 F. App'x 718 (2d Cir. 2014) ................................................................11

*Walker v. Time Life Films, Inc.*,
   784 F.2d 44 (2d Cir. 1986) ....................................................................15, 16

*Warner Bros., Inc. v. Am. Broad. Cos.*,
   720 F.2d 231 (2d Cir. 1983) .........................................................................3

*White v. Twentieth Century Fox Corp.*,
   2012 WL 13008330 (C.D. Cal. Apr. 11, 2012), *aff'd*, 572 F. App'x 475 (9th Cir. 2014) ......18

*Williams v. Crichton*,
   84 F.3d 581 (2d Cir. 1996) ................................................................ *passim*

**State Cases**

*Schroeder v. Cohen*,
   93 N.Y.S.3d 287 (2019) ............................................................................11

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................... *passim*

Defendants Warner Media, LLC, HBO Home Entertainment, Inc., Warner Bros. Worldwide Television Distribution Inc., NBC Universal Television Studio Digital Development LLC, CBS Broadcasting Inc., and Grammnet NH Productions ("Defendants") submit this memorandum of law in support of their motion pursuant to Fed. R. Civ. P. 12(b)(6) for an order dismissing Plaintiff's Amended Complaint, Dkt. 1-1 ("Am. Compl.").

## PRELIMINARY STATEMENT

This lawsuit is a classic example of "that obsessive conviction, so frequent among authors . . . that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism." *Dellar v. Samuel Goldwyn, Inc.*, 150 F.2d 612, 613 (2d Cir. 1945) (per curiam). Based on nothing more than a shared broad and abstract premise—sitcoms featuring an ensemble of young professionals balancing work, friendships, and relationships in a city—and decades after each of these shows first aired, Plaintiff LeTicia Lee now brings this copyright infringement action, claiming that four of television's most popular and acclaimed sitcoms ("Living Single," "Friends," "Sex and the City," and "Girlfriends") (collectively, "Shows") copied her unproduced treatment and pilot script that she created in 1991. But Plaintiff's own bare-bones allegations reveal that her work and the Shows have nothing in common beyond the unprotectible idea of a group of friends navigating personal and professional life in a city. Whether considered individually or collectively, Plaintiff's claim is so unfounded and inherently implausible that it should be summarily dismissed.

The law is clear. Courts in this Circuit and across the country routinely dismiss copyright claims on up-front motions to dismiss when, as here, the copyright infringement claim is based on nothing more than unprotectible ideas or standard scènes à faire. *Gal v. Viacom Int'l, Inc.*, 403 F. Supp. 2d 294, 305 (S.D.N.Y. 2005) (collecting cases). Even a cursory review of Plaintiff's work and the respective Shows confirms that, apart from the isolated generic concept of friends living

together and navigating their young adult life in a city, the respective works are strikingly dissimilar—from the plots to the settings to the characters to the total concept and feel. Plaintiff's treatment for a sitcom called "Girlfriends" is an eight-page document that roughly sketches out episode ideas for a show focusing on a group of young African-American women living in Brooklyn in the 1990s. Plaintiff alleges *no* specific similarities between her treatment and any plots, characters, settings (other than a city), or any other element of any of the Shows. Nor could she, because those series each aired for multiple seasons (almost all for more than a hundred episodes) and involved distinctive, richly developed characters, years-long story arcs, and varied settings. Indeed, the very fact that Plaintiff brings this claim against *four* separate, distinctive shows indicates that there is nothing unique or copyrightable about her work.

A comparison of Plaintiff's treatment with Defendants' Shows mandates dismissal because her claim rests on nothing more than the purported use of a broad, unprotectible idea. Since the total lack of similarity of protected expression between the works may be readily determined as a matter of law, this Court should dismiss the Amended Complaint with prejudice pursuant to Rule 12(b)(6).

## FACTS

### A.  The Parties

Plaintiff LeTicia Lee ("Plaintiff") is the creator of a treatment for a 30-minute television sitcom series titled "Girlfriends" (the "Treatment") and a pilot script for that same show. Am. Compl. ¶ 1; Declaration of Elizabeth A. McNamara ("McNamara Decl.") Ex. C. Each of the named Defendants—Warner Media, LLC, HBO Home Entertainment, Inc., Warner Bros. Worldwide Television Distribution Inc., NBC Universal Television Studio Digital Development LLC, CBS Broadcasting Inc., and Grammnet NH Productions—owns or controls rights in the

respective Shows either directly or indirectly through their parent, affiliate, or subsidiary companies.

**B.      The Works**

Since "a determination of substantial similarity requires a detailed examination of the works themselves," *Williams v. Crichton*, 84 F.3d 581, 583 (2d Cir. 1996) (citation and internal quotation marks omitted), a summary of each of the works at issue follows.  So as to provide the Court with the opportunity to review the works in their entirety, as the law requires, copies of the Treatment[1] and the first seasons of the Shows[2] are annexed to the McNamara Declaration as Exhibits C and D-G, respectively.  *See Warner Bros., Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983) (substantial similarity requires review of the works at issue).  On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) this Court may review the works themselves and any documents on which the plaintiff relied in drafting the complaint.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  The Treatment and the Shows are central to Plaintiff's claim, referenced in her Amended Complaint, and, therefore, properly considered on this motion.

---

[1] Plaintiff did not attach her allegedly infringed works to her Amended Complaint, nor did she include those works' U.S. Copyright Office Registration Numbers.  Instead, in her Amended Application to Proceed *in forma pauperis* in the state court prior to Defendants' removal, Plaintiff attached two copyright registrations for (1) the Treatment, with Registration No. PAu1544414; and (2) a script for a "Girlfriends" pilot episode titled "Sasha Says," with Registration No. PAu1594108.  Dkt. 1-7.  Although Defendants requested the deposit material for both registrations from Plaintiff directly, Plaintiff did not respond and failed to provide the material to Defendants.  McNamara Decl. ¶ 3.  Defendants also requested both deposit copies, and received the Treatment, from the U.S. Copyright Office.  McNamara Decl. ¶¶ 2, 4.  However, as to the "Sasha Says" episode script, on January 17, 2023, the U.S. Copyright Office informed Defendants that the deposit material had been "misplaced/misfiled at [their] storage facility" and that "they are unable to locate the work" and sent a similar email on January 27, 2023.  McNamara Decl. ¶¶ 5-6 & Exs. A-B.  That said, the Treatment includes a "Sasha Says" episode summary, McNamara Decl. Ex. C at 10, and Plaintiff does not allege any specific similarities based on the "Sasha Says" episode script.  Accordingly, Defendants base their analysis on the Treatment.

[2] As for Defendants' works, Plaintiff does not allege any similarities between her work and specific plotlines, episodes, or even seasons of Defendants' long-running shows.  Because each of the Shows aired for multiple seasons, and to avoid burdening the Court with review of hundreds of episodes, Defendants are manually filing DVDs containing the first season of each series, which establish the basic premise, characters, plots, and settings of each Show.  McNamara Decl. Exs. D-G.  Defendants' analysis focuses on the pilot episodes of each Show, which introduce those elements.

### 1.    Defendants' Television Shows

Plaintiff's claims target four award-winning television shows: "Living Single," "Friends," "Sex and the City," and "Girlfriends" that each originally aired 20-30 years ago; each Show was groundbreaking in separate and distinct ways.  Am. Compl. ¶ 1. The characters, settings, and tone are all established in the pilot episodes of each Show, as set forth below.

### a.    "Living Single"

"Living Single" is a 30-minute sitcom that aired for five seasons on Fox from 1993-1998. Am. Compl. ¶ 1; McNamara Decl. Ex. D.  The show focuses on the professional and personal lives of four Black women and two men, most of whom live in the same brownstone in Prospect Heights, Brooklyn.  Three of the women—Khadijah James, Synclaire James, and Régine Hunter—live in one apartment.  Khadijah, a Howard University graduate, is the editor of *Flavor*, an independent magazine dedicated to the African-American community.  Synclaire is Khadijah's affable cousin who works as *Flavor*'s receptionist while dreaming of becoming famous.  Régine, Khadijah's childhood friend, loves dating and is known for her flirtatious nature and love for gossip.  The trio is frequently visited by a fourth woman, Maxine "Max" Shaw, a sharp and sarcastic attorney who became best friends with Khadijah in college.  Meanwhile, Kyle Barker and Overton Jones share another apartment in the brownstone.  Kyle is an ambitious, well-heeled stockbroker whose frequent verbal sparring with Max reflects their romantic tension.  Overton, the brownstone's friendly and naïve maintenance man, nurses a longstanding crush on Synclaire.

In the pilot episode, "Judging by the Cover," Khadijah and Synclaire struggle to find an artful way to tell Régine that her new boyfriend Brad is married, while Khadijah tries to find a new cover star for her magazine after Synclaire forgets to book one.  McNamara Decl. Ex. D (Episode 101).  The Show switches between the offices of *Flavor* and the brownstone the characters live in. This episode opens at *Flavor*'s headquarters and introduces viewers to each character's distinctive

nature.  *Id.*  Synclaire playfully answers the phone in a variety of accents, while Khadijah chastises her for not taking her job seriously.  *Id.*  Régine swans into the magazine to brag about her rich new boyfriend, and Khadijah tells her that she is shallow.  *Id.*  Later, in the brownstone, Overton flirts with Synclaire, while Carl tells Overton he has no chance with her.  *Id.*  Max pops by to brag about scoring legal victories for her divorced client and trades jabs with Carl.  *Id.*  The ladies find out the next day that Brad is married when his wife comes by *Flavor*.  *Id.*  They later spill the beans to Régine who confronts Brad, but he convinces her to keep seeing him, until he later fails to show up to a date.  *Id.*  The ladies comfort Régine and encourage her to be more independent. *Id.*  Meanwhile, Max tells Khadijah that *Flavor*'s new issue on dating married men is sold out on stands, and all of the ladies sing and dance together as they get ready for an evening out.  *Id.*

### b.    "Friends"

"Friends" is a 30-minute sitcom that aired for ten seasons on NBC from 1994-2004 with record-breaking popularity.  Am. Compl. ¶ 1; McNamara Decl. Ex. E.  The Show centers on a tight-knit group of six white twenty-somethings—three women, three men—who live in Manhattan and are struggling to survive in the real world while balancing dating, work, and friendships.  Two of the women, Rachel Green (a spoiled fashion enthusiast) and Monica Geller (her childhood best friend) are roommates.  Rachel starts the show as a waitress at the group's favorite coffee shop, Central Perk.  Monica is a perfectionist and competitive chef.  Two of the men—Joey Tribbiani and Chandler Bing—are roommates and their neighbors.  Joey is a struggling actor who later scores a role on a soap opera.  Chandler is a sarcastic corporate data analyst who eventually marries Monica.  The crew is rounded out by Ross Geller, Monica's nerdy older brother and a paleontologist who has an on-again, off-again romantic relationship with Rachel throughout the entire show, and Phoebe Buffay, a quirky masseuse and musician who used to be Monica's roommate.  The group regularly hangs out in Rachel and Monica's apartment and Central Perk.

The pilot, "The One Where It All Began," introduces the gang.  McNamara Decl. Ex. E (Episode 101).  At Central Perk, Joey, Chandler, and Phoebe tease Monica about her upcoming date.  *Id.*  Ross arrives, and we learn that his ex-wife recently came out as gay and moved out of their apartment.  *Id.*  Rachel stumbles into the coffee shop in a soaked wedding dress after leaving her fiancé at the altar, and she later moves into Monica's apartment after her father financially cuts her off.  *Id.*  Later, Joey and Chandler help Ross assemble furniture in his new place and comfort him about his break-up.  *Id.*  Monica goes on her date, who confides that his wife left him, and they sleep together.  *Id.*  Monica later finds out that the story was just a pick-up line.  *Id.*  Rachel is still tied to her father's credit card, and her friends encourage her to become financially independent.  *Id.*  That night, Ross confesses to Rachel that he had a crush on her in high school, and Rachel tells him that she knew and that he could ask her out sometime.  *Id.*  The episode concludes with the entire group hanging out in Central Perk enjoying coffee with Rachel, who has started working there as a waitress.  *Id.*

### c.    "Sex and the City"

"Sex and the City" is a 30-minute series that aired for six seasons on HBO from 1998-2004.  Am. Compl. ¶ 1; McNamara Decl. Ex. F.  The show revolves around the lives of four white women (three in their mid-30s and one in her early 40s) living in Manhattan: Carrie Bradshaw, the show's protagonist, a sex columnist and fashionista who has an enduring on-again, off-again relationship with "Mr. Big," a businessman; Charlotte York, a conventional and romantic WASP who works at an art gallery and dreams of finding Mr. Right; Miranda Hobbes, a career-minded lawyer who graduated from Harvard Law and is cynical about dating and romance; and Samantha Jones, a confident, sexually adventurous public relations strategist who dates "like a man" and eschews formal relationships.  The show tackles modern themes of dating, romance, sexuality,

feminism, and female friendship, and each episode centers around a central question posed by Carrie in her weekly column, such as whether men and women can be friends.

The pilot, "Sex and the City," opens with Carrie writing a column about a woman who meets an eligible man, has a whirlwind romance, and gets dumped. McNamara Decl. Ex. F (Episode 101). Carrie ruminates about the plight of single, financially-independent women in Manhattan. *Id.* The episode features various straight-to-camera interviews from random singles across the city who contemplate the significant advantages of being a single male 30-something versus a single female 30-something. *Id.* These interviews introduce Miranda and Charlotte: Miranda references a friend who had a breakdown at 41 because she could not get dates; Charlotte shares her view that to get a guy, you have to "keep your mouth shut and play by the rules." *Id.* At Miranda's birthday party, Samantha tells her friends that she is going to have "sex like a man." *Id.* The friends debate dating as women in their 30s and early 40s in Manhattan. *Id.* Later, Carrie hangs out with her best friend, a gay man named Stanford Blatch, and she has a casual sexual liaison with an ex-boyfriend in an attempt to take Samantha's advice. *Id.* While walking home, she meets and flirts with a businessman who she nicknames "Mr. Big." *Id.* The ladies go out to a club, where various pairings emerge; and Carrie walks home before being picked up in Mr. Big's car. *Id.* Carrie gets out at her apartment and asks Mr. Big if he'd ever been in love. He replies "Abso-f******-lutely." *Id.*

### d.    "Girlfriends"

"Girlfriends" is a 30-minute sitcom that aired for eight seasons on UPN and later The CW from 2000-2008. Am. Compl. ¶ 1; McNamara Decl. Ex. G. The show follows four Black women living in Los Angeles: Joan Clayton, a successful lawyer who is unlucky in love; Maya Wilkes, Joan's assistant who grew up in a working-class home in Compton, California, and is often corrected for her grammatical errors; Lynn Searcy, Joan's sexually adventurous college roommate

who bucks societal norms; and Toni Childs-Garrett, Joan's stylish, popular, and somewhat superficial childhood friend who frequently butts heads with Maya. The women all come from different backgrounds and often clash over their distinct values and desires.

The pilot episode, "Toe Sucking," opens at Joan's law firm, where Joan is turning 29 and receives flowers at work from "Derek," who tells her that he got back together with his ex. McNamara Decl. Ex. G (Episode 101). Meanwhile, Toni kicks Lynn out of her apartment, and tells her to go back to Joan's place. *Id.* Toni tells Lynn that she is dating Charles, Joan's venture capitalist ex-boyfriend, and Lynn responds that Toni should tell Joan about the relationship. *Id.* Toni tells Joan that she's bringing Charles as her date to Joan's birthday party, and we learn from a flashback that Joan wanted to marry Charles, but Charles was commitment-phobic and refused. *Id.* To make Charles jealous, Joan asks William, her work colleague and close friend, to come as her date, and she dresses to the nines. *Id.* When Charles tells Joan that he's ready to marry Toni, Joan is furious and ends the party. *Id.* Later that night, Toni has a change of heart and tells Charles that she cannot betray Joan by dating him. *Id.* Joan confesses her real age to William and her fears about turning 30 and being single; Lynn moves back into Joan's place; and Charles tells Joan that he put off marriage solely to prioritize his career. *Id.* Charles and Joan kiss, just as Toni comes over and apologizes. *Id.* Realizing Charles is not worth losing her friendship for, Joan and Toni make up, and the episode closes with the four women dining at an Italian restaurant. *Id.* Joan shares that she made junior partner but confesses to the camera that she is still thinking about Charles. *Id.*

### 2.    Plaintiff's Treatment: "Girlfriends"

Plaintiff registered the Treatment for a 30-minute television sitcom titled "Girlfriends" on August 19, 1991. McNamara Decl. Ex. C. The Treatment loosely describes the main characters as "spunky, fresh, young Afro-American women of the nineties" who "met in college (N.Y.U.)

where they studied film and theatre." *Id.* at 4.  The three women "have reunited a few years later

under one roof in a brownstone in Brooklyn." *Id.*

The Treatment provides a brief character breakdown – three leads (Terri, Monique, and

Erika) and three "additional players" (Bobbi, Robert, and Sasha) – none of whom have last names.

*Id.* "Terri" is a 28-year-old "aspiring actress/singer" who works as a "receptionist" at an unnamed

talent agency and has a laundry list of qualities, including that she "fears being poor and unknown,"

"has an offbeat sense of humor," "lives from paycheck to paycheck," is "very sentimental and is

always falling in love with a different man." *Id.* "Monique," a former dancer and model, is a 30-

year-old "independent film producer" who is "very practical, loves her work, and feels very

maternal towards her problematic housemates." *Id.* Monique "often lectures the girls" but also

"often finds herself seeking advice from them as well;" she "loves peace and quiet and believes in

structure [a]nd calmness." *Id.* "Erika" is a 29-year-old writer who is "spiritual" and "follows her

intuition and not logic." *Id.* She "lives in the shadow of her childhood conscious [sic]" and "feels

that she must please her family." *Id.* Erika also "welcomes all kinds of strangers in need into the

household" and "habitually falls asleep in public." *Id.*

The "additional players" all have short character descriptions.  "Bobbi" is the "gay next

door neighbor," who is an "excellent listener and is extremely supportive" who "maintains a

freezer full of ice cream" with each flavor "symboliz[ing] a different problem." *Id.* Bobbie takes

an "Afrobics class three times a week with the girls."  Rounding out the cast is "Robert," the

"neighborhood mailman" who is "very flirtatious with the girls and is homophobic," and "Sasha,"

who is Erika's "tarot card reader and confidant." *Id.*

The rest of the Treatment provides cursory sketches of six episodes. *Id.* at 5-10.  None of

the events outlined in the episode descriptions are alleged to have been taken or adapted in any of

the Shows.  The "Sold on Spec" episode, for example, concerns Erika's tendency to fall asleep at inappropriate times (including when she falls asleep during a ceremony honoring her writing); with Monique and Terri expressing concern that "Erika's sleeping condition is getting serious," but Erika says that she is simply meditating.  *Id* at 5.  The "In the Red" episode focuses on Terri's financial problems, *id.* at 6, with Terri borrowing money from her friends, then taking a job as a waitress at a popular nightclub, only to realize her "desire to sing" and now needing money for singing classes.  *Id.*  The "Personal Ads" episode deals with Erika's "dry season in the dating circuit."  *Id.* at 7.  "Out of desperation," Erika answers a personal ad in "Chocolate Singles," and she begins dating Chuck, a fellow writer, who ends up stealing her story ideas.  *Id.*  Ultimately, Terri shows Erika the works Chuck has sold, and Erika is "faced with the truth" of Chuck's thievery.  *Id.*

"The Seminar" episode features the girls "treat[ing] themselves to a night on the town" in which they practice Terri's theory that to attract a man, you have to "[l]ook him deeply into his eyes…and watch him fall apart."  *Id.* at 8.  Then, the girls "toss[] out the bait and are reeling them in" but then "toss [the men] back in" as they "only play for the sport."  *Id.*  The "Interception" episode deals with Monique intercepting her boyfriend Tony's calls, only to learn about a great screenplay that "could set her career back on the right path."  *Id.* at 9  She feels guilty and, in the end, Monique tells Tony, who is not interested in the script, and Monique produces it herself.  *Id.*  Finally, the "Sasha Says" episode focuses on Erika's "writer's block" that will not go away.  *Id.* at 10.  Eventually, she visits a "spiritual guide" named Sasha, who "tells her what she must do" to overcome the block.  *Id.*  Terri and Monique then also visit the spiritual guide, with various predictions coming true or not.  But Erika does break through her writer's block, publishing two

stories, and when she finds her crystal in the ice cube tray, Terri says that "Erika was getting too hot and needed to chill out." *Id.*

### C.      The Amended Complaint

Plaintiff filed this action in the Ontario County Supreme Court of the State of New York on November 9, 2022, with an Amended Complaint on November 16, 2022.  Dkt. 1-1 at 1.  The Amended Complaint asserts a claim against Defendants for copyright infringement of Plaintiff's "original treatment and pilot script" for the show titled "Girlfriends" that she purportedly created in 1991.  Am. Compl. ¶ 1.[3]  Defendants timely removed this action to this Court on January 11, 2023, since Plaintiff's copyright infringement claim arises under federal law.  Dkt. 1.[4]

Fundamentally, Plaintiff identifies a single similar concept between her works and Defendants' four independently created Shows, at the highest level of generality.  She alleges that Defendants infringed on her idea about an "original sitcom ensemble in their twenties balancing life, relationships, and career in a major urban metropolitan city most of whom lived in one building."  Am. Compl. ¶ 1; *see also id.* ¶¶ 8-9, 14 (similar).  First, Plaintiff claims that "Living Single" infringes on this broad idea because it was about "four urban women and two men balancing life and career with strikingly similar character descriptions and stories . . . we pitched . . . from Girlfriends © 1991."  *Id.* ¶ 19; *see also id.* ¶ 20 (similar).  Next, Plaintiff claims that

---

[3] Plaintiff also states that her copyright claim stems from "conversations" she had during purported pitch meetings, but it goes without saying that such "conversations" cannot form the basis for a copyright infringement claim.  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984) ("Copyright protection 'subsists . . . in original works of authorship fixed in any tangible medium of expression.'") (citing 17 U.S.C. § 102(a)).

[4] Plaintiff does not expressly plead any claim against Defendants for misappropriation of ideas under New York law.  But to the extent any of her allegations can be so construed, she fails to plausibly allege either of the "two essential elements" of that claim.  *Turner v. Temptu Inc.*, 586 F. App'x 718, 722 (2d Cir. 2014) (citation omitted).  First, Plaintiff does not plead the existence of any "requisite legal relationship" between herself and the Defendants, namely a "fiduciary" or "contract[ual] relationship."  *Id.*  Second, she does not allege that her broad idea regarding an ensemble of friends living in a city is "novel and concrete" in any respect.  *Id.*; *see also Schroeder v. Cohen*, 93 N.Y.S.3d 287, 288 (2019) (dismissing misappropriation of ideas claim where "[p]laintiffs' ideas amount to nothing more than a collection of broad concepts").

"Friends"—a "white version" of her show, *id.* ¶ 22—similarly relies on the concept of "an ensemble of three women and three men in their twenties who lived under one roof in New York City who met regularly at a café to discuss life, career and relationships" and was also "strikingly similar" to her Treatment, "including that we and our friends met at a film/tv/arts crew industry favorite Brooklyn café called Mike's." *Id.* ¶ 24. Plaintiff claims that "Friends" derived its abbreviated title from her Treatment and "changed [the] local social meeting place, Mike's Café to Perks Cafe."[5] *Id.* ¶ 25. As for "Sex and the City," Plaintiff makes no specific allegations, but vaguely claims that HBO "renamed Girlfriends as Sex and the City," "much of which was inspired by the treatment, personal stories, and outlined episodes" Plaintiff authored. *Id.* ¶ 28. Finally, regarding "Girlfriends," Plaintiff claims that the show used the "same title" and "strikingly similar treatment/notes" that she allegedly shared with HBO except that the show "chang[ed] some character names and location from New York City to Los Angeles." *Id.* ¶ 30.

Plaintiff's copyright infringement claim rests solely on this alleged highly generalized conceptual similarity between the Treatment and the Shows. *Id.* ¶¶ 47-48. Plaintiff seeks damages of $750,000,000 in addition to "ten (10%) percent of all current and future royalties from gross revenues" derived from the four [S]hows and "any/all spinoffs . . . in any format in perpetuity." *Id.* ¶ 51.[6]

---

[5] As described above, the coffee shop in "Friends" is titled "Central Perk," not "Perks Cafe." McNamara Decl. Ex. E (Episode 101).

[6] Plaintiff apparently seeks damages for alleged infringement extending from the Shows' first airing date in the 1990s to the present. Under the Copyright Act, however, claims are barred unless "commenced within three years after the claim accrued." *Est. of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163 (2d Cir. 2003). Accordingly, to the extent that Plaintiff has any copyright infringement claim—which she does not—she is statutorily limited to allegedly infringing acts within the last three years.

**ARGUMENT**

## I.   DISMISSAL IS REQUIRED WHERE THE PARTIES' WORKS ARE NOT SUBSTANTIALLY SIMILAR

To survive a motion to dismiss, a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Montgomery v. NBC Television*, 833 F. App'x 361, 363 (2d Cir. 2020) (citation omitted).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Monbo v. Nathan*, 2022 WL 4591905, at *8 (E.D.N.Y. Aug. 26, 2022) (citation omitted).  Those factual allegations "must be enough to raise a right to relief above the speculative level." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 306 (2d Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013) ("[Courts] are not required to credit conclusory allegations or legal conclusions couched as factual allegations.") (citing *Twombly*, 550 U.S. at 555).

### A.   Copyright Infringement Requires Substantial Similarity of Protectible Expression and Cannot Be Premised on Similar Ideas or Stock Elements

"Copyright infringement is established when the owner of a valid copyright demonstrates unauthorized copying." *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  To prevail on a claim of copyright infringement, "'a plaintiff must first show that his work was actually copied . . . [and] then must show that the copying amounts to an improper or unlawful appropriation.'" *Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132, 137 (2d Cir. 1998) (citation omitted).  In the absence of direct evidence of copying, a copyright plaintiff must first allege facts to show that defendant had "a reasonable possibility of access" to the preexisting work and that there are similarities in the allegedly

infringing work that are probative of copying.[7]  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 54-55 (2d Cir. 2003).  "'It is only *after* actual copying is established that one claiming infringement' then proceeds to demonstrate that the copying was improper or unlawful by showing that the second work bears 'substantial similarity' to *protected expression* in the earlier work."  *Castle Rock Entm't*, 150 F.3d at 137 (emphasis added) (quoting *Repp*, 132 F.3d at 889).

To determine whether works are substantially similar, courts in this Circuit generally apply the "ordinary observer test," asking "whether a lay observer would consider the works as a whole substantially similar to one another."  *Williams*, 84 F.3d at 590.  Critically, where, as here, the works in question contain both protectible and unprotectible elements, courts must apply a "discerning ordinary observer test" and "take care to inquire only whether 'the *protectible elements, standing alone,* are substantially similar.'"  *Id.* (quoting *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995)); *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 309 (S.D.N.Y. 1999).  In performing its gatekeeper function, there are several fundamental principles which the Court must apply.

<u>First</u>, "[i]t is a principle fundamental to copyright law that a copyright does not protect an idea, but only the expression of an idea."  *Williams*, 84 F.3d at 587 (citations and internal quotation marks omitted).  "It has long been recognized that all fictional plots, when abstracted to a sufficient level of generalization, can be described as similar to other plots."  *Jones v. CBS, Inc.*, 733 F. Supp. 748, 753 (S.D.N.Y. 1990).  As Judge Learned Hand explained:

---

[7] Plaintiff alleges that Defendants had access to her Treatment in 1991 via "Karen Handel at HBO, Warren Hutchinson, and Shelley Raskov at Warner Bros. Television."  Am. Compl. ¶ 48; *see also id.* ¶¶ 4, 14-19.  But Plaintiff does not specifically allege that she provided the *Treatment* to any of those individuals during those purported pitch meetings.  *Id.*  Such "speculation of access is insufficient."  *Adams v. Musk*, 2016 WL 2757392, at *4 (E.D.N.Y. May 11, 2016).  Instead, "access must be more than a bare possibility and may not be inferred through speculation or conjecture."  *Id.* (citation omitted).  Accordingly, Plaintiff has failed to plausibly allege access.  But in any event, the Court need not resolve that issue because the lack of substantial similarity between the works is dispositive.

> Upon any work . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. . . . [T]here is a point in this series of abstractions where they are no longer protected, since otherwise the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930).

Second, copyright law does not protect stock scenes and themes, often termed scènes à faire.  These are defined as "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic," *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980) (citation omitted), or as "thematic concepts . . . which necessarily must follow from certain plot situations."  *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976).  In a police story set in the Bronx, for example, "[e]lements such as drunks, prostitutes, vermin and derelict cars" as well as "[f]oot chases[,] . . . the morale problems of policemen . . . [and] the Irish cop" were unprotectible scènes à faire or stock elements.  *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986).[8]

Third, purported "similarities" isolated from the context in which they appear are "inherently subjective and unreliable."  *Williams*, 84 F.3d at 590 (citation omitted).  This is particularly true where, as here, any high-level similarities are not copyrightable.

In recognition of the necessarily close parallels in abstract ideas and artistic conventions in many creative works, the standard for establishing substantial similarity is a demanding one.  A copyright plaintiff must demonstrate that the defendant has "appropriated the 'fundamental essence or structure' of plaintiff's work."  *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1073 (2d Cir.

---

[8] *See also Monbo*, 2022 WL 4591905, at *13 (similarities in Baltimore settings, dirt bike stunt riders, and young aspiring riders were scènes à faire in works about a famed dirt bike stunt group from that city); *Hoehling*, 618 F.2d at 979 (revelry in German beer hall, common greetings of that time such as "Heil Hitler" and songs such as German national anthem were scènes à faire in works about *Hindenburg* airship).

1992) (quoting 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 13.03[A][1] at 13-27 (defining "comprehensive non-literal similarity")).  Moreover, "the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization." *Reyher*, 533 F.2d at 91.  The works must share similarities in "such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting." *Williams*, 84 F.3d at 588.  While differences alone may not excuse actual infringement, "the Second Circuit has observed that 'numerous differences tend to undercut substantial similarity.'" *Adsani v. Miller*, 1996 WL 194326, at *3 (S.D.N.Y. Apr. 22, 1996) (quoting *Warner Bros.*, 720 F.2d at 241).

**B.    The Court May Dismiss Plaintiff's Claim as a Matter of Law Without Discovery Based on the Lack of Substantial Similarity of the Works**

It is well-established that courts can make a substantial similarity determination at the motion to dismiss stage.  Where the works in question are incorporated into a plaintiff's complaint, "it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010).  No discovery is needed. *See id.* (no discovery necessary because "what is required is only a . . . comparison of the works") (citation omitted); *Polsby v. St. Martin's Press, Inc.*, 8 F. App'x 90, 92 (2d Cir. 2001) (discovery "not necessary for a comparison of the works in order to assess whether, as to the protectible elements, they were substantially similar").  And critically, "the works themselves, not [any party's] descriptions or impressions of them, are the real test for claims of infringement." *Walker*, 784 F.2d at 51.

If the court determines that the works are not substantially similar as a matter of law, the court "can properly conclude that the plaintiff's complaint, together with the works incorporated

therein, do not plausibly give rise to an entitlement to relief." *Peter F. Gaito*, 602 F.3d at 64. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)); *see also Gal*, 403 F. Supp. 2d at 305 ("[T]here is ample authority for the proposition that a district court may make [a determination as to substantial similarity] on a motion to dismiss for failure to state a claim under Rule 12(b)(6)." (citing cases)).   Courts routinely dismiss claims where the alleged similarity "concerns only noncopyrightable elements of plaintiff's work or no reasonable trier of fact could find the works substantially similar." *Williams*, 84 F.3d at 587 (citation and internal quotation marks omitted).

Unsurprisingly, popular television series and movies are common targets for baseless copyright claims in which plaintiffs contend that the successful works were somehow derived from plaintiffs' works.   And in case after case, these claims are dismissed because, inevitably, no similarity exists beyond abstract ideas, facts or random words or phrases—much less the substantial similarity that the law requires.   *See, e.g.*, *Shull v. TBTF Prods., Inc.*, 2021 WL 3027181, at *2 (2d Cir. July 19, 2021) (no substantial similarity between "Billions" television series and investment book because any character similarities are "generalized and non-protectible"); *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 59-60 (2d Cir. 2020) (no substantial similarity between Star Trek television series and videogame where both works involve "tardigrades," creatures with "eight short legs," an "O-shaped mouth," and the "ability to survive in space without protection"); *Montgomery*, 833 F. App'x at 365 (no substantial similarity between "Rosemary's Baby" miniseries and two short stories where the works share "common plot elements," including an "interracial friendship, an investigation, a mysterious disappearance, and incident involving a strange photograph"); *Nobile v. Watts*, 289 F. Supp. 3d 527, 534, 537 (S.D.N.Y. 2017) (no substantial similarity between defendants' book and movie "The Light Between Oceans" where both works involved couples coping with the moral complexities

surrounding "the providential arrival of a baby in a boat to a childless couple"), *aff'd*, 747 F. App'x 879 (2d Cir. 2018); *Hord v. Jackson*, 281 F. Supp. 3d 417, 425 (S.D.N.Y. 2017) (dismissal of copyright action arising out of defendant's television show "Power" where both "works involve an African–American protagonist who deals drugs and engages in violence" because "such a story line is extremely common in television and movies").

Here, Plaintiff fails to allege any specific similarities between her Treatment and any particular element of the Shows, other than the broad concept of an ensemble group of friends living in a city.  Courts regularly deny analogous cases brought by plaintiffs who allege that such broad concepts across numerous works give rise to an infringement claim.  *See, e.g.*, *Feldman v. Twentieth Century Fox Film Corp.*, 723 F. Supp. 2d 357, 360 (D. Mass. 2010) (dismissing *pro se* plaintiff's claim that several television series—"Journeyman," "Grey's Anatomy," "Private Practice," "Eli Stone," "All My Children," and "Cupid"—infringed her four-book series where plaintiff alleged broad similarities like "people stories," "medical dramas," the "'harbor city' setting," and "tragic components"); *White v. Twentieth Century Fox Corp.*, 2012 WL 13008330, at *4, 7 (C.D. Cal. Apr. 11, 2012) (dismissing *pro se* plaintiff's claim that several works—the films "There's Something About Mary" and "Me Myself and Irene" and the television show "Unhitched"—infringed his screenplay where the "overall plots bear no resemblance to each other" other than broadly generic elements), *aff'd*, 572 F. App'x 475 (9th Cir. 2014).  By simply reading Plaintiff's Treatment and comparing it with the pilot episode of the Shows' first seasons, only one conclusion can reasonably be reached: there is no similarity between the protectable elements of the works.  Therefore, Plaintiff's claim of copyright infringement should be rejected.

## II.   THE WORKS ARE COMPLETELY DISSIMILAR

Plaintiff's Treatment and the Shows are not remotely similar.  Indeed, Plaintiff's Amended Complaint hardly musters any allegations that her Treatment is similar to the Shows in any specific

ways: plots, characters, settings, or the total concept and feel. Instead, she primarily asserts one similarity existing only at the most general level: an ensemble sitcom "based on the personal and career lives of twenty-somethings just finding their way in life in a competitive metropolitan city." Am. Compl. ¶ 9. But this concept constitutes an idea rather than protectible expression, and thus cannot support her copyright infringement claim. An analysis of the actual works demonstrates that they are readily distinct on every level. Thus, Plaintiff's copyright claim fails as a matter of law.

## A.      The Plots of the Works Are Not Similar

Frequently, in copyright lawsuits over literary works, plot elements "that appear similar in their abstract description prove to be quite dissimilar once examined in any detail." *Williams*, 84 F.3d at 590. This is clearly the case here. When one goes beyond the superficial idea of a group of friends experiencing personal and professional life in a city, any similarity between the actual plots of the works dissolves. Indeed, the very existence of these four different Shows reflects the diversity of execution of this expansive concept.[9]

At the outset, any broad similarities between the works resulting from the general concept of an urban ensemble of 20-something friends living together are nothing more than scènes à faire, or concepts that naturally flow from an event or scene.[10] For example, in such stories, it necessarily

---

[9] Plaintiff also claims that the shows "Girlfriends" and "Friends" infringed her work because they use the same or similar title as her Treatment. Am. Compl. ¶¶ 25, 30. However, it is axiomatic in copyright law that "words and short phrases . . . such as . . . titles" are typically "not copyrightable because they contain a de minimis amount of authorship." *In re Jackson*, 972 F.3d 25, 45 (2d Cir. 2020) (citation omitted); *see also McDonald v. West*, 138 F. Supp. 3d 448, 459 (S.D.N.Y. 2015) (dismissing copyright claim where songs shared a "ubiquitous, unprotectable [] title" because such shared similarity was "not enough to overwhelm the profound dissimilarity of the two works"), *aff'd*, 669 F. App'x 59 (2d Cir. 2016).

[10] It is also worth noting that even within this broad concept, numerous differences exist between the Treatment and the Shows. Although the Treatment's main characters all live together in a Brooklyn brownstone, McNamara Decl. Ex. C at 3, that is not the case for any of the Shows. In "Living Single," three of the main characters – Khadijah, Régine, and Synclaire live in one apartment, and Kyle and Overton live in another in the same Brooklyn brownstone, while Max lives separately. *Id.* Ex. D (Episode 101). In "Friends," Monica and Rachel, and Chandler and Joey live as roommates in two different Manhattan apartments, while Ross and Phoebe live separately elsewhere. *Id.* Ex. E

follows that they will "try[] to balance life, relationships, and career," Am. Compl. ¶¶ 1, 14, and attempt to "find[] their way in life in a competitive metropolitan city," *id.* ¶ 9.  Such stories will automatically involve common urban settings, like coffee shops.  *Benay v. Warner Bros. Entm't.*, 607 F.3d 620, 627-28 (9th Cir. 2010) (stories that both involve an "American war veteran who travels to Japan to help the Emperor fight a samurai rebellion" will necessarily include shared settings like "scenes in the Imperial Palace" and "training grounds").  These ideas are simply not protected by copyright law, as "no one can own the basic idea for a story."  *Brown v. Perdue*, 2005 WL 1863673, at *7 (S.D.N.Y. Aug. 4, 2005), *aff'd*, 177 F. App'x 121 (2d Cir. 2006).

As for any specific plotlines, Plaintiff fails to allege how the Shows infringe *any* of the rough episode outlines summarized in her Treatment.  Nor can she.  The Treatment provides perfunctory descriptions of plots involving, for example, a character being hired as a TV writer only to fall asleep during a production meeting, McNamara Decl. Ex. C at 5; a character struggling with her finances while figuring out whether she wants to be an actress or singer, *id.* at 6; a character dating a fellow writer only to learn he is stealing her ideas, *id.* at 7; or, several characters seeking advice from a "spiritual guide," *id.* at 10.  Critically, Plaintiff does not allege that any of these specific plotlines appear in any episode of the Shows.  Nor can she, as these specific plotlines do not appear in any episode of the Shows.

By contrast, the Shows are richly developed, multi-year series that focus on several groups of friends in urban cities experiencing a wide range of struggles, conflicts, and successes.  Though similar in the abstract concept central to Plaintiff's claim, none of the Shows (as evidenced from their pilot episodes) include any of the plot lines identified in Plaintiff's Treatment.  *See supra* at

---

(Episode 101).  In "Sex and the City," the four protagonists live separately in apartments all across Manhattan.  *Id.* Ex. F (Episode 101).  Finally, in "Girlfriends," Joan, Maya, and Toni live separately in Los Angeles, with Lynn moving into Joan's place at the end of the pilot episode.  *Id.* Ex. G (Episode 101).

8-11. These Shows would each go on to air *hundreds* of episodes over several years, with elaborately detailed plots dependent on the characters' unique arcs. Nothing remotely approximating any of this detail appears in any of the Treatment's plot sketches; nor does Plaintiff identify any specific plot similarities.

In case after case, courts in this Circuit dismiss copyright claims where there is far greater overlap in plot elements than anything alleged here. *See Mallery v. NBC Universal, Inc.,* 2007 WL 4258196, at *6 (S.D.N.Y. Dec. 3, 2007) (no substantial similarity where works shared the ideas of "(1) painting a future in which tragic and destructive events take place, such as the destruction of landmark buildings in New York City; (2) having a prediction confirmed by a newspaper report; and (3) making an attempt to prevent a tragic event in light of a prediction of the future," *aff'd*, 331 F. App'x 821 (2d Cir. 2009); *Sheldon Abend Revocable Tr. v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010) (no substantial similarity between the short story *Rear Window* and the movie *Disturbia* where "both works [told] the story of a male protagonist, confined to his home, who spies on neighbors to stave off boredom, . . . discovers that one of his neighbors is a murderer, . . . is himself discovered by the suspected murderer, is attacked by the murderer, and is ultimately vindicated").

At bottom, Plaintiff's claim is based on zero alleged specific plot similarities; instead, her case rests on nothing more than her apparent belief that the unprotectible idea of an ensemble show about an urban group of friends belongs to her and her alone. That theory plainly does not support a copyright infringement claim.

### B.   The Characters in the Works Are Not Similar

There are no similarities among the characters of the Treatment and any of the Shows. "In determining whether characters are similar, a court looks at the 'totality of [the characters'] attributes and traits as well as the extent to which the defendants' characters capture the 'total

concept and feel' of figures in [plaintiff's work]." *Hogan*, 48 F. Supp. 2d at 309-10 (quoting *Walker*, 784 F.2d at 50) (internal quotation marks omitted). "The bar for substantial similarity in a character is set quite high." *Spielberg*, 748 F. Supp. 2d at 208. In cases where the characters have shared far more specific characteristics, such as both being half-vampires and half-humans named Nicholas Gaunt, *Hogan*, 48 F. Supp. 2d at 311, minority artists with the ability to paint the future, *Mallery*, 2007 WL 4258196, at *7, African-American FBI agents fearing for their jobs, *A Slice of Pie Prods., LLC v. Wayans Bros. Entm't*, 487 F. Supp. 2d 41, 49 (D. Conn. 2007), or two "famous male wizards, initiated late into wizarding (in pre/early adolescence), who receive formal education in wizardry and are chosen to compete in year-long wizard competitions," *Allen v. Scholastic, Inc.*, 739 F. Supp. 2d 642, 659 (S.D.N.Y. 2011), courts have found no substantial similarity as such shared traits are simply general prototypes.

Here, the main characters in the works have nothing in common, nor does Plaintiff allege that they do. In the Treatment, the three leads met at NYU. McNamara Decl. Ex. C at 4. Terri is a 28-year-old aspiring actress/singer who works as a talent agency receptionist; Monique is a 30-year-old independent film producer; and Erika is a 29-year-old writer. *Id.* Other than the barest description of their careers, the Treatment attributes various general qualities to them; for instance, Terri has an "offbeat sense of humor" and struggles with finances; Monique is "practical," "health conscious," and "maternal"; and Erika is "spiritual" and "follows her intuition." *Id.*

By contrast, each of the Shows features an ensemble of well-drawn diverse characters. In "Living Single," Khadijah is a Howard University alumna, where she met Max, and is now a thriving magazine editor; Max is an attorney; Synclaire is a receptionist; and Régine works at a boutique. McNamara Decl. Ex. D (Episode 101). In "Friends," Rachel begins working as a coffee shop waitress; Monica is a chef; Ross is a paleontologist; Joey is an actor; Chandler is a corporate

analyst; and Phoebe is a masseuse/musician.  *Id.* Ex. E (Episode 101).  In "Sex and the City," Carrie is a sex columnist; Charlotte is an art gallerist; Samantha is a PR agent; and Miranda is an attorney.  *Id.* Ex. F (Episode 101).  In "Girlfriends," Joan is an attorney; Maya is her assistant; Lynn is an anthropology student at the start of the show; and Toni seems to derive income from her rich boyfriends.  *Id.* Ex. G (Episode 101).  Of course, those are just their careers; over the Shows' arcs of several years, each character's personality evolves in light of their individual stories, decisions, and experiences.  Plaintiff's one-paragraph summary of her lead characters shares no similarities with any of these characters, nor does she assert any.  To the contrary, Plaintiff *admits* that the Shows' characters have different names and traits.  Am. Compl. ¶¶ 30, 49.

C.    **The Settings of the Works Are Not Similar**

Plaintiff claims that her Treatment and the Shows share the broad common setting of a "major urban metropolitan city," Am. Compl. ¶ 1, specifically that of a "Brooklyn Brownstone," *id*. ¶ 8.  As an initial matter, setting a story in the same city—or even the same type of urban dwelling, is not remotely protectible.  *Alexander v. Murdoch*, 2011 WL 2802923, at *7 (S.D.N.Y. July 14, 2011) ("[T]he choice of [a particular city] as a setting is not in itself copyrightable[.]"), *aff'd*, 502 F. App'x 107 (2d Cir. 2012), *as amended* (Nov. 16, 2012); *Sinicola v. Warner Bros.*, 948 F. Supp. 1176, 1189 (E.D.N.Y. 1996) (rejecting plaintiff's argument that "use of New York City as a setting is a protectible element of his work").  Even if Plaintiff could copyright a Brooklyn urban setting—which she plainly cannot—the actual settings between the Treatment and the Shows are entirely distinct.  Although most of the characters in "Living Single" reside in a Brooklyn brownstone, they live in two separate apartments, and the pilot episode alone heavily features another setting: *Flavor* magazine's headquarters.  McNamara Decl. Ex. D.  The groups in "Friends" and "Sex and the City" live in apartments across Manhattan, not Brooklyn.  *Id.*  Exs. E-F.  And the ensemble in "Girlfriends" lives in another city entirely, Los Angeles, which Plaintiff

acknowledges.  Am. Compl. ¶ 30.  Of course, over the entirety of each of the Shows, the characters are found in a range of settings within and outside their home cities, including nightclubs, restaurants, offices, bars, and parks.  McNamara Decl. Exs. D-G.

Otherwise, Plaintiff only alleges one specific setting similarity between her works and one of the Shows, "Friends": she alleges that in her purported pitch meeting to HBO, she referenced her "favorite Brooklyn café called Mike's" (which is not included in her Treatment), which she claims was changed to "Perks Café" in "Friends."  *Id.* ¶¶ 24-25.  For starters, the café in "Friends" is called "Central Perk," not "Perks Café," McNamara Decl. Ex. E (Episode 101).  In any event, any story involving 20-somethings in an urban setting will almost certainly involve coffee shops and cafes.  Plaintiff can no more claim copyright in the broad setting of a coffee shop than she can a city, which, especially in an urban setting, is a stock element.  *See Montgomery*, 833 F. App'x at 364 ("settings of cafés" are  "*scenes a faire* arising from the works' respective depictions of Americans living in Paris, and therefore are not protectable").

### D.    The Total Concept and Feel of the Works Are Not Similar

Here, the total concept and feel of a work refers to the way the author selected, coordinated and arranged the elements of the work, taking into consideration similarities in "mood, details or characterization." *Reyher*, 533 F.2d at 91-92.  In comparing the total concept and feel of the works, courts consider the works as a whole.  *See Jones*, 733 F. Supp. at 754.

The Treatment roughly sketches a concept for a show about three lead women who are trying to make it professionally and romantically in Brooklyn.  McNamara Decl. Ex. C.  But the Treatment does not develop the concept of the show in any specific way and fails to provide any roadmap or vision as to the show's pace, mood, or style.  *Id.*  The Treatment simply leaves too many questions unanswered, and it is therefore difficult to even ascribe a "total concept and feel" to it.  By contrast, on top of the Shows' differences in plot, themes, characters, or settings, they

each have a distinctive style that Plaintiff's bare-bones, unproduced Treatment simply does not approximate.  As just one example, the Shows are told from different perspectives.  "Sex and the City" is narrated by Carrie, while the other three reflect a more traditional sitcom style with an audience laugh track.  McNamara Decl. Exs. D-G.  The Shows are shot in unique ways; for instance, "Sex and the City" and "Girlfriends" both feature characters who break the fourth wall. The Shows have a range of moods depending on the episode—from light and comedic to highly emotional and contemplative—as well as developed storylines for each character over the course of several seasons.  *Id.*  To the extent the Treatment even has a total concept and feel, it is far from substantially similar to that of the Shows.

## CONCLUSION

Since Plaintiff cannot allege substantial similarity between the works at issue, Defendants respectfully request that the Court grant their motion to dismiss the Amended Complaint with prejudice under Rule 12(b)(6).


DATED: March 6, 2023                DAVIS WRIGHT TREMAINE LLP
                                    ELIZABETH A. MCNAMARA


                                    By: */s/ Elizabeth A. McNamara*
                                    Elizabeth A. McNamara (N.Y. Bar No. 1930643)
                                    1251 Avenue of the Americas, 21st Floor
                                    New York, New York 10020
                                    Telephone: (212) 603-6437
                                    Email: lizmcnamara@dwt.com

                                    Meenakshi Krishnan (*pro hac vice* application
                                    forthcoming)
                                    1301 K Street NW, Suite 500
                                    Washington, DC 20005
                                    Telephone: (202) 510-5204
                                    Email: meenakshikrishnan@dwt.com

*Attorneys for Defendants Warner Media, LLC; HBO Home Entertainment, Inc.; Warner Bros. Worldwide Television Distribution Inc.; NBC Universal Television Studio Digital Development LLC; CBS Broadcasting Inc.; and Grammnet NH Productions*