Case #6:23-cv-06025-FPG-MWP

MAY 2012

# With *Friends* Like These

*Friends* began with a casting miracle—the uncanny chemistry of six up-and-coming actors (two of whom weren't even really available)—combined with a legendary director, and a pair of writers who nailed the young, single, urban life as never before on TV. In an adaptation from his new book on the rise and fall of NBC's "Must See" TV, Warren Littlefield, the network's former president, presents an oral history of its 10-season ratings juggernaut, learning how the stars' characters were shaped, their lives altered, and their hearts a little bit broken. *Related slide show:* See Photos of the *Friends* Cast and Vintage Set Pictures.

BY WARREN LITTLEFIELD

APRIL 26, 2012



pproaching the fall season of 1994, NBC was in a tight spot. Under the leadership of Brandon Tartikoff, the network had dominated its competition through much of the 1980s, on the strength of series such as* Cheers, Hill Street Blues, The Cosby Show, St. Elsewhere, The Golden Girls, *and* L.A. Law. *Warren Littlefield had taken over the presidency of NBC Entertainment in the summer of 1990 and helped develop new hits such as* Seinfeld, Mad About You, *and* Frasier. *But with its stalwart 80s shows having ended their runs, the network slipped to second place behind ABC. NBC needed more successes, and, against all odds, it was about to land two of the biggest hits in TV history.*

**WARREN LITTLEFIELD (former president of NBC Entertainment):** NBC's pilot season of 1994 is legendary in the business. In a world where failure is commonplace, we midwifed the birth of both *Friends* and *ER*. While *ER* came essentially out of the blue, we'd been casting around for a *Friends*-like show for some time at the network.

One morning while I had been studying the overnight ratings from the major markets, I found myself thinking about the people in those cities, particularly the twentysomethings just beginning to make their way. I imagined young adults starting out in New York, L.A., Dallas, Philly, San Francisco, St. Louis, or Portland all faced the same difficulties. It was very expensive to live in those places as well as a tough emotional journey. It would be a lot easier if you did it with a friend.

Addressing that general idea became a development target for us. We wanted to reach that young, urban audience, those kids starting out on their own, but none of the contenders had ever lived up to our hopes. Then Marta Kauffman and David Crane showed up with their pitch for a show called *Six of One.*

*Kauffman and Crane were New York playwrights who had moved into television.*

**KAREY BURKE (former prime-time executive, NBC):** I remember reading a Kauffman-and-Crane play when I was a secretary at NBC. We tracked them, me and Jamie Tarses. Jamie always wanted Kauffman and Crane to develop a show.

**JAMIE TARSES (former vice president of comedy development, NBC):** That was a great pitch. Marta and David finished each other's sentences. We'd been hearing so many of those pitches. The six friends was a concept that was around. But that was a great pitch.

Friends Oral History: Inside the Ratings Juggernaut's Secret Past | Vanity Fair

3/16/2021

**KAREY BURKE:** The pitch was like two old friends telling you a story. The jokes were already there. They performed the pitch. The pitch was total entertainment. It was theater.

**JAMIE TARSES:** I remember there being no question about the show.

W    3/23
Case #6:23-cv-06025-FPG-MWP

*One of the series Kauffman and Crane had been working on was the early HBO sitcom* Dream On.

**MARTA KAUFFMAN (writer and producer of *Friends*):** We got to *Friends* in a roundabout way. We'd just come off of *Dream On*, with one actor who was in every scene, and it was brutal. So we told ourselves, "We want to do an ensemble comedy."

**DAVID CRANE (writer and producer of *Friends*):** Not that long before, we'd been living in New York, not doing TV. It was only three years later that we were pitching *Friends,* so we'd just been living it—that point in your life when your friends are your family.

**MARTA KAUFFMAN:** And we wanted to write something we would watch.

**DAVID CRANE:** If you read the *Friends* pitch now, the show was incredibly true to the pitch.

**WARREN LITTLEFIELD:** David and Marta's script was just as wonderful as the pitch. Smart and funny.

**MARTA KAUFFMAN:** When we finally started doing the show, the writers were so much younger than us that we felt like anthropologists.

**DAVID CRANE:** We were 33 or 34 by then.

*NBC committed to shooting a pilot for the show, and brought in the legendary writer-director-producer James Burrows to direct.*

**MARTA KAUFFMAN:** It was a fascinating casting experience. We saw a countless number of actors, but things happened as they were supposed to happen. One of the first

actors on our list was Matthew Perry to play Chandler, but he was doing a show called *LAX 2194* [a Fox pilot about baggage handlers in the year 2194], so he wasn't available. We brought other people in.

W   4/23
Case #6:23-cv-06025-FPG-MWP

**DAVID CRANE:** We brought *everybody* in. We were so sure that Chandler would be the easiest part to cast. It's got the most joke jokes. It's sarcastic and kind of quippy, but no one could do it. No one.

**MARTA KAUFFMAN:** The person who came closest was Craig Bierko, and we found out later that Matthew had coached him.

**LORI OPENDEN (former head of casting, NBC):** The producers wanted to go with Craig Bierko instead of Matthew Perry for Chandler. Bierko read the *Friends* script and passed.

**WARREN LITTLEFIELD:** Thank God! There was something Snidely Whiplash about Craig Bierko. He seemed to have a lot of anger underneath, more of a guy you love to hate. The attractive leading man who you love and can do comedy is very rare.

**MARTA KAUFFMAN:** We took Matthew in second position [meaning he would be cast in *Friends* only if his commitment to *LAX 2194* fell through].

We originally offered Rachel to Courteney Cox, but she said she wanted to do Monica, not Rachel.

**DAVID CRANE:** Courteney had just come off a terrible Bronson Pinchot show, where she played the wife.

**MARTA KAUFFMAN:** There was something about Courteney that was adorable.

**LORI OPENDEN:** Nancy McKeon, from *The Facts of Life*, also read for Courteney's part. She gave a terrific performance. Warren let Marta and David make the call. They went off for a walk and came back and said Courteney.

**MARTA KAUFFMAN:** Because we were casting an ensemble, there was something appealing about Not Nancy McKeon.

**DAVID CRANE:** When we originally wrote the role, we had Janeane Garofalo's voice in our head. Darker and edgier and snarkier, and Courteney brought a whole bunch of other

colors to it. We decided that, week after week, that would be a lovelier place to go to.

**MARTA KAUFFMAN:** And more maternal.

Case #6:23-cv-06025-FPG-MWP

**DAVID CRANE:** We brought in two actors for Joey, and everyone preferred Matt LeBlanc. We were told he was an actor who'd get better every week.

**MATT LeBLANC (actor):** I got the script, and it was Jimmy Burrows's new project and the producers of *Dream On*. That was all I really needed to know: the guys are funny. I'd done two series for Fox. *Friends* was my fourth series.

I was practicing lines with an actor friend of mine, and he said, "This show is all about a group of friends, so we should go out tonight and get drunk, as though we were friends. We should just keep that in mind." So we went out, and I fell down and skinned my nose really badly. I went to the audition with this huge scab on my face, and Marta said, "What happened to your face?"

I said, "Aw, it's a long story." She thought it was funny and laughed, and that kind of set the tone for the room. Who knew? I would never suggest: "You know what you do before an audition? You go out and face-plant on the sidewalk, and then go in all bloody."

**DAVID CRANE:** Joey was never stupid when we pitched the show. He wasn't stupid until we were shooting the pilot, and somebody said, "Matt plays dumb really well."

**MARTA KAUFFMAN:** And he had so much heart. Down deep, you just wanted to take care of him. You knew that, at some point, he'd fall in love.

**MATT LeBLANC:** I had some sitcom experience. I knew my way around a joke a little bit. The time on *Married with Children* [where he had had a recurring role] and with Joe Bologna [who had co-starred with LeBlanc on one of his earlier sitcoms]—I learned a lot. I watched how they did things. I learned the process: where the joke is, how to set up a joke. I learned a lot. So it went well. I got laughs.

Then I got a callback and had a studio test. It was between me and this guy—his last name was Yeager, I think. He was dressed in a denim jacket, jeans, cowboy boots. I think he had a cowboy hat with him, but he didn't have it on. I looked at him and thought, One of us is way off the mark. God, I hope it's you.

Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 6 of 109

**DAVID CRANE:** An exec at NBC called to say she'd offered the part of Rachel to Jami Gertz. We didn't have a Rachel, and Jami Gertz is a really talented actress, but not Rachel. So we held our breath for 24 hours until she passed.

Case #6:23-cv-06025-FPG-MWP

**WARREN LITTLEFIELD:** Jennifer Aniston had been in our weak attempt a few years earlier to do *Ferris Bueller* as a series. (We did not have the services of John Hughes.) She played Ferris's sister, Jeannie, and we liked what we saw. We cast her in a few more pilots, but none were very good. One night while gassing up my car on Sunset Boulevard in Hollywood, I ran into Jennifer, and she asked me, "Will it ever happen for me?" God, I wanted it to. I didn't care what it would take—this was the role for her.

**MARTA KAUFFMAN:** Rachel was the part that was hardest to cast. Jennifer Aniston came in, and she was in a show that was on the air—*Muddling Through* [on CBS].

**DAVID CRANE:** We had a meeting with the guy who created *Muddling Through* and asked him if he'd let her go. What chutzpah.

**LORI OPENDEN:** Jennifer Aniston and Matthew Perry were technically not available. We had second position [on both]—we were taking a gamble that the show in first position wasn't going forward.

We auditioned other actors for Jennifer's part, but nobody else was good enough. It was a pretty big risk. Her show was a comedy for CBS. They'd shot 10 episodes and had them on the shelf for six months. They still had the rights to air it.

**JAMIE TARSES:** Then we had Jennifer Aniston crying to Les Moonves [then president of Warner Bros. Television, which produced *Friends*] to let her out of the CBS show she was on.

**WARREN LITTLEFIELD:** I remember watching *Muddling Through*, Jennifer's show. It was bad. I thought, They won't pick up this horrible show just to fuck us, will they?

**PRESTON BECKMAN (former executive vice president of program planning, NBC):** I put Danielle Steele movies on opposite the Jennifer Aniston show on CBS. I killed it.

**LORI OPENDEN:** When Lisa [Kudrow] auditioned for *Friends* as Phoebe, she owned it. There was no debate on her.

W 7/23

Case #6:23-cv-06025-FPG-MWP

**DAVID CRANE:** We knew her from *Mad About You*.

*At the time, Lisa Kudrow had a recurring role on the NBC sitcom.*

**LISA KUDROW (actor):** I thought *Mad About You* was the best-written show I'd ever seen, and I always liked talking to writers. Jeffrey Klarik was one of the writers who was always really friendly and complimentary, and I didn't know his boyfriend was David Crane. David saw me, because he paid attention to everything Jeffrey did. And I think that's how I got called in for an audition for *Friends*.

I read for David and Marta, and then I had to go back and read for Jimmy Burrows. That scared me a lot, because of *Frasier*. He's kind of who fired me.

*Kudrow had originally been cast as Roz on the sitcom* Frasier *but was fired during rehearsals for the pilot episode, which Burrows directed.*

**LISA KUDROW:** So I was nervous to go in, thinking I'm about to read for the guy who doesn't get me and doesn't think I'm funny. My audition was a monologue, so there was no reacting off of anybody. Jimmy said, "No notes ... O.K., thank you, Lisa." And I thought, All right, so that's it. "No notes" either means "It was so great I don't have anything to say" or "Why do they keep putting this girl in front of me?"

At one point I even said, "You know, I'm more like Rachel." And they told me, "No. You're this quirky girl." And then once I knew that I was going to the network—and that's when you work out the deal—that's when I was like, "Thank God it's on NBC. Pilots work and don't work, but we have to protect *Mad About You*, please." That was the only thing I cared about, so that I could still do that show. I thought since it was on the same network maybe it wouldn't be a problem.

**DAVID CRANE:** When we got our time slot, we were following *Mad About You*. It was weird, so that's when we said, "What if Phoebe and Ursula [Kudrow's *Mad About You* character] were sisters?" We called Danny Jacobson [a co-creator and executive producer of *Mad About You*], and he said, "O.K." I'm not sure I would have.

**HAROLD BROOK (former executive vice president of business affairs, NBC and NBC Studios):** With *Friends,* the last actor to sign was David Schwimmer. Everybody loved Schwimmer, and his agent knew it. We were $2,500 [per episode] apart. We both dug

in our heels. Lori Openden came to me and begged [me to make the deal]. I hated it, but we gave it to them.

Case #6:23-cv-06025-FPG-MWP

**MARTA KAUFFMAN:** Schwimmer had auditioned the year before for a pilot we were making, and he just stuck in our heads. That was an offer. No audition.

**ERIC McCORMACK (actor):** I went out for Schwimmer's role on *Friends*. Years later I told Burrows the story, and he said, "Honey, you were wasting your time. They wrote the part for Schwimmer."

*Fed up with the industry after a bad experience on a short-lived series, Schwimmer had vowed never to work in TV again.*

**DAVID SCHWIMMER (actor):** I told my agents not to send me anything. I was in Chicago doing a play with my company. [Schwimmer is a co-founder of Lookingglass Theatre Company.] We were doing *The Master and Margarita*—this book that we had adapted. I was playing Pontius Pilate with a very short Roman haircut, which is why Ross eventually had this haircut.

I got the call from my agent [Leslie Siebert at the Gersh Agency], and she said, "Look, I know you told me not to send you anything, but there's a show I *really* think you should take a look at. It's by Marta and David, who—if you remember—had done that show *Couples*" [the pilot Schwimmer had auditioned for]. And I go, "Oh, yes. I remember *loving* the writing." And she said the magic words to me: "It's an ensemble show. There's no star. There are six people, all similar age." And I say, "O.K., I'll read it, but I'm not going to do it."

Then I got a phone call from [actor and director] Robby Benson in Chicago, who is friends with Marta and David. I was a huge fan of Robby Benson, and I had never met him. Out of the blue, I get this phone call from him. He said, "Look, I really think you should consider doing this. At least go and meet Marta and David and talk about it." And then Jim Burrows called. Jim is my idol. I just think the world of him.

It was hugely flattering, and I thought, Well, it's quite disrespectful with all this talent asking to meet and just consider it. I'd be an idiot not to go.

**LISA KUDROW:** I'd be at *Mad About You*, and other guest stars would say, "I'm reading for Joey—will you help me with it?" And I just thought, Wow. Everyone wants to do this show. I wonder why.

The drama people really wanted to do *ER*, and the comedy people really wanted *Friends*. The whole thing is such a crap-shoot, and just because the script is good doesn't mean much.

W    9/23

Case #6:23-cv-06025-FPG-MWP

**MARTA KAUFFMAN:** The first day we went to a run-through, and the six of them were together for the first time, onstage in the coffee shop, I remember the atmosphere being electric. A chill ran down my spine. I knew we had something special.

**DAVID SCHWIMMER:** I felt that it was something special immediately in the first rehearsals. Even the first read-through, I thought, Oh. You could feel it. The energy.

The miracle is the casting. Having been on the other side of it now in terms of directing and producing, to find one magical actor who is just right for the role is difficult enough, but to find six and then to have them actually *have chemistry* with each other is just kind of a miracle. I think we were just lucky. I looked at the five of them, I watched their work, and I thought, Everyone is just so talented and perfect for their character. And they grew into their characters and enriched them and deepened them.

**DAVID CRANE:** We had absolutely no idea what this show was going to be. For us, it was just another pilot. We'd just had a series canceled. We were thinking we'd never work again, so we were scrambling. You pitch a bunch of stuff. We were doing this thing at Fox and at NBC. *Friends* was feeling good, but it was just another pilot. Or it was just another pilot until Jimmy Burrows wants to direct it. Excuse me, James Burrows. We thought, *That's crazy.*

**MARTA KAUFFMAN:** I was most surprised by how good he was dramaturgically. He had such a good sense of structure and story.

**DAVID CRANE:** And he really embraced what we wanted to do. In the pilot, the structure is really loose. We started out doing a much more traditional story. It still had to do with Rachel leaving a guy at the altar, but we had an original version where her parents came, and the act break [before going to a commercial] was her parents' showing up. It wasn't good.

We approached it again and made it much looser. The structure is loose and unconventional. There's no event at the act break. Ross [whose wife, a lesbian, has left him]

Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 10 of 109

and Rachel are each looking out at the rain. In a pilot, that seems crazy. You couldn't do it today, and I'm surprised we did that then.



**MARTA KAUFFMAN:** Jimmy had a way of making a moment with a small action. You realize very quickly that Ross has a terrible crush on Rachel, and there's a scene at the end where he says, "Do you maybe want to go out maybe on a date sometime?" And Rachel says, "Maybe." There was one Oreo cookie left. I will never forget, Jimmy said to David, "Try the cookie in your mouth when you say that line."

**DAVID CRANE:** Rachel says, "Maybe," and David says, "Maybe I will," and pops the cookie in his mouth.

**MARTA KAUFFMAN:** It was such a victory for him. It made the moment.

**DAVID CRANE:** The first four minutes of the pilot were just the group sitting in the coffeehouse talking about nothing. Chandler has had a dream. Ross comes in, and he's mopey. It's just talk. There's no movement. There's no story. When Jimmy read it in our first meeting, he said, "It's great. It's radio." The fact that he got that and embraced it made all the difference.

**MATT LeBLANC:** I was this kid who got this gig, and here I am with the guy—Jimmy Burrows. I remember thinking, Every episode of *Cheers*? I love that show! And almost every episode of *Taxi*? Wait a minute. I love *that* show!

He had this air about him that I had never seen. At that point, I had worked with a handful of different directors, and I had never come across anyone who had such an ease to him. Like "It ain't the cure for cancer" kind of thing. I'm sure he understands the value and importance of it all, but he never let the actors worry about that. "That's not your job to worry about that. All of that happens after we shoot it, so let's not worry about that. It's all about these little moments. We're all in it together. And also, I want to be out by two."

**LISA KUDROW:** I was terrified that first week. It was Jimmy ... again. He would say, "Why are *they* friends with her?" Meaning me. "We have to figure that out. She doesn't fit." And I was like, "Oh my God, here we go again. Well, if everyone just acts like they like me. If Monica acts like she likes me." And at one point he thought it would be funny if I deliver my monologue under the table. They're all sitting around the table. Instead of being with them, I'm under the table, because I'm "quirky."

I thought, This is the run-through where Marta and David are going to say, "This character doesn't work. We have to reconceive it. She's just not part of the group." And I really thought that was going to be what came out of that run-through. And, thank God, they said, "Um, Lisa, not that it's a bad choice, but I don't think that's a good spot for you, under the table." I didn't know how to answer. I would never put myself under the table. Jimmy said, "No, that was me. We were just trying it."

**DAVID SCHWIMMER:** What I was most struck by was the spirit of collaboration.

**LISA KUDROW:** Courteney Cox was the best known of all of us, and she had done a guest star on *Seinfeld*. She said, "Listen, I just did a *Seinfeld*, and they all help each other. They say, 'Try this,' and 'This would be funny.' " And she said, "You guys, feel free to tell me. If I could do anything funnier, I want to do it."

There's a code with actors. Actors don't give each other notes under any circumstances. So she was giving us permission to give her notes, and we all agreed that that would be great. Why not? And she also said, "Listen, you know, we all need to make this thing great." She just set the stage with: "I know I'm the one who's been on TV, but this is all of us." She was the one who set that tone and made it a real group that way. And I thought that was a real turning point.

**DAVID CRANE:** We were the last pilot to deliver [to NBC for consideration for the coming season], and we got one note from Don Ohlmeyer [the network's West Coast president]: "The opening is too slow." The word came down that Don said if we didn't trim it we weren't on the air. We fucking loved the beginning. It's right. We don't want to change it. We cut a 90-second opening title sequence to R.E.M.'s "Shiny Happy People." We didn't cut anything, but it started with energy. Don said, "Now it's right."

**WARREN LITTLEFIELD:** It may seem hard to believe today, but in '94 we were playing in core-conceptual territory that hadn't been explored that much on network TV—young-adult relationships. We wanted these characters to feel real, and we knew they had to be likable. We thought Marta and David were navigating that well, and of course we had Jimmy, TV's best barometer. Don didn't see it that way.

*One subplot in the pilot has Monica going on a first date with "Paul the wine guy." She brings him home for the night after he confesses that he hasn't been able to sleep with*

*anyone for two years, since his wife left him. The next day, Monica learns this was just a line.*

**MARTA KAUFFMAN:** We were doing the network run-through with an audience, and Don said that when Monica slept with Paul the wine guy she got what she deserved—that's how he rationalized it. Fire began to come out of my nose.

They handed out a questionnaire to the audience: *Do you think Monica sleeping with wine guy makes her (a) a slut, (b) a whore, (c) a trollop.* And even with the deck stacked that way, the audience didn't care [about the sex].

**JAMIE TARSES:** The questionnaire for the audience after the run-through—that was completely Don. He didn't like the casual sex. It was just one guy worrying about this.

**DAVID CRANE:** Overall, the network notes were almost nonexistent. Don objected to a Maxipad joke. [The joke was] Ross couldn't throw out his ex-wife's Maxipads. He was using them as arch supports. O.K., Don was uncomfortable with Maxipads.

**PRESTON BECKMAN:** The *Friends* pilot didn't test great.

**WARREN LITTLEFIELD:** True—a "high weak"—but we loved it! Even though we still only had Jennifer Aniston in second position—CBS had yet to cancel *Muddling Through*—*I decided to take another multi-million-dollar bet and shoot episodes with Jennifer in them.

**KAREY BURKE:** *Six of One* was the name of the show during the pilot. Then Kauffman and Crane came back with *Friends,* which we thought was such a snore. Some people thought the show was too Gen X, way too narrow. There was much more buzz about Fox's version of the same concept, a show called *Wild Oats* with Paul Rudd. Between *Friends* and *NewsRadio* [another NBC comedy that had only modest success, comparatively], I couldn't have told you which one would be a hit. The *Friends* cast came to the pilot taping of *NewsRadio*. Jimmy Burrows was directing it, and the *Friends* cast was jealous.

**JIM BURROWS (director):** Based on the [live] audience for the *Friends* pilot, I knew how popular that show would be. The kids were all pretty and funny, so beautiful. I said to Les Moonves, who was head of Warner Bros., "Give me the plane. I'll pay for dinner." I took the cast to Vegas.

Case #6:23-cv-06025-FPG-MWP
W 13/13

**MATT LeBLANC:** Who goes to Vegas on a private jet? And Jimmy gave me 500 bucks to gamble.

**LISA KUDROW:** On the plane he showed us the first episode of *Friends*. None of it had aired yet.

Jimmy took us to dinner, and he gave us each a little money to gamble with. He said, "I want you to be aware that this is the last time that you all can be out and not be swarmed, because that's what's going to happen." And everyone was like, "*Really?*" I thought, Well, we'll see. Maybe. Who knows? We don't know how the show's going to do. Why is he so certain?

**JIM BURROWS:** I told them they had a special show and this was their last shot at anonymity. They wanted to gamble, and I was the only one with money. They wrote me checks. Schwimmer gave me a check for $200, and Jen did. I should have saved them.

**MATT LeBLANC:** We went to Caesars for dinner. We sat at the big round table in the middle of the room. Jimmy said, "Look around." Nobody knew us. People kind of knew Courteney from that "Dancing in the Dark" video.

He said, "Your life is going to change. The six of you will never be able to do this again." It was almost like Don Corleone talking. He's not going to be wrong. He's Jimmy Burrows.

*Friends premiered on Thursday, September 22, 1994, at 8:30, to generally good reviews and solid but not initially spectacular ratings.*

**JAMIE TARSES:** I remember sweating the ratings of *Friends* the first few weeks. It was falling off more than anybody wanted it to. Outside of development, there was a lot of doubt about *Friends*. The first couple of scripts after the pilot, we were struggling with scripts and struggling with story. Then it was a soap opera, and it was hilarious. The Ross-and-Rachel thing set the tone for that, and you got thrust into a sort of soapy storytelling.

**WARREN LITTLEFIELD:** For me, we were about six scripts in, and each time I'd read one I saw tremendous emotional resonance. I thought, This is a Shakespearean soap opera. It's a drama that's really, really funny, and with a complex architecture. Unlike *Seinfeld*, which lived to be funny but not to feel.

**DAVID CRANE:** That's why we were always surprised when people compared us to *Seinfeld*.

Case #6:23-cv-06025-FPG-MWP    N    14/33

**MATT LeBLANC:** In between all the jokes, there was this emotional thread. You cared about these people. You were invested in these relationships. You can't get enough of these people. Why? No one could describe their passion for it. An emotional soap opera is a great way to describe it. That emotional through line threaded the whole season.

**MARTA KAUFFMAN:** It was so surprising to us how invested the audience was in these characters, how desperately they wanted them to be happy, how putting them together made some kind of weird sense.

**DAVID CRANE:** The fear was that we'd jump the shark. We only had six characters. When we brought Monica and Chandler together [in Season Five], I don't think we thought it would last. They'd just sleep together.

**MARTA KAUFFMAN:** One crazy lesson from the show was that everything was better with the six of them. Sometimes it was better to hear them talk about something that happened rather than see it dramatically. What the audience wanted, we had to learn, was the six of them in the room.

**DAVID CRANE:** Apparently, what they really wanted was two of them in the bed.

**JIM BURROWS:** Ross and Rachel were the guts of that show. Everybody was good-looking on that show, so the critics didn't realize how funny they were.

**MARTA KAUFFMAN:** The cast was very astute, very smart, and when things didn't work for them, they didn't work for a reason.

**DAVID SCHWIMMER:** I would give so much credit to David and Marta and the other writers, because they *really* invited our ideas. They created an atmosphere in which we could play *and fail* and pitch stuff, and because of that, it wasn't about any individual—it was about all of us trying to come up with the funniest and the best and the most emotional material we could.

It was thrilling to be part of, and it was hands down the best creative experience I've had professionally as an actor. That kind of collaboration with your director, with those writers, and with the other actors—it's a huge high, and it spoils you for life. It does.

**MATT LeBLANC:** There was a conversation I had early on, when the show was just starting to take shape, and I remember standing back and being as objective as I could about

Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 15 of 109

Joey and thinking, This thing could go a long time. Does my character fit if it goes a long time? Because in the beginning I was hitting on the girls all the time.

Strictly out of self-preservation, I went to Marta and David and said, "Can I ask you guys something? I have an idea."

They said, "Yeah, sure."

I said, "What if Joey hits on every girl in New York but these three? What if I'm like a big brother to these three?" Of course, I didn't say, "Because I'm afraid that you're going to run out of stories for me. I'm going to have to move out from across the hall."

We went in that direction, and then my guy fit in more. He became this sort of big brother to the group.

**LISA KUDROW:** When we started shooting that first season, Jimmy said, "Use my dressing room to hang out." Because it was bigger. We would all hang out playing poker and bonding because I think we all understood that the point of the show was that we were family and best friends. We needed to hang out, get to know each other, and bond as quickly as possible, because that's the only way that the show was going to work.

**MATT LeBLANC:** It wasn't like we were in college together. We were on a giant fucking television show together. Everybody worked really hard. Lisa Kudrow said it best. She said that she worked harder on these relationships than she did on her marriage.

We really spent a lot of time if someone's feelings got hurt. "Oh, let's drop everything and fix that. And I'm sorry." Rule No. 1: Get along. Everyone knew the importance of getting along the whole way through.

**DAVID SCHWIMMER:** We spent an *enormous* amount of time together those first several years. We wouldn't want to leave each other. We'd go out to dinner after work, or we'd go to lunch together, or play poker, or just play games. I think we were genuinely having the time of our lives, and also there was something very bonding about how scary the whole experience was. We had the other five, like a very protective cocoon.

**WARREN LITTLEFIELD:** One way in which *Friends* did resemble *Seinfeld* is that it really found its audience over the summer of 1995 in reruns. That's when the main title song, "I'll Be There for You," by the Rembrandts, exploded, too.

**MATT LeBLANC:** It was that first season of reruns that did it. We were like No. 27 in the big grand scheme of things. It was that summer that we broke the Top 10, or Top 5.

**WARREN LITTLEFIELD:** During the show's second season, on January 28, 1996, after a particularly compelling Super Bowl (featuring Dallas and Pittsburgh) that delivered a whopping 46.1 rating and 68 share, we played a special one-hour episode of *Friends* featuring guest appearances by Brooke Shields and Jean-Claude Van Damme. Despite the fact that most of the country had already been eating, drinking, and watching television for hours, the *Friends* special delivered a 29.6 rating and a 46 share. No network had ever accomplished that. For the night, NBC averaged a 42.0 rating and a 62 share. It was the most watched night in television history with approximately 140 million Americans tuning in.

**DAVID SCHWIMMER:** For whatever reason, I was "the breakout." I was the guy who had the movie offers—everyone since then has had their time, their moment, but I was the first when the show started. And my agents were saying, "This is the time when you go in for a raise."

I knew—because all of us were friends at this point—that, back when we started, each of us on the show had a different contract. We were all paid differently. Some had low quotes; some had higher. So I knew that I wasn't the highest-paid actor on the show, but I wasn't the lowest. And I thought, O.K., I'm being advised to go in for more money. But, for me, it goes against everything I truly believe in, in terms of ensemble. The six of us are all leads on the show. We are all here for the same amount of hours. The story lines are always balanced.

**MATT LeBLANC:** David was in the position to make the most money. He was the A-story —Ross and Rachel. He could have commanded alone more than anyone else, and David Schwimmer quoted the idea of socialist theater to us. Did he know ultimately there would be more value in that for all of us as a whole? I don't know. I think it was a genuine gesture from him, and I always say that. It was him.

**DAVID SCHWIMMER:** They usually had three story lines going on at any given time. So I said to the group, "Here's the deal. I'm being advised to ask for more money, but I think, instead of that, we should all go in together. There's this expectation that I'm going in to ask for a pay raise. I think we should use this opportunity to talk openly about the six of us being paid the same. I don't want to come to work feeling that there's going to be any kind of

resentment from anyone else in the cast down the line. I don't want to be in their position"—I said the name of the lowest-paid actor on the show—"coming to work, doing the same amount of work, and feeling like someone else is getting paid twice as much. That's ridiculous. Let's just make the decision now. We're all going to be paid the same, for the same amount of work."

**JOHN AGOGLIA (former head of business affairs, NBC):** We convinced ourselves that we'd be better off with the cast if we recognized their success early instead of waiting until their contracts ran out. Chemistry was crucial to that show, and it was important to keep the cast happy. We started giving them raises as they were going along. At one point David Schwimmer's mother convinced the cast to negotiate as a group. She's a prominent divorce attorney. Her license plate is EX BARRACUDA.

**DAVID SCHWIMMER:** I thought it was significant for us to become a mini-union. Because there began to be a lot of decisions that had to be made by the group in terms of publicity.

That was actually a by-product of how the impulse originated, which was from my ensemble theater. [At Lookingglass] we all paid dues. We were all waiting tables and doing other jobs, but we all paid the same amount of dues, and we were all paid out equally. That idea was really important to me.

**HAROLD BROOK:** The problem was how *much* they wanted to be treated the same. The numbers were insane when it came time to renew their contracts.

**WARREN LITTLEFIELD:** That would have been after the fifth season. The cast, quite publicly, was negotiating as one.

**HAROLD BROOK:** The night before we were going to announce the schedule, I was in the bathroom at a restaurant and got a call from Warner Bros. "It's starting," they said. The negotiation started around 10 P.M. and closed around 3 A.M. We had two promos made—one was the season finale, and one was the series finale.

**DICK WOLF (producer of *Law & Order*):** When they made the *Friends* deal, the $100,000-apiece [per episode] deal, I was pretty upset. What I would have done was come out the first day, say I was disappointed the cast had chosen to negotiate in the press, and I

Case #6:23-cv-06025-FPG-MWP

had the unpleasant news that Matt LeBlanc wouldn't be on the show next year. I guarantee that you'd never have gotten to a second name.

**HAROLD BROOK:** We didn't say "Pass" a lot [i.e., walk away from a negotiation]. It's a ploy, and a lot of times we couldn't back it up. You do it once, maybe it wins. You do it twice, it isn't really a pass. Also, the actor could be in another show at another network in a heartbeat.

**DAVID SCHWIMMER:** That negotiation made us realize that the six of us *should* be making decisions as one and looking out for each other. It's just like a union, that's all. We're all equals, and by the way, every decision was a democratic vote.

**MARTA KAUFFMAN:** We didn't experience the success of the show the way the cast did. We could walk through the airport, and we'd see pictures of them on the magazines, but that wasn't us.

**LISA KUDROW:** When we were on *Oprah,* I think that first summer, she showed us all of these people in Internet cafés. People were online talking about the show, which was the first time that people were using the Internet to connect with each other, like the new water-cooler. I thought, O.K., this is something then. This is a big deal. That's when I got it. She was telling us this stuff, and we were watching their little film that they'd made, and she was like, "You all look like you don't know what I'm talking about. You have to know." And we just went, "No, but this is great news."

**DAVID SCHWIMMER:** I had never been a part of the entertainment industry. I didn't know anyone famous. I'd never seen it. I had a girlfriend at the time, and I remember walking down the street with her, holding her hand, when some girls came up, pushed her out of the way, and asked for my number. They were like, "Oh my God, can you come out with us right now?" As if my girlfriend just didn't exist. I found it *very* difficult to handle.

**MATT LeBLANC:** I remember I was living in an apartment in Beachwood Canyon, which, ironically, ended up being the apartment building that they used for the opening credits on *Joey.* I had to move so quickly. It was unbelievable. All of the sudden, the people in the building were banging on my door. People knew I lived there.

I was like, "I've got to get a house. I need a house with a gate, because I need to be able to hide." It's funny—nowadays people that are famous get chased by the paparazzi. They have

Case #6:23-cv-06025-FPG-MWP W 15/23

this fame, but they don't have the money to hide from it. We were really fortunate that we were compensated well enough to be able to turn the switch off, as much as one can. Kind of disappear. Barricade yourself in.

**LISA KUDROW:** We did a photo shoot for *Entertainment Weekly*. When we walked out of it, our cars were all the way across the street, and there were tons of paparazzi, and it was nighttime, and we were blinded by all the flashing. It was scary, because we hadn't had that before. It was unnerving, because they yell at you. It's more of an assault than any kind of congratulations, or "We love you." That's not ever how it feels. So, that was jarring, and then I think all of us understood, "Oh, I get why people get so antagonistic with paparazzi."

**DAVID SCHWIMMER:** For me, the fame is something I've wrestled with and struggled with since it happened. I don't think I responded very well to the sudden celebrity, the sudden fame, and the loss of privacy. There were several moments that were quite traumatic for me. I remember in the early days of just going to the airport and walking to my gate when I heard bloodcurdling screams, and I thought someone was being killed. Before I knew it, a group of girls was running at me and literally grabbing me and wouldn't let me go.

**LISA KUDROW:** Fame doesn't cure whatever is going on inside of you, however you feel about yourself. The lucky thing was that the six of us had each other to go through it. All we would talk about is "What about people who have this and they don't have you and you, and they are just on their own dealing with this?"

**DAVID SCHWIMMER:** As an actor, the training I received was that I walk through the world as an observer of life and of people. That's my training. My job is to actually be looking out all the time and watching people. But the effect of celebrity on me was that I suddenly found myself with a baseball cap, with my head down, hiding everywhere I went.

**LISA KUDROW:** I think before you are famous you think, Oh, if you're famous, you're loved and adored. Then when you really experience that attention and everyone cares what you're doing and wants pictures of you, it doesn't feel like a warm hug. It *really* feels like an assault. Then, not long after, you start to realize, This has *almost* nothing to do with me, and I better do the work.

At first it was all thrilling. I remember going to the Golden Globes, and I was at a table with Kathy Bates. Then you learn soon enough that you're meeting these people, but you're not friends. It's just meeting people. That's all it is.

**MATT LeBLANC:** I never set out to be a role model. I set out to pay the rent.

**WARREN LITTLEFIELD:** For the first time in my memory at NBC, we had to worry about overexposure. We became gatekeepers for the *Friends* cast. Everybody wanted a piece of them: an electronic interview, a photo shoot—something. We realized the cast was so white-hot that we had to pull back, to help protect both them and their show.

To their credit, they all just kept their heads down and worked. Worked hard. The writers and actors on *Friends* were notoriously particular about what made it onto the air. A *Friends* shoot night could extend well into the small hours of the morning.

**DAVID CRANE:** Our hours were crazy. There were so many mornings when we were still finishing the re-writes. We'd get notes from the studio and the network.

**MARTA KAUFFMAN:** But it was *our* notes that killed us. We knew we had to listen to the audience. Their silence tells you a lot. Laughing in good and bad ways. Laughing at setups instead of jokes.

**DAVID CRANE:** We also felt everyone's opinion was valid. There was no hierarchy. It made everything better, but longer too. Sometimes we lost our energy because we took so much time trying to find a better joke when we should have just moved on. We'd walk out after every episode and say, "There's another one that didn't suck." And we meant it.

**MARTA KAUFFMAN:** We only had problems with Standards. For a long time, we couldn't show a condom wrapper.

**DAVID CRANE:** The rules kept changing. For the first three years we could say "penis." Then we couldn't say "penis." Then we could say "penis" again.

**MARTA KAUFFMAN:** They're masturbating on *Seinfeld* and we can't show a condom wrapper.

**WARREN LITTLEFIELD:** That made me crazy. I had a lot of battles with broadcast standards over that. What could be more socially responsible than these characters practicing safe sex?

**DAVID CRANE:** Then in Season Eight or Nine we had Joey fall for Rachel, and that scared everybody. She was pregnant. The actors freaked out. Matt kept saying, "It's wrong. It's like

Case #6:23-cv-06025-FPG-MWP

I want to be with my sister." We said, "Yes, it's absolutely wrong. That's why we have to do it." You can't just keep spinning the same plates. You have to go places where you're not expected to go.

**MATT LeBLANC**: It felt wildly inappropriate. That's how close we all were to the character. I was like, "That's Rachel. She was supposed to be with Ross. Wait a minute." Everybody got super-defensive about the whole thing.

We went to David and Marta as a group and said, "We're really concerned about this. It doesn't feel right. We have a problem with it." David said, "It's like playing with fire, and then you put it down, and you go, 'Remember when we played with that fire?' We're aware of everything. The feelings that you're feeling, we're feeling them, too, and we like it."

**DAVID CRANE:** Once it actually started, it was heartbreaking because it couldn't go anywhere. It was always going to be Ross and Rachel.

**MARTA KAUFFMAN:** The Ross-and-Rachel thing was fascinating. My rabbi, when I dropped my daughter off for Hebrew school, would stop me and say, "When are you going to get them together?"

**DAVID CRANE:** From a technical standpoint, it was really challenging to keep them apart without pissing off the audience. In the pilot, Ross says to Rachel, "Can I ask you out sometime?" We go through an entire season, 24 episodes, and he never asks her out. Every time it's about to happen—we brought in the Italian guy, we threw a cat on his back. We kept asking ourselves, "Will they let us go one more?"

Then they got together and broke up.

**MARTA KAUFFMAN:** And got married and broke up. Their fights were some of my favorite moments.

**DAVID CRANE:** The episode [in Season Three] where Ross and Rachel are on a break and Ross sleeps with the Xerox girl—and the whole episode is in the living room with the other four locked in the bedroom—it's really sad, and we kept going to the bedroom for funny. That's probably one of my favorite episodes.

For the two of us, the emotional stuff was what sustained us.

**MARTA KAUFFMAN:** We did not want to go out on the bottom. We wanted to feel more like it was time for your child to go to college, not die.

**DAVID CRANE:** We wrote three last seasons. It looked for a while like Season Eight was the last season. Then Season Nine. Warner Bros. told us this has to be the last season. Two days later, they come back and say, "Jeff Zucker [who had become NBC's C.E.O.] stepped up, and it's not the last season." Amazing reversal.

**MARTA KAUFFMAN:** At that point, we said, "Season 10 it is."

**DAVID CRANE:** You can't keep writing the last season. You have to know where you're going and go there.

Having seen the *Seinfeld* finale and knowing when you depart from who you are it doesn't make the audience happy, let's deliver to the audience what they want and what they've earned.

**MARTA KAUFFMAN:** Everybody knew where we were going to end up. Ross and Rachel were going to be together somehow. We just had to make it entertaining.

**DAVID CRANE:** We talked about doing a qualified ending ... they're not *together* together, but there's the hope they can be together. We said, "Fuck it. We've jerked these people off for 10 years. Who are we kidding? We've just got to do it well."

**DAVID SCHWIMMER:** You just knew intuitively that that's how it had to end, with Ross and Rachel together. It was a romantic comedy, so it must end—as in great Shakespeare—with the lovers together. So the challenge is how the writers are able to create enough obstacles to sustain over 10 years.

I really sympathize. I think it's incredibly difficult, because I don't think anyone expected it to go for 10 years. So for David and Marta to rise to the challenge of making sure every moment, and every choice, and every decision made by this group of writers—in conjunction and collaboration with the actors—it kept this tension going without upsetting the audience or driving them crazy.

**LISA KUDROW:** I felt like we could have gone longer. David and Marta were saying, "It is getting harder for Rachel and Ross, coming up with reasons why they're not together." And

then, ultimately, it's a good thing that we were done, because sometimes you have to be pushed out of the nest.

**MATT LeBLANC:** That whole ending, that was a rough two weeks. We went away for Christmas for two weeks, and then we came back for two final weeks to shoot the one-hour finale. I had quit smoking for four years, and in that final two weeks I started smoking again because we were so aware that our time together was coming to an end. "Yes, I'll talk to you. Yes, I'll always know you, but I won't know you like this. I won't see you every day, all day. Eat lunch together every day. To have this awesome, *awesome* experience every week. It's coming to an end."

So in those final two weeks, we would steal away these little moments. "Hey, let's go hang out. Let's go sit in my room." It was really ... a lot of Kleenex.

There's only five people in the world who know exactly what being on *Friends* was like, other than me. There's five of them. David, Matthew, Lisa, Courteney, and Jen. That's it. Marta and David were close, but when they left the stage, no one knew what they did. We could never leave the stage, metaphorically speaking. Still can't. Still on that stage. That will follow us around forever.

More important than anything else is the look on people's faces when you cross paths with them in the street, or in the store, or in the grocery line. You can always tell that you were— maybe still are, maybe always will be—a part of their family. Movies have this thing where it's an event. You get dressed up, you go to dinner, and you go to the movies. You're outside of your element. But with television, people are watching you in bed, at their kitchen table eating. You're in their house.

I did not want it to end.

Case 6:23-cv-06025-FPG-MWP  Document 15-3  Filed 04/04/23  Page 25 of 109

W_2

W_2    1/2        Pag 2

Case #6:23-cv-06025-FPG-MWP

Marta refers
to David Schwimmer
(plays Ross on FRIENDS)
interview w/ GUARDIAN

When you purchase through links on our site, we may earn an affiliate commission. Here's how it works.

HOME  ▸  CULTURE

# 'Friends' Co-creator Marta Kauffman on the Reunion, the Characters' Lives Now, and Implausible Fan Theories

—

Guess which of the couples would be in therapy...

  



(Image credit: HBO)

By Neha Prakash
Last Updated October 05, 2021

*Since its mid-aughts finale, we've been on an unofficial break with Friends. But now, in honor of HBO Max's highly-anticipated* <u>Friends reunion</u>—*which is bringing together the beloved sixsome on that iconic orange couch for the first time in 17 years*—Marie Claire *is celebrating, criticizing, and obsessing over the show that was always there for us.*

W2   2/2

**Case #6:23-cv-06025-FPG-MWP**



(Image credit: Hearst Owned)

Like the best kind of confidantes, *Friends* won't go away. Almost three decades since its premiere, the NBC sitcom about, well, friends—the kind who are there for you when your job's a joke, you're broke, and your love life's...you know the rest—has remained a ratings juggernaut and a pop culture force to be reckoned with. And that's thanks, in part, to Marta Kauffman.

Along with David Crane, Kauffman co-created one of the biggest television shows of all time—the duo also served as executive producers throughout the show's 10-season run, alongside Kevin Bright—one that made made A-listers (and millionaires) of its cast; launched 1,000 quotable one-liners, fan theories, and thinkpieces; defined a generation of friendships and relationships; and gave lobsters their romantic due.

Sponsored Links

**Get 4 Months Free. See Offer Details.**
SiriusXM

Ahead of the <u>HBO Max reunion on May 27</u>, Kauffman sat down with *Marie Claire* to chat about the storylines she doesn't regret, where the characters are now, and how Ross fucked up.   *(See David Schwimmer)* poss is *Twitter comment* } *dated an Asian* + *GUARDIAN interview* *on shows lack of diversity* } *or African America*

*Marie Claire*: **What can fans expect from the reunion?**

**Marta Kauffman:** They can expect a celebration of the show—an emotional, joyful, celebration of the show, with a lot of different elements and some crazy surprises.

*MC*: **You filmed on the original sets—how did that feel?**

Wb    1/3

Case #6:23-cv-06025-FPG-MWP

Wb

Follow us on f

Search

Trending Shows ▾    Reviews ▾    TV Show Cancellations    Ted Lasso    Awards    2023 Renewal Scorecard

# *Friends*' David Schwimmer Apologizes for Diversity Comments: 'I Didn't Mean to Imply *Living Single* Hadn't Existed'

By Kimberly Roots / February 3 2020, 7:43 AM PST



Shutterstock

Major Television Roles That Were Almost Played by Other Actors

ADVERTISEMENT

David Schwimmer is responding to a *Living Single* actress who called him out on social media for comments in a recent interview.

In late January, Schwimmer spoke about *Friends*' legacy with *The Guardian*. During the conversation, the actor addressed the show's ongoing popularity and its recent criticisms regarding its lack of racial diversity.

"I don't care," he said of the modern-day reflection on the series, which ran from 1994 to 2004. "That show was groundbreaking in its time for the way in which it handled so casually sex, protected sex, gay marriage and relationships... You have to look at it from the point of view of what the show was trying to do at the time. I'm the first person to say that maybe something was inappropriate or insensitive, but I feel like my barometer was pretty good at that time. I was already really attuned to social issues and issues of equality."

'Ted Lasso' 3x03 | Hannah Waddingham and Toheeb Jim...    ✕




**Ad**
Put brea
Start living
banking.

Bread Financial

3 **Did Young Sheldon Just Confirm Series' Endgame With Morbid Joke About Dad? Plus, 'Difficult' Times Ahead...** 

4 **Star Trek:** Starfleet Academy Series, From Alex Kurtzman and Nancy Drew Creator, Ordered at Paramount+ 

5 **NBC Sets Summer Premieres for AGT, Ninja Warrior, Hot Wheels Competition and Dick Wolf's LA Fire & Rescue** 

**Case #6:23-cv-06025-FPG-MWP**

RELATED STORIES

**Matthew Perry Talks Friends Crushes, Addiction Horrors With Diane Sawyer**

**Mike Hagerty, Longtime Character Actor and Friends' Mr. Treeger, Dead at 67**

ADVERTISEMENT

Schwimmer added that he "campaigned for years" to have Ross date women of color and noted that "Maybe there should be an all-black *Friends* or an all-Asian *Friends*."

Soon after the interview published, Erika Alexander, who played Max on Fox's *Living Single*, argued via Twitter that her series essentially had been an all-black *Friends* — and it debuted a year before the NBC comedy.

"Hey @DavidSchwimmer @FriendsTV, r u seriously telling me you've never heard of #LivingSingle?" Alexander tweeted. "We invented the template. Yr welcome, bro. ;)"

In an attempt to clarify his comments, Schwimmer responded with a lengthy note addressed to Alexander. Saying he was a fan of her show, he wrote, "I didn't mean to imply *Living Single* hadn't existed or indeed hadn't come before *Friends*, which I knew it had. Please remember in an interview quotes are often pieced together and taken out of context, and then these quotes are repurposed in other articles by other people who are trying to be provocative."

The *Living Single/Friends* rivalry of sorts dates back nearly a quarter century, to when *Living Single* star Queen Latifah observed that Warner Bros. TV was giving the NBC sitcom (then ranked No. 3 out of 114 broadcast shows) a far heavier promotional push than *Living Single* (which was ranked 85th).

You can read Schwimmer's response to Alexander in full below:

> "Hi Erika. As you know, I was asked recently in an interview for The Guardian how I felt (for the thousandth time) about a reboot of Friends immediately following a conversation about diversity on the show, and so offered up other possibilities for a reimagining of the show today. I didn't mean to imply Living Single hadn't existed or indeed hadn't come before Friends, which I knew it had. Please remember in an interview quotes are often pieced together and tak of context, and then these quotes are repurposed in other articles by othe people who are trying to be provocative.
> I was a fan of Living Single, and was not implying Friends was the first of i To my knowledge, Friends (which came out a year later) was inspired by [ creators] Marta [Kaufmann] & David [Crane]'s own lives and circle of frie living in NY in their twenties. If it was based on Living Single you'd have to them. It's entirely possible that Warner Brothers and NBC, encouraged by success of Living Single, gave the Friends pilot a green light. I honestly dor know, but seems likely! If that's the case, we are all indebted to Living Sing paving the way.

What to Watch Today

3:00 Unstable
8:00 Walker
8:00 Young Sheldon
9:00 Grey's Anatomy

Full Story

'Ted Lasso' 3x03 | Hannah Waddingham and Toheeb Jim...   ✕

*In any event, if my quote was taken out of context, it's hardly in my control.*
*I assure you I meant no disrespect.*
*David"*

Wb   3/3

**Case #6:23-cv-06025-FPG-MWP**

**If you like TVLine, you'll LOVE our email news alerts!** *Click here to subscribe.*

TAGS: DAVID SCHWIMMER, ERIKA ALEXANDER, FRIENDS, LIVING SINGLE
GET MORE: CONTROVERSY

Add A Comment

## Most Commented

1  **Star Trek:** Starfleet Academy Series, From Alex Kurtzman and Nancy...                63

2  **Donald Trump Indicted by Manhattan Grand Jury — What Happens...**                      52

3  **The X-Files Returns? Black Panther Director Ryan Coogler Eyes...**                     51

4  **Blue Bloods Renewed for Season 14**                                                   49

5  **The Night Agent Renewed for Season 2 at Netflix, Just 6 Days After...**               41

**Look For Any High School Yearbook, It's Free**
Reconnect with old friends and the significant events from your past
Classmates | Sponsored

'Ted Lasso' 3x03 | Hannah Waddingham and Toheeb Jim...          ✕

**Cher's Son Chaz Bono Is So Skinny Now And Looks Like A Model (Photos)**
Daily Finance Stories | Sponsored

**Gwen Stefani, 53, Takes Off Makeup, Leaves Us With No Words**
Finance Wealth Post | Sponsored



**USA TODAY**

W—C
Case #6:23-cv-06025-FPG-MWP

TV                                              **Friends**    Add Topic

# 'Living Single' star Erika Alexander reacts to David Schwimmer's comments on 'Friends' diversity



**Sara M Moniuszko**
USA TODAY

Published 3:28 p.m. ET Jan. 27, 2020 | Updated **10:01 a.m. ET Jan. 30, 2020**

A day after David Schwimmer opened up about how he pushed for diversity on the hit sitcom "Friends," "Living Single" star Erika Alexander is reacting.

In an interview with UK's The Guardian, Schwimmer, 53, said he made conscious efforts to have more people of color on the show.

"I was well aware of the lack of diversity and I campaigned for years to have Ross date women of color. One of the first girlfriends I had on the show was an Asian American woman, and later I dated African American women. That was a very conscious push on my part," he said. "Maybe there should be an all-black 'Friends' or an all-Asian 'Friends.'"

Although he acknowledged that parts of the show were problematic, Schwimmer, who played Ross on the show, stood up for the series in pushing boundaries in other ways.

"The truth is also that show was groundbreaking in its time for the way in which it handled so casually sex, protected sex, gay marriage and relationships. The pilot of the show was my character's wife left him for a woman and there was a gay wedding, of my ex and her wife, that I attended," he said.

Alexander tweeted an article of his comments with a message for the star.

"Hey @DavidSchwimmer @FriendsTV - r u seriously telling me you've never heard of #LivingSingle? We invented the template! Yr welcome bro," she tweeted with a winky face.

3/21/23, 10:56 AM                    You'll never believe how much money the 'Friends' cast STILL earns today

W2

 USA TODAY

W2

Case #6:23-cv-06025-FPG-MWP

ENTERTAIN THIS                                  **Jennifer Aniston**     Add Topic

# You'll never believe how much money the 'Friends' cast STILL earns today

**Arienne Thompson** USA TODAY

Published 4:24 p.m. ET Feb. 27, 2015

During a break from Oscars week mania in L.A., I took the Warner Bros. VIP studio tour, where I learned from my guide Noah that the *Friends* cast is still rolling in MAJOR dough more than a decade after the show ended.

How major?

Well, through the magic of syndication revenue, *Friends* pulls in a whopping $1 billion each year for Warner Bros. Here's the kicker though: That translates into about a $20 million annual paycheck *each* for Jennifer Aniston, Courteney Cox, Lisa Kudrow, Matt LeBlanc, Matthew Perry and David Schwimmer, who each make 2% of that syndication income.

$20 million. Each year. For doing nothing.

Just let that sink in.

That wasn't the only thing I learned on my tour though...

## That Central Perk set is tiny

Despite how it looks on TV, the coffee spot where the *Friends* gang hung out is not much bigger than a cramped NYC apartment. Oh, and it's shaped like a wedge to give the illusion of



W₃

W₃    1/2

Case #6:23-cv-06025-FPG-MWP

# How Much Money Does US Sitcom "Friends" Make?

DREAMMORE • MAR 31, 2022 7:45 PM EDT

The hit Warner Bros. sitcom from the 90s, *Friends*, is still a big moneymaker for the studio with average earnings that are estimated to be roughly a billion dollars per year. Keep in mind that this is a show that ended nearly 15 years ago. Beyond all imagination, this is still one of the most-watched sitcoms in 2017. I know, hard to believe. However, we have all fallen victim to the warmth of the *Friends* cast, and have probably seen every episode at least three times. That being said, Warner Bros. can rest easy at night knowing that they still have a source of substantial income from a show that they no longer have to raise funds for.

The cast has still been earning money from the show thanks to syndication revenue. The stars still earn a combined income of $20 million a year. Divided among the six stars, that's roughly $3.3 million for each one.

So how much are the *Friends* stars worth? Let's take a look at the net worth of each one.

## Jennifer Aniston-$220 Million

Jennifer Aniston is the richest of the *Friends* bunch as her annual earnings for movie roles and endorsements are an estimated $20 million per year. Those are substantial earnings, and her career has long since moved past her days on the sitcom. She is now well-known for her performances in romcoms, comedies, and the occasional drama role. She earned $10 million for her role in the popular comedy sequel *Horrible Bosses 2* and she regularly demands a paycheck of $5 million per movie performance.

## Courtney Cox-$120 Million

Courtney Cox may not be as successful as Jennifer Aniston in the movies, but she has starred in her own sitcom, *Cougar Town*. The show ran from 2009 to 2015. She also gained considerable popularity from her role as Gale Weathers in the horror-slasher movie series, *Scream*. The series ran for four installments, all of which starred Courtney Cox as a lead performer. From *Friends* alone, Courtney earned a total of $88 million.

How Much Money Does US Sitcom "Friends" Make? - ReelRundown

# Lisa Kudrow-$70 Million

*W₃    2/2*

**Case #6:23-cv-06025-FPG-MWP**

Aside from *Friends*, Lisa Kudrow has not seen a considerable amount of success in the movie or television business. As such, the show is still her greatest achievement.

# Matt LeBlanc-$80 Million

A similar career trajectory has moved Matt LeBlanc out of the Hollywood limelight. However, he was the only one of the *Friends* cast to be offered a spin-off show with *Joey*. Sadly, the show crashed and burned as it failed to gain an audience. It was canceled after its first season.

# Matthew Perry-$80 Million

Matthew Perry was one of Hollywood's most liked stars at the height of Friends. He starred in various romcoms such as *Fools Rush In* and *The Whole Nine Yards*. Since the show ended, he has distanced himself from the Hollywood scene and has not seen any substantial success in movies or television.

# David Schwimmer-$85 Million

After *Friends* ended, it seemed like David Schwimmer was going to be a movie star and even a great movie director. With only a few successes as an actor and director in Hollywood, he has been shifted from the limelight.

The only one of the *Friends* bunch to shake their past on the show was Jennifer Aniston, all thanks to her brilliant performances in comedies, romcoms, and some surprisingly emotional performances in low-budget dramas. Her acting career was helped by her strong relationship with A-list actor Brad Pitt as rumors and gossip sells Hollywood magazines. After their breakup, she gained massive sympathy from fans. This most certainly rocketed her acting career even higher. Even though Aniston is still tied to doing comedy as an actor, there really is no saying where her career will be in another 10 years.

Each of the six stars earned $1 million per episode in the ninth season. By the tenth and final season, they were earning approximately $1.6 million per episode; the season had 24. Sitcoms can be surprisingly expensive. *The Big Bang Theory* had production costs that reached up to $9 million per episode in season 10. Half of that money was spent on paying the lead actors who earn $1 million per episode.

© 2017 Dreammore

Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 34 of 109

 

Case #6:23-cv-06025-FPG-MWP

# The Top 10 Highest Earning Sitcoms In Syndication

Sitcoms such as 'Friends,' 'Frasier', and most recently 'Modern Family' are just some of the popular TV shows that have become syndicated.

BY **SABRINA COSTABILE**      PUBLISHED MAR 13, 2021



One of the best ways to get a steady stream of income as an actor is to join a successful sitcom and have it syndicated. A show that has become syndicated allows actors to make a huge amount of money every year without having to find any other major acting jobs. Why do you think so many sitcom actors are either never seen again or don't appear in many projects afterward?

## RELATED:

## 'Friends': Joey's 10 Best Episodes

Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 35 of 109

W 4    2/3

**Case #6:23-cv-06025-FPG-MWP**

Here is a list of the top ten highest-earning sitcoms in syndication.





## 2    'Seinfeld' ($3 Million Per Episode)

One of the most successful sitcoms to hit our TV screens is the show about nothing, *Seinfeld*. The show was originally sold into syndication for $3 million per episode, according to Bezinga.com, but the viewership was so high it ended up earning so much more. In April 2013, *Seinfeld* had grossed $3 billion from syndication alone, amounting to roughly $17 million per episode.

W 4    3/3

Case #6:23-cv-06025-FPG-MWP

## 1   'Friends' ($1 Billion Per Year)

Another successful sitcom that has developed a cult following in recent years is the 90's, hit *Friends*. According to Living.ALot.com, the series brings in approximately $1 billion in residuals each year. The former stars of the show receive around two percent in residuals meaning the cast makes roughly $20 million just from the syndication. Even though several cast members, such as Jennifer Aniston and Lisa Kudrow, continue to work in film and TV, it's safe to say they don't need to.

'The Big Bang Theory' ($1.5 Million Per Episode)

*The Big Bang Theory* was able to receive one of the biggest syndication deals of all time. The network TBS paid CBS $1.5 million per episode to get it syndicated on their network. Fox broadcast paid $500,000 for each episode. This brought them a total of $2 million per episode back in 2010. While it is unclear how much the cast makes per episode, Jim Parson, who played Sheldon Cooper on the series, brings in about $10 million a year in residuals.

Case #6:23-cv-06025-FPG-MWP

MacLachlan's Trey), pregnant without the comfort of marriage (Miranda is ripe with child, *Sex*'s best subplot), or looking to replace zipless "f"s with, if not marriage, at least monogamy (randy Samantha finally falls in love with a rich gent, played by James Remar, whose eyes say romance but whose smile is all smarm). Unfulfilled in ways that match their strengths and neuroses, these sophisticated ladies-who-lunch are sated with dating; tired of the hunt for the perfect man, their enthusiasm (to reconfigure another HBO show's title) has been curbed.

If you think I'm giving away plot details, you're crazy—aside from not wanting angry e-mails accusing me of spoiling surprises that fans have been anticipating, I'm also mindful that this is the network that could send an *Oz* parolee or a *Sopranos* hitman to my house if I revealed so much as the sex of Miranda's baby. Instead, I'll say that at this point in the series, even *my* heart flutters when Chris Noth reappears as Carrie's woulda-coulda-shoulda fella, Mr. Big: Noth makes capitalist piggery seem like the height of suave romance. (Carrie and Big have a scene set to, of all things, Henry Mancini's version of "Moon River" that'll get you in your heart.) And that Cynthia Nixon finally gets to show some of the subtlety and range she's used on New York stages for years in a terrific episode about her baby shower. And that Candice Bergen is utterly ab-fab as a ferocious *Vogue* editor who gleefully eviscerates Carrie's freelance story about accessories. When the series hits its sleek stride in moments like this, it makes most other half hours look flat-footed.

All this, plus good jokes about Rogaine, Fendi, and *The Producers* (in which *Parker*'s real-life partner, Matthew Broderick, stars). Also, for anyone contemplating a move to *Sex*'s glorious city, interesting real-money figures are bandied about in the fourth episode. (This I *will* divulge: Carrie pays $750 a month for her comfy, rent-controlled apartment and accompanies a real-estate agent to an above-a-restaurant hovel that goes for $2,800 a month. Also, writers take note: Carrie says proudly, "I have been offered four dollars a word at *Vogue*; that is a lot—most people get two.")

In a poignant time lag, *Sex and the City* went on its planned hiatus in August, and now returns to a post–Sept. 11 world with shows that were in the can before the tragedy. There's a scene in the second episode with a melancholy Carrie shaking a snow-globe containing what I must sorrowfully refer to as the old Manhattan skyline; it's a moment that may leave you shaken as well. **B+**

---

It's Smart. It's Funny. It's on UPN. You've Probably Never Seen It—But You Should.

# 'GIRLFRIENDS' IN NEED

**P**OP QUIZ: NAME THE COMEDY series that (a) features four big-city girls grappling with men, work, and wardrobes (hint: It doesn't star Sarah Jessica Parker); (b) is executive-produced by Emmy Award-winning actor Kelsey Grammer (note: We're not talking about *Frasier*); and (c) is the highest-rated sitcom in the key adult 18–49 demographic on both The WB and UPN.

Give up? It's *Girlfriends*—UPN's Monday-night ensemble comedy starring Tracee Ellis Ross (yes, Diana's daughter). Never heard of it? That's not surprising, given that the sophomore show ranks a paltry No. 112 among total viewers. But they've gotta be doing something right: *Girlfriends* is the third-most-popular show among African-American viewers (behind UPN's *The Parkers* and *One on One*), it ranks No. 1 in its time slot among female teens, and it was recently nominated for an NAACP Image Award for Outstanding Comedy Series. So here's the 411 on UPN's under-the-radar gem. —*Lori L. Tharps*

**WHAT IT'S UP AGAINST** *Becker* (CBS), *Third Watch* (NBC), *Ally McBeal* (Fox), *Angel*



**LADIES NIGHT** (Clockwise from top) Girls Ross, Jones, Golden Brooks, Persia White

(The WB), and *Monday Night Football* (ABC). **WHY IT ISN'T A MAINSTREAM HIT** For one thing, there are no white people in the cast, and unless your last name happens to be Cosby, that is still an obstacle on the road to victory in TV land. Offers Grammer: "People draw conclusions pretty rapidly [about an all-black cast], and it takes time to break down those doors." Series creator and executive producer Mara Brock Akil agrees: "As much as we like to think our country is diverse and accepting, we still have segregated television." **SAMPLE PLOT** When materialistic Girlfriend Toni (Jill Marie Jones) loses her job, her man, and her money, she finds God and starts carrying a plastic Jesus figurine everywhere: "Do you realize how hard it is to go from sinner to saint without all the Christian accessories?" **WHY IT'S NOT JUST ANOTHER SITCOM** "We're not afraid to put our characters in real-life situations," says Akil. "We deal with the ugly side." Adds Danielle Greene, UPN's VP of Comedy and Alternative Development: "I don't think there's been a show in a while, if ever, that deals with issues so honestly and authentically about African-American men and women." **SOUNDS INTERESTING…BUT ARE THEY GOING TO CANCEL IT?** Says Greene: "There's no reason that I could foresee that the show won't be brought back next season." Good plan, because it's never smart to make Diana Ross angry.





**Corrections:**

In the Oct. 29th issue cover story, Mara Brock Akil (c), the creator and one of the executive producers of the UPN comedy "Girlfriends," was incorrectly identified as Martha Brock Akil. The show's cast includes (l-r) Tracee Ellis Ross, Jill Marie Jones, Persia White, Reggie Hayes and Golden Brooks.



In the Oct. 8th issue, a photograph in the story on the massive Yankee Stadium prayer service, which was held after the Sept.11 terrorist attacks, failed to identify Rev. Carolyn Holloway (rear), pastor of DeWitt Reformed Church located near the World Trade Center site in New York City. Rev. Holloway read Scripture during the event. The church provided food and other assistance to victims and emergency workers as well. Also shown is singer Bette Midler and Cardinal Edward Egan, the Catholic Archbishop of New York. The Rev. Dr. Holloway is one of only 28 Black ministers currently serving the Reformed Church. JET regrets the omission.

18

JET MAGAZINE    November 2001

3/28/23, 11:16 AM
Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 39 of 109
Favorite aughts show about four women: 'Girlfriends' or 'Sex and the City' | The Tylt



**SEARCH**

Every vote is a voice that tells a story.



CULTURE ENTERTAINMENT POLITICS SPORTS | RESULTS PODCASTS VIDEOS          ABOUT

ADVERTISEMENT

Z    1/4
Case #6:23-cv-06025-FPG-MWP

# Favorite aughts show about four women: 'Girlfriends' or 'Sex and the City'?

"Girlfriends" and "Sex and the City" are two of the most iconic shows showcasing the friendships of women to date. "Girlfriends" premiered on the UPN in 2000, following the friendships, love and relationships of four black women. The show ended after eight seasons in 2008, but fans are crusading for an epic reboot. "Sex and the City," debuted on our TV screens in 1998, and the empowering series remains one of the most beloved girl shows of all time. **Which all-woman cast is your favorite?**

**By Keydra Manns**
Published **9/12/18**

Favorite aughts show about four women: 'Girlfriends' or 'Sex and the City'? | The Tylt

# TyIt

**C U L T U R E   E N T E R T A I N M E N T   P O L I T I C S   S P O R T S** |

2    2/4

**Case #6:23-cv-06025-FPG-MWP**



**RESULTS**

## FINAL RESULTS

**E N T E R T A I N M E N T**

# Favorite aughts show about four women: 'Girlfriends' or 'Sex and the City'?



| | |
|---|---|
| **#TeamGirlfriends** | **60.5%** |
| **#TeamSATC** | **39.5%** |

JOIN THE CONVERSATION.
SHARE THESE RESULTS.



Real-time Voting
**Favorite aughts show about four women:
'Girlfriends' or 'Sex and the City'?**



**CULTURE ENTERTAINMENT POLITICS SPORTS |**         **ABOUT**

2     3/4

Case #6:23-cv-06025-FPG-MWP

## #TeamGirlfriends

Almost two decades after the show debuted, fans are still obsessed with "Girlfriends." They are vocal about wanting a reboot. It doesn't look like fans are getting their wish anytime soon. So, Essence created their own cast members wish list for a potential reboot.

https://giphy.com/gifs/television-black-girlfriends-kDvsMV3Fvo9fG

The Tylt

### Does 'Pretty Little Mamas' top 'Teen Mom OG'?

Does 'Pretty Little Mamas' top 'Teen Mom OG'? Voting is closed, but you can still share the results!
Tweet Share Share

**#TeamTeenMomOG**

**#TeamPLM**

## #TeamSATC

"Sex and the City" brings on immediate feelings of

3/28/23, 11:16 AM
Case 6:23-cv-06025-FPG-MWP Document 15-3 Filed 04/04/23 Page 42 of 109
Favorite aughts show about four women: 'Girlfriends' or 'Sex and the City' | The Tylt



**Tylt**

CULTURE ENTERTAINMENT POLITICS SPORTS |

But Sarah Jessica Parker recently spoke to The Hollywood Reporter about one of the shows biggest flaws:

> After the anniversary that launched a thousand think pieces, Sex and the City star Sarah Jessica Parker acknowledged that the groundbreaking show now looks "tone-deaf."
>
> "You couldn't make 'Sex and the City' today because of the lack of diversity on screen," she said of a potential reboot for the HBO show, which starred four white actresses.

https://giphy.com/gifs/city-entertainment-popsugar-caH3HQRogbUoU



**FINAL RESULTS**

ENTERTAINMENT

**Favorite aughts show about four women: 'Girlfriends' or 'Sex and the City'?**

**#TeamGirlfriends**          60.5%

**#TeamSATC**          39.5%

JOIN THE CONVERSATION.
SHARE THESE RESULTS.

Case 6:23-cv-06025-FPG-MWP - Document 15-3 Filed 04/04/23 Page 43 of 109

Case #6:23-cv-06025-FPG-MWP



**A.V. CLUB**  Pop culture obsessives writing for the pop culture obsessed.

Shop    Subscribe

HOME    LATEST    FILM    TV CLUB    MUSIC    GAMES    VIDEO    TV REVIEWS    REVIEWS    AND MORE

FOR OUR CONSIDERATION

# How *Friends* changed the sitcom landscape

Gwen Ihnat
8/18/14 12:00AM

570    Save       







more weight. The first sitcom not to feature any sort of authority figure (i.e., parent or boss) was *The Monkees*, which debuted in 1966 (I like this parallel because Matthew Perry's delivery always seemed rather Dolenzian). Hip young sitcoms of earlier eras usually featured young couples (*Bridget Loves Bernie*, *He & She*), en route to eventually starting their own families. It's safe to say that before *Friends,* the youth sitcom was far from as prevalent as it is today (although *Living Single,* a sitcom about six African American friends living in Brooklyn, preceded *Friends* by a year).



*Seinfeld* had debuted on the same network (NBC) a few years earlier, and had paved the way with its show about nothing and Larry David's moratorium: "No hugging, no learning." Lord knows *Friends* broke the former rule at least a few times an episode, but held fast to the latter. Other than romantic relationships, there were no real plot or character developments; the main criteria for a successful episode seemed to be that the *Friends* just hang out with each other as much as possible (in season three's classic "The One Where No One's Ready," filmed in real time, they don't even leave Monica's apartment).



Paramount+ - 30-Day Trial

*Friends* didn't really need character or plot progression because the cast had what Burrows spotted immediately: an off-the-charts chemistry. David Schwimmer

23, 11:15 AM    Girlfriends vs. Sex and the City : GirlfriendsTVshow

Case 6:23-cv-06025-FPG-MWP    Document 15-3    Filed 04/04/23    Page 45 of 109

🔍  ⊙ r/GirlfriendsTVshow ⊗    Search Reddit    👤⌄

**FEEDS**

🏠 Home

⊘ Popular

**RECENT**

🔵 r/GirlfriendsTVshow

**TOPICS**

🎮 Gaming    ⌄

🏅 Sports    ⌄

📈 Business, Economics, a…    ⌄

☸ Crypto    ⌄

▣ Television    ⌄

◎ Celebrity    ⌄

••• More Topics    ⌄

---

Create an account to follow
your favorite communities
and start taking part in
conversations.

Join Reddit

Case #6:23-cv-06025-FPG-MWP

## r/GirlfriendsTVshow

~ Posts
← ⑰ r/GirlfriendsTVshow

Posted by u/LadyBug_0570 4 months ago ③    🔔

# Girlfriends vs. Sex and the City

So, I wanna talk, real talk (if permissible) since I'm sure the folks in this sub are my demographic.

There's a certain sub on Reddit I needed to leave (cough, cough SATC, cough) because too many Redditors felt the secret to everlasting life was within that show and were absolutely offended if you didn't agree Carrie Bradshaw farted rainbows from her boney ass.

Too many times I had people say to me "Why do you watch the show if you hate the main character?" Meanwhile it seems like people on this sub love Girlfriends but can recognize when Joan has acted foul as hell without getting questioned for it.

Also (and as a Black woman, *this* truly offended me), there are MUTLIPLE posts about how SATC was "revolutionary" and "before it's time" and it "tackled things that had never been discussed before" and (my fave) "there's never been a show with 4 women as friends before."

I wanted to scream, "Bitch please... when Living Single, which had 4 girlfriends with a publisher, a "slut", an attorney and a "good girl" went off the air in 1998, SATC premiered with similar characters. But also Girlfriends tackled many of the same issues that show did in a more blunt way, despite *not* being on HBO.

The only time SATC tackled AIDS Sam had to get tested (and was clean despite her history). Compare that to the multi-episodes on Girlfriends that included the prejudice of people around the HIV person (Joan and the knife, Maya and her feelings) plus the sad conclusion.

And for all the sex on SATC, it never addressed really STDs the way Girlfriends did when Toni got chlamydia. And speaking of that episode, when Toni cheated she faced real life consequences versus when Carrie cheated and not only got Aidan back, she ultimately got with the guy she cheated with.

3, 11:15 AM     Girlfriends vs. Sex and the City : GirlfriendsTVshow

Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 46 of 109

🔍   r/GirlfriendsTVshow

FEEDS

🏠 Home

↗ Popular

RECENT

r/GirlfriendsTVshow

TOPICS

💬 53 Comments    ↱ Share   ⋯      95% Upvoted

GIF   **B**   *i*   🔗   S̶   <c>   A^   ⊘   ꞮT   ☰   ☷   99⁺  🗊     ⊞

2₂    2/4

Case #6:23-cv-06025-FPG-MWP

Sort By: Best ▾   |   🔍 Search comments

washyohooha · 4 mo. ago

SATC is a glimpse in upper crust, manhattan white womens lives who were entering their 30's & were ready to marry but realized the pool of men were slim pickings, while existing in the late 90's where AOL.com was the "newest" thing. Thats it. Its fun, fashions are cute for the time & the subject matter does not dive deeper than a kiddie pool. It talked about sex in a way a lot of women at the time discussed & at the same time showed up the one side-ness of friendships & messy friendships (carrie/joan moments, friends no longer speaking etc). Thats what tv needed at the time. Hence why we have Girlfriends, a early 00's show about a group of female black friends (in cali$ who were entering their 30's realizing the pool of potential mates was slim & also had careers. Take each show for what is was. Girlfriends was blessed enough to have writers/creator that did dive deeper, or else the show wouldnt lasted past 3 seasons. If i need a ki-ki, or just in need of drinking wine while watching tv, I'll throw on SATC Because honestly thats how a lot of those woman in manhattan live. In their little upper crust bubble worried about the newest jimmy choo shoe or some BS art show where they dine with their own.

⬆ 21 ⬇   💬 Reply   Share   ⋯

LadyBug_0570 OP · 4 mo. ago

You are 100% correct.

I guess that's my problem tho. Because many of the demographic that watches/watched SATC don't see it as light-hearted "fun... the subject matter does not dive deeper than a kiddie pool". They take that show seriously and SWEAR it is in the first and only show of it's kind. I personally have listed half a dozen shows just like it and got ignored

Create an account to follow your favorite communities and start taking part in conversations.

23, 11:15 AM

Girlfriends vs. Sex and the City : GirlfriendsTVshow



🔍 |  r/GirlfriendsTVshow

2z   3/4

**FEEDS**

🏠 Home

◎ Popular

**RECENT**

🟣 r/GirlfriendsTVshow

**TOPICS**

⌄
⌄
⌄
⌄
⌄
⌄
⌄

Have you been on that sub? It's frickin toxic.

Like if you say "Carrie is not likeable because..." you get inundated with multiple posts from people who think rainbows shoot out of Carrie's ass when she farts and who are personally offended that you don't feel the same way.

Meanwhile, we can bring up here how unlikeable Joan can be (and she had her moments), and no one is throwing a bitch fit or endlessly arguing with you.

I guess it's one of the reasons I like this show. The main character is flawed and there's no dispute about it.

⬆ 12 ⬇ | 💬 Reply   Share   ···

**Continue this thread →**

---

deludedinformer · 4 mo. ago

Girlfriends got better as the seasons went on...**Spoiler alert**

They tackled real issues like alcoholic moms or conflict between friends or even mental illness...

Sex and the City was more like a cartoon version of New Yorker posh life, sanitized and stripped of any authentic emotion IMO

⬆ 13 ⬇ | 💬 Reply   Share   ···

---

LadyBug_0570 OP · 4 mo. ago

You bring up a good point and another major difference why I identify with the Girlfriends. Our families (close or not) make up who we are.

Toni's mom being an alcoholic, Joan's dad being... whatever the hell he was, Lynn being adopted (and her forever trying to find out who she was) and Maya's mom being a poor, single mom, all of that got reflected in who they were. They seemed like whole people with histories.

Compare that with SATC girls, who we never even really met their families. Were all of them 4 only children? Plus any conflict between the 4 was resolved within the episode as opposed to the several episodes where Joan and Toni "broke up".

⬆ 10 ⬇ | 💬 Reply   Share   ···

---

Create an account to follow your favorite communities and start taking part in conversations.

Chasitydacers · 4 mo. ago

23, 11:15 AM

Girlfriends vs. Sex and the City : GirlfriendsTVshow

Case #6:23-cv-06025-FPG-MWP

 Q  🅡 r/GirlfriendsTVshow

**FEEDS**

🏠 Home

🔼 Popular

**RECENT**

🅡 r/GirlfriendsTVshow

**TOPICS**

This may be off topic and idk if it has anything to do with the demographic of Reddit but it always bothers me how black shows has little to no subreddits on this app. Or an amazing show like girlfriends only has 2k members. Vs a show like SATC or others has like 20k plus. I understand some shows may be a little popular than others, but I do wish some black shows got a little more love a recognition on this app.

⬆ 9 ⬇   💬 Reply   Share   •••

**LadyBug_0570** OP • 4 mo. ago

I'd say the larger problem is, black shows (and movies) don't get enough love in general because many non-blacks see a black cast and assume without even watching that they can't relate to it.

I thought the latter part of season 1 of The Game into about season 4 or 5 was some of the best TV ever. Best Real Housewives show? Potomac. Also Married to Medicine (also with a whole black cast of doctors or women married to doctors).

But when you check out the Real Housewives sub, there are many who haven't watched either (or Atlanta) because they don't think they could relate. As if anyone could relate to wealth in Beverly Hills? Makes no sense.

⬆ 7 ⬇   💬 Reply   Share   •••

Continue this thread →

.                                    .

**Impressive-Project59** • 4 mo. ago

Sex in the city is boring as hell imo. I love girlfriends and have always loved GF since it originally aired.

⬆ 8 ⬇   💬 Reply   Share   •••

**LadyBug_0570** OP • 4 mo. ago

I feel like the storylines are just so much deeper on this show.

⬆ 5 ⬇   💬 Reply   Share   •••

Create an account to follow your favorite communities and start taking part in conversations.

**lazarus_mccloud** • 4 mo. ago

This is timely for me; I'm venturing in to rewatch SATC and was considering joining the subreddit. But that myopia sounds irritating and inane (if unsurprising). SATC has no depth to speak of, and I find carrie highly selfish and petty with few redeeming

3/28/23, 11:17 AM
Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 49 of 109
'Girls' vs. 'Sex and the City:' Their similarities, differences, and purposes | Hypable

# Hypable

Z₃ 4/98

Z₃  1/4

Case #6:23-cv-06025-FPG-MWP

TV

11:15 AM EDT, JUNE 22, 2012

# 'Girls' vs. 'Sex and the City:' Their similarities, differences, and purposes

BY **ALYCE ADAMS**

Two TV shows both set in New York City, both focusing on four women and their lives, both progressive of their portrayal of women, and both produced by HBO. One was hugely popular and successful during its time, and the other is gathering its own reputation and following. So which one is better?

*Sex and the City* (SatC) first ran from 1998 to 2004, with six seasons and later two movies. (We do not need to mention the movie sequel. It's unanimously agreed that it was terrible.)

What was great about *SatC* was that it was about modern women. Women who were independent, who could support themselves, who had power, who were confident. These types of representations through the four leading ladies were not common on TV, and especially not in the entire principal cast.

*SatC* broke a lot of taboos by talking about subjects that weren't mentioned often on TV, mainly revolving around sexual issues, like sexually transmitted infections. For a lot of women, this is how they learnt about their own body, because it had previously been deemed socially unacceptable to talk about such matters. The matter of fact and sometimes comedic way these "forbidden" topics were dealt with allowed women a new way to view themselves.

Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 50 of 109

However, *SatC* received a lot of criticisms as well as acclaim, and large portions were from feminists.

Z3        2/4

Case #6:23-cv-06025-FPG-MWP

The main problem listed, and which I agree with, is that all the major storylines revolve around women and their search for boyfriends/husbands. For instance, Samantha, the biggest supporter of sex without emotion, ends up paired with a guy. Miranda even acknowledges it when she asks, "How does it happen that four such smart women have nothing to talk about but boyfriends?"

ARTICLE CONTINUES BELOW



**Co-Stars Who Enjoyed Kissing Each Other Just A Little Too Much**



**This Is The Perfect Gateway Horror Movie**

In fact, the six seasons could be summarised as Carrie waiting for Big to realise the sweet deal he has. Instead, he acts like a jerk for the majority of the time and then they get married. Oh wait, he first gets cold feet and ditches their wedding.

Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 51 of 109

23   5/14
Case #6:23-cv-06025-FPG-MWP

Then they get married.

Personally, I also found it hard to relate to and superficial at times. All they seem to care for is men and fashion, which I know doesn't represent my, or other girls', priorities.

In the first episode of *Girls*, Shoshanna (one of the four main girls) has a giant *SatC* poster on her wall that she points out. She also matches up each of her friends and herself with the corresponding characters from SatC. *Girls* is aware of their similarities. They want the audience to realise that as well. In many ways, *Girls* is SatC, just ten years later.

Like *SatC*, *Girls* is portraying a new type of woman than what is currently on TV. Conversely, where *SatC* depicts women as successful and fashionable, *Girls* shows women who are relatable. Struggling to get a job, struggling to pay the bills, struggling to find their own place in the world. The women in *Girls* aren't thinner than a stripper's pole, or have the same amount of make up on as a stripper. When we look at them, we see ourselves.

The majority of women today aren't counting their collection of Louis Vuitton handbags, but are more concerned with what is the smallest tip you can possibly leave behind without being rude, because you need that money for your fare home.

*Sex and the City* is what we wish we were. *Girls* is what we are.

Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 52 of 109

Case #6:23-cv-06025-FPG-MWP

That's not to say there aren't any problems with *Girls*. Disapproval of *Girls*, though, has largely come from its lack of diversity. Here again are four white, heterosexual, educated and privileged women. It focuses on girls, but only a very small, exact group of them. It isn't representative of a majority, but is targeted towards a specific audience to enjoy.

Ultimately, it doesn't matter which one is better. What's important is that there are more shows like these, with the focus on women and real issues relating to women, because the biggest criticism of both is that it isn't 'representative.' This is only said because there are so few shows that are about women, so they unfairly get burdened with having to speak for all women, no matter if they're gay, straight, black or white. Not only is this impossible and ridiculous, TV shows about men never get held up to the same scrutiny.

Hopefully the success of these two TV shows will make producers and big TV executives realise that a show with an all-female cast is an advantage, and not a weakness.

*Listen to similar discussions related to pop culture on the podcast* **Memoirs of a Fangirl**.

SHARE THIS ARTICLE:  

We want to hear your thoughts on this topic!
Write a comment below or        to Hypable.

FROM THE WEB



**The Real Reason Keanu's Accent In**



**Stars Who Need To Realize They Aren't**



# How 'Living Single' Was The Blueprint For 'Friends'

## The impact of Living Single can't be understated or ignored.



Photo: Amy Krimm (https://www.34st.com/staff/amy-krimm)

BY SHELBY ABAYIE (HTTPS://WWW.34ST.COM/STAFF/SHELBY_ABAYIE)

November 22, 2021 at 3:39 pm



Six friends, all spunky twenty–somethings, are living together in a vibrant city facing relationship drama, job struggles, and wacky hijinks. But no matter what happens, their bond remains strong. Any guesses on the sitcom's name? Here's a hint, it's not *Friends*.

*Living Single* (https://www.hulu.com/series/living-single-df59d585-ed41-4700-

THE COMPLETE FIRST SEASON

sex and the city

Lee v. Warner Media, LLC et al.
No. 6:23-cv-6025 (WDNY)
Exhibits in Support of Defendants' Motion To Dismiss



girlfriends

THE FIRST SEASON

Lee v. Warner Media, LLC et al.
No. 6:23-cv-6025 (WDNY)
Exhibits in Support of Defendants' Motion To Dismiss



F·R·I·E·N·D·S

THE COMPLETE FIRST SEASON

Lee v. Warner Media, LLC et al.
No. 6:23-cv-6025 (WDNY)
Exhibits in Support of Defendants' Motion to Dismiss

season 1

NOW WITH FOOTAGE YOU'VE NEVER SEEN

THE COMPLETE 1 FIRST SEASON

Living single

Lee v. Warner Media, LLC et al.
No. 6:23-cv-6025 (WDNY)
Exhibits in Support of Defendants' Motion to Dismiss

Case #6:23-cv-06025-FPG-MWP



ZS   3/4

Case #6:23-cv-06025-FPG-MWP

# WIKIPEDIA
The Free Encyclopedia

# File:Girls HBO Poster.jpg



No higher resolution available.

*Z S*          *4/4*

**Case #6:23-cv-06025-FPG-MWP**

Girls_HBO_Poster.jpg (259 × 383 pixels, file size: 23 KB, MIME type: image/jpeg)

| Open in Media Viewer | |
|---|---|

## Summary

| Non-free media information and use rationale for Girls (TV series) | |
|---|---|
| **Description** | The poster for series premier. |
| **Source** | HBO |
| **Article** | Girls (TV series) |
| **Portion used** | Full |
| **Low resolution?** | No |
| **Purpose of use** | To show the promotional poster. |

Related titles

Case #6:23-cv-06025-FPG-MWP

|  |  |
|---|---|
| Plaintiff, <br><br> v. <br><br> MICHAEL PHILLIP JAGGER, professionally known as, MICK JAGGER, KEITH RICHARDS, collectively and professionally known as THE ROLLING STONES, UNIVERSAL MUSIC GROUP, INC, BMG RIGHTS MANAGEMENT, LLC, AND PROMOPUB B.V., <br><br> Defendants. | **COMPLAINT FOR COPYRIGHT INFRINGEMENT** <br><br> **JURY TRIAL DEMANDED** |

Comes now, Plaintiff, Sergio Garcia Fernandez, professionally known as, Angelslang, by and through its his counsel of record herein, for its complaint against Defendants, and each of them, alleges as follow:

### INTRODUCTION

1. This is a civil action for the infringement of registered copyrights in violation of The U.S. Copyright Act brought by the Plaintiff, Sergio Garcia Fernandez, professionally known as, Angelslang, (hereinafter referred to as "Plaintiff"), to recover compensatory, statutory, and punitive damages as a result of the Defendants' unauthorized exploitation of the copyrighted musical works of Plaintiff.

Related titles

Case #6:23-cv-06025-FPG-MWP

3. Venue is proper in this district pursuant to 28 U.S.C. 1391(b)(2) and 1400(a) as a substantial part of the events giving rise to this claim occurred in this district. Defendants regularly conduct business in the State of Louisiana and substantial acts of infringement have occurred in this district. Defendants expect or should have reasonably expected their acts to have consequences in this district. Defendants have directed their activities and marketing of musical recordings to Louisiana residents and Louisiana residents were able to purchase and download infringing musical recordings by way of mechanisms controlled or authorized by the Defendants.

**PARTIES**

4. Plaintiff, Sergio Garcia Fernandez, is a person of the full age and majority and domiciled in the country of Spain.

5. Defendant Michael Phillip Jagger, professionally known as Mick Jagger, and a member of the collective, "The Rolling Stones," is a person of the full age and majority, who, upon information and belief, is a citizen of the State of Florida.

6. Defendant Keith Richards is a person of the full age and majority, and one part of the collective, "The Rolling Stones," who, upon information and belief, is a citizen of State of Connecticut.

7. Upon information and belief, Defendant Universal Music Group, Inc is an active corporation organized and existing pursuant to the laws of the State of California. Plaintiff

Related titles                                                                ^

1

3/8

**Case #6:23-cv-06025-FPG-MWP**

active limited liability company organized and existing pursuant to the laws of the State of

New York. Plaintiff is informed and believes, and thereupon alleges, that BMG Rights

Management, LLC does substantial, continuous and systematic business in the State of

Louisiana and in this judicial district.

9. Defendant Promopub B.V. is a foreign corporation, organized and existing

pursuant to the laws of the country of Netherlands. Plaintiff is informed and believes, and

thereupon alleges, that Promopub B.V. does substantial, continuous and systematic

business in the State of Louisiana and in this judicial district.

## FACTS

10. In or about 2006, Plaintiff authored sound recording and musical composition

entitled "So Sorry." Plaintiff's "So Sorry" was wholly original and is registered with the

Sociedad General de Autores y Editores, Registration Number 6.567.119. In or around

2007, Plaintiff authored the sound recording and musical composition entitled "Seed of

god (Talent in the Trash)." Plaintiff's "Seed of god (Talent in the Trash)" was wholly

original and registered with the Sociedad General de Autores y Editores, Registration

Number 16.055.652.

11. Subsequently, the musical works, "So Sorry" and "Seed of god (Talent in the

Trash)" were released as a part of Angelslang's compilation album, "Brick Songs," in

Related titles                                                                    ^

1

Case #6:23-cv-06025-FPG-MWP                4/8

musical composition, and lyrics for the subject songs.

13. In or around 2013, Angelslang provided a demo compact disc (CD) containing the musical works, "So Sorry" and "Seed of god (Talent in the Trash)," to an immediate family member of Defendant Jagger. Thereafter, the immediate family member of Defendant Jagger confirmed receipt of the demo compact disc (CD) containing the musical works, "So Sorry" and "Seed of god (Talent in the Trash)," to the Plaintiff via e-mail, and expressed that the musical works of the Plaintiff and its style was a sound The Rolling Stones would be interested in using.

22. In 2020, Defendants released a sound recording entitled "Living in a ghost town" that misappropriated many of the recognizable and key protected elements of the Plaintiff's musical works, "So Sorry" and "Seed of god (Talent in the Trash)," into their infringing work, "Living in a Ghost Town."

23. Defendants used unauthorized copying and sampling of "So Sorry" and "Seed of god (Talent in the Trash)," in the infringing sound recording, "Living in a Ghost Town."

24. The Plaintiff did not authorize the defendants' reproduction, distribution, public performance of the sound recording, or creation of an unauthorized derivative work of "Living in a Ghost Town."

Related titles                                                              ^

1                    5/8

Case #6:23-cv-06025-FPG-MWP

the recognizable and key protected elements of the Plaintiff's works into their infringing

works, "Living in a Ghost Town" The infringing work, "Living in a Ghost Town,"

misappropriates key protected elements of "So Sorry," including without limitation its

vocal melodies, the chord progressions, the drum beat patterns, the harmonica parts, the

electric bass line parts, the tempos, and other key signatures.

27. The infringing work, "Living in a Ghost Town," also misappropriates key

protected elements of "Seed of god (Talent in the Trash)." The infringing work, "Living

in a Ghost Town," misappropriates key protected elements of "Seed of god (Talent in the

Trash)," including without limitation its harmonic and chord progression and melody.

28. Defendants, without authority have willfully copied and sampled many

protected elements of the Plaintiff's copyrights and further infringed upon those copyrights

by acts of reproduction, distribution, publish, display, and unauthorized creation of

derivative works.

**FIRST CLAIM FOR RELIEF**

**(Copyright infringement of "So Sorry" and "Seed of god (Talent in the**

**Trash)," into the sound recording, "Living in a Ghost Town" against all defendants)**

29. Plaintiff repeats and re-alleges paragraphs 1 through 28 of this Complaint as

if fully set forth herein.

Related titles                                                                  ∧

1            6/8
Case #6:23-cv-06025-FPG-MWP

bears Registration nos. 16/2020/2179, 6.567.119 and 16.055.652 respectively.

   31.  Upon information and belief, and without authorization or permission from the plaintiff, in direct violation of Plaintiff's rights, Defendants, have directly infringed the copyrights in Plaintiff's "So Sorry" and "Seed of god (Talent in the Trash)," by among other things: a) preparing unauthorized derivatives of Plaintiff's "So Sorry" and "Seed of god (Talent in the Trash),"in the form of "Living in a Ghost Town;" b) reproducing copyrighted elements of the Plaintiff's "So Sorry" and "Seed of god (Talent in the Trash),"in "Living in a Ghost Town;" c) distributing copies of "Living in a Ghost Town," which contains copyrighted elements of Plaintiff's "So Sorry" and "Seed of god (Talent in the Trash),"and d) publishing, displaying, selling and licensing copies of "Living in a Ghost Town," which contains copyrighted elements of Plaintiff's "So Sorry" and "Seed of god (Talent in the Trash)," Defendants never paid Plaintiff, nor secured the authorization for the use of "So Sorry" and "Seed of god (Talent in the Trash),"in "Living in a Ghost Town."

   32.  Moreover, without authorization or permission from Plaintiff, Defendants sampled and copied Plaintiff's "So Sorry" and "Seed of god (Talent in the Trash),"in purporting to author the sound recording and composition, "Living in a Ghost Town." Defendants have published, manufactured, distributed, sold and licensed copies of "Living in a Ghost Town." Defendants never paid Plaintiff, nor secured the authorization for the

Related titles                                                                                                    ⌃

*1*    *7 / 8*

**Case #6:23-cv-06025-FPG-MWP**

misappropriates key protected elements of "So Sorry," including without limitation its

vocal melodies, the chord progressions, the drum beat patterns, the harmonica parts, the

electric bass line parts, the tempos, and other key signatures.

34. The infringing work, "Living in a Ghost Town," also misappropriates key

protected elements of "Seed of god (Talent in the Trash)." The infringing work, "Living

in a Ghost Town," misappropriates key protected elements of "Seed of god (Talent in the

Trash)," including without limitation its harmonic and chord progression and melody.

35. As a direct and proximate result of the Defendants' infringement, Plaintiff is

entitled to its actual damages in addition to Defendants' profits that are attributable to the

copyrighted material; moreover, plaintiff is entitled to other compensatory, statutory and

punitive damages in an amount to be proven at trial.

36. Defendants' conduct was willful with full knowledge of and complete

disregard for Plaintiff's rights. Therefore, the Plaintiff is entitled to statutory damages.

37. As a direct and proximate result of Defendants' infringement, Plaintiff has

incurred attorneys' fees and costs, in amount according to proof, which are recoverable

under 17 U.S.C. 504.

WHEREFORE, Plaintiff prays for judgment as set forth hereinafter.

a) For actual damages according to proof at trial;

Related titles ^

Case #6:23-cv-06025-FPG-MWP

the infringing works;

**e)** For attorney's fees pursuant to 17 U.S.C. 504;

**f)** For costs of suit incurred;

**g)** For interest, prejudgment interest and post-judgment interest according to proof at trial;

**h)** For compensatory damages

**i)** For attorney fees

**j)** Any such other or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in the above matter.

Dated: March 9, 2023

Respectfully submitted,

/s/DASHAWN HAYES_____
DaShawn Hayes (LA State Bar #34,204)
The Hayes Law Firm, PLC
1100 Poydras St., Ste 1530
New Orleans, LA 70163
PH: 504-799-0374
FAX: 504-799-0375
dphayesesquire@gmail.com
Attorneys for Plaintiff

## WAIVER OF SERVICE REQUESTED

Case #6:23-cv-06025-FPG-MWP

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PETRELLA *v.* METRO-GOLDWYN-MAYER, INC., ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 12–1315.   Argued January 21, 2014—Decided May 19, 2014

The Copyright Act (Act) protects copyrighted works published before 1978 for an initial period of 28 years, renewable for a period of up to 67 years. 17 U. S. C. §304(a).  The author's heirs inherit the renewal rights.  See §304(a)(1)(C)(ii)–(iv).  When an author who has assigned her rights away "dies before the renewal period, . . . the assignee may continue to use the original work only if the author's successor transfers the renewal rights to the assignee," *Stewart* v. *Abend*, 495 U. S. 207, 221.  The Act provides both equitable and legal remedies for infringement: an injunction "on such terms as [a court] may deem reasonable to prevent or restrain infringement of a copyright," §502(a); and, at the copyright owner's election, either (1) the "owner's actual damages and any additional profits of the infringer," §504(a)(1), which petitioner seeks in this case, or (2) specified statutory damages, §504(c).  The Act's statute of limitations provides: "No civil action shall be maintained under the [Act] unless it is commenced within three years after the claim accrued." §507(b).  A claim ordinarily accrues when an infringing act occurs.  Under the separate-accrual rule that attends the copyright statute of limitations, when a defendant has committed successive violations, each infringing act starts a new limitations period.  However, under §507(b), each infringement is actionable only within three years of its occurrence.

Here, the allegedly infringing work is the motion picture Raging Bull, based on the life of boxing champion Jake LaMotta, who, with Frank Petrella, told his story in, *inter alia,* a screenplay copyrighted in 1963.  In 1976, the pair assigned their rights and renewal rights, which were later acquired by respondent United Artists Corporation, a subsidiary of respondent Metro-Goldwyn-Mayer, Inc. (collectively, MGM).  In 1980, MGM released, and registered a copyright in, the

Case #6:23-cv-06025-FPG-MWP

2        PETRELLA *v.* METRO-GOLDWYN-MAYER, INC.

Syllabus

film Raging Bull, and it continues to market the film today.  Frank
Petrella died during the initial copyright term, so renewal rights re-
verted to his heirs.  Plaintiff below, petitioner here, Paula Petrella
(Petrella), his daughter, renewed the 1963 copyright in 1991, becom-
ing its sole owner.  Seven years later, she advised MGM that its ex-
ploitation of Raging Bull violated her copyright and threatened suit.
Some nine years later, on January 6, 2009, she filed an infringement
suit, seeking monetary and injunctive relief limited to acts of in-
fringement occurring on or after January 6, 2006.  Invoking the equi-
table doctrine of laches, MGM moved for summary judgment.  Pet-
rella's 18-year delay in filing suit, MGM argued, was unreasonable
and prejudicial to MGM.  The District Court granted MGM's motion,
holding that laches barred Petrella's complaint.  The Ninth Circuit
affirmed.

*Held*:

    1. Laches cannot be invoked as a bar to Petrella's pursuit of a claim
for damages brought within §507(b)'s three-year window.  Pp. 11–19.

    (a) By permitting a successful plaintiff to gain retrospective relief
only three years back from the time of suit, the copyright statute of
limitations itself takes account of delay.  Brought to bear here,
§507(b) directs that Petrella cannot reach MGM's returns on its in-
vestment in Raging Bull in years before 2006.  Moreover, if infringe-
ment within the three-year window is shown, a defendant may offset
against profits made in that period expenses incurred in generating
those profits.  See §504(b).  In addition, a defendant may retain the
return on investment shown to be attributable to its own enterprise,
as distinct from the value created by the infringed work.  See *ibid.*
Both before and after the merger of law and equity in 1938, this
Court has cautioned against invoking laches to bar legal relief.  See,
*e.g., Holmberg* v. *Armbrecht*, 327 U. S. 392, 395, 396.  Pp. 11–14.

    (b) MGM's principal arguments regarding the contemporary
scope of the laches defense are unavailing.  Pp. 14–19.

    (1) MGM urges that, because laches is listed in Federal Rule of
Civil Procedure 8(c) as an affirmative defense discrete from a statute
of limitations defense, the plea should be "available . . . in every civil
action" to bar all forms of relief.  Such an expansive role careens
away from understandings, past and present, of the essentially gap-
filling, not legislation-overriding, office of laches.  This Court has
never applied laches to bar in their entirety claims for discrete
wrongs occurring within a federally prescribed limitations period.
Inviting individual judges to set a time limit other than the one Con-
gress prescribed would tug against the uniformity Congress sought to
achieve in enacting §507(b).  Pp. 14–15.

    (2) MGM contends that laches, like equitable tolling, should be

Case #6:23-cv-06025-FPG-MWP

Cite as: 572 U. S. ____ (2014)       3

Syllabus

"read into every federal statute of limitation," *Holmberg*, 327 U. S., at 397.  However, tolling lengthens the time for commencing a civil action where there is a statute of limitations and is, in effect, a rule of interpretation tied to that statutory limit.  See, *e.g., Young* v. *United States*, 535 U. S. 43, 49–50.  In contrast, laches, which originally served as a guide when no statute of limitations controlled, can scarcely be described as a rule for interpreting a statutory prescription.  Pp. 15–16.

(3) MGM insists that the laches defense must be available to prevent a copyright owner from sitting still, doing nothing, waiting to see what the outcome of an alleged infringer's investment will be.  It is hardly incumbent on copyright owners, however, to challenge each and every actionable infringement.  And there is nothing untoward about waiting to see whether an infringer's exploitation undercuts the value of the copyrighted work, has no effect on that work, or even complements it.  Section 507(b)'s limitations period, coupled to the separate-accrual rule, allows a copyright owner to defer suit until she can estimate whether litigation is worth the candle.  Pp. 16–17.

(4) MGM is concerned that evidence needed or useful to defend against liability will be lost during a copyright owner's inaction.  But Congress must have been aware that the passage of time and the author's death could cause evidentiary issues when it provided for reversionary renewal rights that an author's heirs can exercise long after a work was written and copyrighted.  Moreover, because a copyright plaintiff bears the burden of proving infringement, any hindrance caused by evidence unavailability is as likely to affect plaintiffs as defendants.  The need for extrinsic evidence is also reduced by the registration mechanism, under which both the certificate and the original work must be on file with the Copyright Office before a copyright owner can sue for infringement.  Pp. 17–18.

(5) Finally, when a copyright owner engages in intentionally misleading representations concerning his abstention from suit, and the alleged infringer detrimentally relies on such deception, the doctrine of estoppel may bar the copyright owner's claims completely, eliminating all potential remedies.  The gravamen of estoppel, a defense long recognized as available in actions at law, is wrongdoing, overt misleading, and consequent loss.  Estoppel does not undermine the statute of limitations, for it rests on misleading, whether engaged in early on, or later in time.  P. 19.

2. While laches cannot be invoked to preclude adjudication of a claim for damages brought within the Act's three-year window, in extraordinary circumstances, laches may, at the very outset of the litigation, curtail the relief equitably awarded.  For example, where owners of a copyrighted architectural design, although aware of an

4          PETRELLA *v.* METRO-GOLDWYN-MAYER, INC.

Syllabus

allegedly infringing housing project, delayed suit until the project
was substantially constructed and partially occupied, an order man-
dating destruction of the project would not be tolerable. See *Chirco* v.
*Crosswinds Communities, Inc.*, 474 F. 3d 227, 236. Nor, in the face of
an unexplained delay in commencing suit, would it be equitable to
order "total destruction" of a book already printed, packed, and
shipped. See *New Era Publications Int'l* v. *Henry Holt & Co.*, 873
F. 2d 576, 584–585. No such extraordinary circumstance is present
here. Petrella notified MGM of her copyright claims *before* MGM in-
vested millions of dollars in creating a new edition of Raging Bull,
and the equitable relief she seeks—*e.g.*, disgorgement of unjust gains
and an injunction against future infringement—would not result in
anything like "total destruction" of the film. Allowing Petrella's suit
to go forward will put at risk only a fraction of the income MGM has
earned during the more than three decades Raging Bull has been
marketed and will work no unjust hardship on innocent third parties.
Should Petrella ultimately prevail on the merits, the District Court,
in determining appropriate injunctive relief and assessing profits,
may take account of Petrella's delay in commencing suit. In doing so,
however, the court must closely examine MGM's alleged reliance on
Petrella's delay, taking account of MGM's early knowledge of her
claims, the protection MGM might have achieved through a declara-
tory judgment action, the extent to which MGM's investment was
protected by the separate-accrual rule, the court's authority to order
injunctive relief "on such terms as it may deem reasonable," §502(a),
and any other relevant considerations. Pp. 19–22.

695 F. 3d 946, reversed and remanded.

GINSBURG, J., delivered the opinion of the Court, in which SCALIA,
THOMAS, ALITO, SOTOMAYOR, and KAGAN, JJ., joined. BREYER, J., filed a
dissenting opinion, in which ROBERTS, C. J., and KENNEDY, J., joined.

Cite as: 572 U. S. ____ (2014)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–1315

## PAULA PETRELLA, PETITIONER *v.* METRO-GOLDWYN-MAYER, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 19, 2014]

JUSTICE GINSBURG delivered the opinion of the Court.

The Copyright Act provides that "[n]o civil action shall be maintained under the [Act] unless it is commenced within three years after the claim accrued." 17 U. S. C. §507(b). This case presents the question whether the equitable defense of laches (unreasonable, prejudicial delay in commencing suit) may bar relief on a copyright infringement claim brought within §507(b)'s three-year limitations period. Section 507(b), it is undisputed, bars relief of any kind for conduct occurring prior to the three-year limitations period. To the extent that an infringement suit seeks relief solely for conduct occurring within the limitations period, however, courts are not at liberty to jettison Congress' judgment on the timeliness of suit. Laches, we hold, cannot be invoked to preclude adjudication of a claim for damages brought within the three-year window. As to equitable relief, in extraordinary circumstances, laches may bar at the very threshold the particular relief requested by the plaintiff. And a plaintiff's delay can always be brought to bear at the remedial stage, in determining appropriate injunctive relief, and in assessing

2      PETRELLA *v.* METRO-GOLDWYN-MAYER, INC.

Opinion of the Court

the "profits of the infringer . . . attributable to the in-
fringement." §504(b).[1]

Petitioner Paula Petrella, in her suit for copyright in-
fringement, sought no relief for conduct occurring outside
§507(b)'s three-year limitations period. Nevertheless, the
courts below held that laches barred her suit in its en-
tirety, without regard to the currency of the conduct of
which Petrella complains. That position, we hold, is con-
trary to §507(b) and this Court's precedent on the province
of laches.

I

The Copyright Act (Act), 17 U. S. C. §101 *et seq.*, grants
copyright protection to original works of authorship.
§102(a). Four aspects of copyright law bear explanation at
the outset.

*First,* the length of a copyright term. Under the Act, a
copyright "vests initially in the author or authors of the
work," who may transfer ownership to a third party. §201.
The Act confers on a copyright owner certain exclusive
rights, including the rights to reproduce and distribute the
work and to develop and market derivative works. §106.
Copyrighted works published before 1978—as was the
work at issue—are protected for an initial period of 28
years, which may be—and in this case was—extended for
a renewal period of up to 67 years. §304(a). From and
after January 1, 1978, works are generally protected from
the date of creation until 70 years after the author's death.

---

[1] As infringement remedies, the Copyright Act provides for injunc-
tions, §502, impoundment and disposition of infringing articles, §503,
damages and profits, §504, costs and attorney's fees, §505. Like other
restitutional remedies, recovery of profits "is not easily characterized as
legal or equitable," for it is an "amalgamation of rights and remedies
drawn from both systems." Restatement (Third) of Restitution and
Unjust Enrichment §4, Comment *b*, p. 28 (2010). Given the "protean
character" of the profits-recovery remedy, see *id.,* Comment *c*, at 30, we
regard as appropriate its treatment as "equitable" in this case.

Cite as: 572 U. S. ____ (2014)        3

Opinion of the Court

§302(a).

*Second*, copyright inheritance.  For works copyrighted under the pre-1978 regime in which an initial period of protection may be followed by a renewal period, Congress provided that the author's heirs inherit the renewal rights. See §304(a)(1)(C)(ii)–(iv).  We held in *Stewart* v. *Abend*, 495 U. S. 207 (1990), that if an author who has assigned her rights away "dies before the renewal period, then the assignee may continue to use the original work [to produce a derivative work] only if the author's successor transfers the renewal rights to the assignee." *Id.*, at 221.[2]

*Third*, remedies.  The Act provides a variety of civil remedies for infringement, both equitable and legal.  See §§502–505, described *supra*, at 2, n. 1.  A court may issue an injunction "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  §502(a).  At the election of the copyright owner, a court may also award either (1) "the copyright owner's actual damages and any additional profits of the infringer," §504(a)(1), which petitioner seeks in the instant case, or (2) statutory damages within a defined range, §504(c).

*Fourth*, and most significant here, the statute of limitations.  Until 1957, federal copyright law did not include a statute of limitations for civil suits.  Federal courts therefore used analogous state statutes of limitations to determine the timeliness of infringement claims.  See S. Rep. No. 1014, 85th Cong., 1st Sess., 2 (1957) (hereinafter Senate Report).  And they sometimes invoked laches to abridge the state-law prescription. As explained in *Teamsters & Employers Welfare Trust of Ill.* v. *Gorman Bros. Ready Mix*, 283 F. 3d 877, 881 (CA7 2002): "When Congress fails to enact a statute of limitations, a [federal]

---

[2]For post-1978 works, heirs still have an opportunity to recapture rights of the author.  See 3 M. Nimmer & D. Nimmer, Copyright §11.01[A], p. 11–4 (2013) (hereinafter Nimmer).

4          PETRELLA *v.* METRO-GOLDWYN-MAYER, INC.

Opinion of the Court

court that borrows a state statute of limitations but permits it to be abridged by the doctrine of laches is not invading congressional prerogatives. It is merely filling a legislative hole." (internal citation omitted). In 1957, Congress addressed the matter and filled the hole; it prescribed a three-year look-back limitations period for all civil claims arising under the Copyright Act. See Act of Sept. 7, 1957, Pub. L. 85–313, 71 Stat. 633, 17 U. S. C. §115(b) (1958 ed.). The provision, as already noted, reads: "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." §507(b).[3]

The federal limitations prescription governing copyright suits serves two purposes: (1) to render uniform and certain the time within which copyright claims could be pursued; and (2) to prevent the forum shopping invited by disparate state limitations periods, which ranged from one to eight years. Senate Report 2; see H. R. Rep. No. 2419, 84th Cong., 2d Sess., 2 (1956). To comprehend how the Copyright Act's limitations period works, one must understand when a copyright infringement claim accrues.

A claim ordinarily accrues "when [a] plaintiff has a complete and present cause of action." *Bay Area Laundry and Dry Cleaning Pension Trust Fund* v. *Ferbar Corp. of Cal.*, 522 U. S. 192, 201 (1997) (internal quotation marks omitted). In other words, the limitations period generally begins to run at the point when "the plaintiff can file suit and obtain relief." *Ibid.* A copyright claim thus arises or "accrue[s]" when an infringing act occurs.[4]

_____

[3]The Copyright Act was pervasively revised in 1976, but the three-year look-back statute of limitations has remained materially unchanged. See Act of Oct. 19, 1976, §101, 90 Stat. 2586.

[4]Although we have not passed on the question, nine Courts of Appeals have adopted, as an alternative to the incident of injury rule, a "discovery rule," which starts the limitations period when "the plaintiff discovers, or with due diligence should have discovered, the injury that

Cite as: 572 U. S. ____ (2014)    5

Opinion of the Court

It is widely recognized that the separate-accrual rule attends the copyright statute of limitations.[5]  Under that rule, when a defendant commits successive violations, the statute of limitations runs separately from each violation. Each time an infringing work is reproduced or distributed, the infringer commits a new wrong.  Each wrong gives rise to a discrete "claim" that "accrue[s]" at the time the wrong occurs.[6]  In short, each infringing act starts a new limitations period.  See *Stone* v. *Williams*, 970 F. 2d 1043, 1049 (CA2 1992) ("Each act of infringement is a distinct harm giving rise to an independent claim for relief.").

Under the Act's three-year provision, an infringement is actionable within three years, and only three years, of its occurrence.  And the infringer is insulated from liability for earlier infringements of the same work.  See 3 M. Nimmer & D. Nimmer, Copyright §12.05[B][1][b], p. 12–150.4 (2013) ("If infringement occurred within three years prior to filing, the action will not be barred even if prior

---

forms the basis for the claim." *William A. Graham Co.* v. *Haughey*, 568 F. 3d 425, 433 (CA3 2009) (internal quotation marks omitted).  See also 6 W. Patry, Copyright §20:19, p. 20–28 (2013) (hereinafter Patry) ("The overwhelming majority of courts use discovery accrual in copyright cases.").

[5]See generally *id.*, §20:23, at 20–44; 3 Nimmer §12.05[B][1][b], at 12–150.2 to 12–150.4.  See also, *e.g.*, *William A. Graham Co.*, 568 F. 3d, at 433; *Peter Letterese & Assoc., Inc.* v. *World Inst. of Scientology Enterprises, Int'l*, 533 F. 3d 1287, 1320, n. 39 (CA11 2008); *Bridgeport Music, Inc.* v. *Rhyme Syndicate Music*, 376 F. 3d 615, 621 (CA6 2004); *Makedwde Publishing Co.* v. *Johnson*, 37 F. 3d 180, 182 (CA5 1994); *Roley* v. *New World Pictures, Ltd.*, 19 F. 3d 479, 481 (CA9 1994).

[6]Separately accruing harm should not be confused with harm from past violations that are continuing.  Compare *Klehr* v. *A. O. Smith Corp.*, 521 U. S. 179, 190 (1997) (for separately accruing harm, each new act must cause "harm [to the plaintiff] over and above the harm that the earlier acts caused"), with *Havens Realty Corp.* v. *Coleman*, 455 U. S. 363, 380–381 (1982) ("[W]here a plaintiff . . . challenges . . . an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [the limitations period, measured from] the last asserted occurrence of that practice." (footnote omitted)).

2        10/10
Case #6:23-cv-06025-FPG-MWP

6          PETRELLA *v.* METRO-GOLDWYN-MAYER, INC.

Opinion of the Court

infringements by the same party as to the same work are
barred because they occurred more than three years pre-
viously.").   Thus, when a defendant has engaged (or is
alleged to have engaged) in a series of discrete infringing
acts, the copyright holder's suit ordinarily will be timely
under §507(b) with respect to more recent acts of in-
fringement (*i.e.*, acts within the three-year window), but
untimely with respect to prior acts of the same or similar
kind.[7]

In sum, Congress provided two controlling time pre-
scriptions: the copyright term, which endures for decades,
and may pass from one generation to another; and
§507(b)'s limitations period, which allows plaintiffs during
that lengthy term to gain retrospective relief running only

---

[7]A case arising outside of the copyright context is illustrative.  In *Bay
Area Laundry and Dry Cleaning Pension Trust Fund* v. *Ferbar Corp. of
Cal.*, 522 U. S. 192 (1997), an employer was delinquent in making a
series of scheduled payments to an underfunded pension plan.  See *id.*,
at 198–199.  The trustees filed suit just over six years after the first
missed payment, barely outside of the applicable six-year statute of
limitations.  See *id.*, at 198.  Because the first missed payment in the
series fell outside the statute of limitations, the employer argued that
the subsequent missed payments were also time barred.  See *id.*, at
206.  We rejected that argument.  The remaining claims were timely,
we held, because "each missed payment create[d] a separate cause of
action with its own six-year limitations period." *Ibid.*  Cf. *Klehr*, 521
U. S., at 190 (for civil Racketeer Influenced and Corrupt Organizations
Act claims, plaintiff may recover for acts occurring within the limita-
tions period, but may not use an "independent, new predicate act as a
bootstrap to recover for injuries caused by other earlier predicate acts
that took place outside the limitations period"); *National Railroad
Passenger Corporation* v. *Morgan*, 536 U. S. 101, 114–121 (2002)
(distinguishing discrete acts, each independently actionable, from
conduct "cumulative [in] effect," *e.g.*, hostile environment claims pur-
sued under Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e
*et seq.*; "in direct contrast to discrete acts, a single [instance of hostility]
may not be actionable on its own").  But cf. *post*, at 10–11 (ignoring the
distinction *Morgan* took care to draw between discrete acts inde-
pendently actionable and conduct cumulative in effect).

Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 76 of 109

32   1/2   3a
2 pgs

Case #6:23-cv-06025-FPG-MWP

# STARZ ENTERTAINMENT, LLC V. MGM DOMESTIC TELEVISION DISTR., No. 21-55379 (9th Cir. 2022)

## Justia Opinion Summary

Starz Entertainment LLC (Starz) entered into two licensing agreements with MGM Domestic Television Distribution LLC (MGM). Starz sued MGM in May 2020, asserting 340 claims of direct copyright infringement, 340 claims of contributory copyright infringement, 340 claims of vicarious copyright infringement, one claim of breach of contract, and one claim of breach of the covenant of good faith and fair dealing. MGM moved for dismissal under Federal Rule of Civil Procedure 12(b)(6), arguing that many of Starz's copyright infringement claims are barred by the Supreme Court's decision in Petrella.

The district court concluded that Petrella left unaffected the discovery rule—that under the Copyright Act there exists "a three-year damages bar [under Section 507(b)] except when the plaintiff reasonably was not aware of the infringements at the time they occurred." The Ninth Circuit affirmed the district court's denial.

The court wrote that generally, a copyright claim accrues when the infringement occurs. The court held that Petrella did not do away with the discovery rule, under which a claim alternatively accrues when the copyright holder knows or reasonably should know that an infringement occurred. The court held that the discovery rule allows copyright holders to recover damages for all infringing acts that occurred before they knew or reasonably should have known of the infringing incidents, and the three-year limitations period runs from the date the claim accrued. The court held that the district court correctly applied the discovery rule, thus Plaintiff was not barred from seeking damages for all acts of infringement.

Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 77 of 109

Want to stay in the know about new opinions from the Ninth Circuit US    Collapse Summary
Court of Appeals?
Sign up for free summaries delivered directly to your inbox. Learn More ›

Case #6:23-cv-06025-FPG-MWP

**Court Description:** Copyright. The panel affirmed the district court's denial of a motion
to dismiss copyright infringement claims as barred by the three-year limitations period set
forth in 17 U.S.C. § 507(b). Generally, a copyright claim accrues when the infringement
occurs. The panel held that Petrella v. Metro- Goodwyn-Mayer, Inc., 572 U.S. 663 (2014),
did not do away with the discovery rule, under which a claim alternatively accrues when the
copyright holder knows or reasonably should know that an infringement occurred.
Declining to adopt the approach taken by the Second Circuit, the panel held that the
discovery rule allows copyright holders to recover damages for all infringing acts that
occurred before they knew or reasonably should have known of the infringing incidents,
and the three-year limitations period runs from the date the claim accrued. The panel held
that the district court correctly applied the discovery rule to conclude that plaintiff timely
filed its claims of copyright infringement. Because plaintiff brought its claims within three
years after they accrued, it was not barred from seeking damages for all acts of
infringement. STARZ ENTERTAINMENT V. MGM 3

**PRIMARY HOLDING**

The Ninth Circuit affirmed the district court's denial of a motion to dismiss copyright
infringement claims as barred by the three-year limitations period set forth in 17 U.S.C.
Section 507(b).

**Disclaimer:** Justia Annotations is a forum for attorneys to summarize, comment on, and
analyze case law published on our site. Justia makes no guarantees or warranties that the
annotations are accurate or reflect the current state of law, and no annotation is intended
to be, nor should it be construed as, legal advice. Contacting Justia or any attorney through
this site, via web form, email, or otherwise, does not create an attorney-client relationship.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

3b          1/23    3b

**Case #6:23-cv-06025-FPG-MWP**

## FOR PUBLICATION

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| STARZ ENTERTAINMENT, LLC, <br> *Plaintiff-Appellee,* <br><br> v. <br><br> MGM DOMESTIC TELEVISION DISTRIBUTION, LLC, <br> *Defendant-Appellant.* | No. 21-55379 <br><br> D.C. No. <br> 2:20-cv-04085- <br> DMG-KS <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted February 10, 2022
San Francisco, California

Filed July 14, 2022

Before: Kim McLane Wardlaw, Sandra S. Ikuta, and
Bridget S. Bade, Circuit Judges.

Opinion by Judge Wardlaw

3b        2/23

Case #6:23-cv-06025-FPG-MWP

2          STARZ ENTERTAINMENT V. MGM

## SUMMARY*

### Copyright

The panel affirmed the district court's denial of a motion to dismiss copyright infringement claims as barred by the three-year limitations period set forth in 17 U.S.C. § 507(b).

Generally, a copyright claim accrues when the infringement occurs. The panel held that *Petrella v. Metro-Goodwyn-Mayer, Inc.*, 572 U.S. 663 (2014), did not do away with the discovery rule, under which a claim alternatively accrues when the copyright holder knows or reasonably should know that an infringement occurred. Declining to adopt the approach taken by the Second Circuit, the panel held that the discovery rule allows copyright holders to recover damages for all infringing acts that occurred before they knew or reasonably should have known of the infringing incidents, and the three-year limitations period runs from the date the claim accrued.

The panel held that the district court correctly applied the discovery rule to conclude that plaintiff timely filed its claims of copyright infringement. Because plaintiff brought its claims within three years after they accrued, it was not barred from seeking damages for all acts of infringement.

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

3b       3/23
Case #6:23-cv-06025-FPG-MWP

STARZ ENTERTAINMENT v. MGM                3

## COUNSEL

Mark A. Perry (argued), Gibson Dunn & Crutcher LLP, Washington, D.C.; Orin Snyder, Gibson Dunn & Crutcher LLP, New York, New York; Blaine H. Evanson, Gibson Dunn & Crutcher LLP, Irvine, California; Jay P. Srinivasan, Gibson Dunn & Crutcher LLP, Los Angeles, California; for Defendant-Appellant.

J. Wesley Earnhardt (argued), Evan R. Chesler, and Justin C. Clarke, Cravath Swaine & Moore LLP, New York, New York; Robert N. Klieger, Hueston Hennigan LLP, Los Angeles, California; for Plaintiff-Appellee.

Tyler T. Ochoa, Santa Clara University School of Law, Santa Clara, California, for Amicus Curiae Professor Tyler T. Ochoa.

Benjamin H. Diessel and Michael Rondon, Wiggin and Dana LLP, New Haven, Connecticut; Nathan E. Denning, Wiggin and Dana LLP, New York, New York; for Amici Curiae Authors Guild Inc., and Other Artists' Rights Organizations.

3b        4/23

**Case #6:23-cv-06025-FPG-MWP**

4        STARZ ENTERTAINMENT V. MGM

## OPINION

WARDLAW, Circuit Judge:

The Copyright Act, 17 U.S.C. § 101 *et seq.*, provides that a civil action for copyright infringement is timely so long as it is "commenced within three years after the claim accrued." 17 U.S.C. § 507(b). Generally, the claim "accrues" when the infringement or violation of one of the copyright holder's exclusive rights occurs, known as the "incident of injury rule." In our circuit, and every other circuit to have reached the question, an exception to that infringement rule has developed. Known as the "discovery rule," a claim alternatively accrues when the copyright holder knows or reasonably should know that an infringement occurred.

In 2014, the Supreme Court addressed the interplay between § 507(b) and the doctrine of laches, holding that laches does not bar relief on a copyright infringement claim brought within § 507(b)'s three-year limitations period. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667–68 (2014). Since then, defendants accused of copyright infringement have seized upon certain language in *Petrella* to argue that the Court also did away with the discovery rule. Most courts, including the district court here, have rejected that argument, reasoning that *Petrella* addressed only the availability of laches in cases where the copyright owner is seeking damages for infringing acts that occurred during the three-year window before a claim is filed. Moreover, because *Petrella* noted, but did not pass upon, the discovery rule, any language in that opinion discussing relief beyond that window is dicta and did not affect the viability of the discovery rule. Because we agree with the district court that the discovery rule of accrual of copyright claims is alive and well, we affirm.

3/21/23, 11:28 AM
Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 82 of 109
PDF.js viewer

3b        5ḃ3
Case #6:23-cv-06025-FPG-MWP

## I.

### A.

#### 1. *The exclusivity agreements*

Starz Entertainment LLC (Starz) provides premium subscription video programming through a suite of premium cable television channels and on-demand services. The content Starz provides to subscribers includes original programming as well as popular movies and television shows licensed from other studios. To acquire external content, Starz enters into licensing agreements with studios and other copyright holders, providing Starz with the exclusive right to exhibit specific content on its services for a defined period.

On July 26, 2013, Starz entered into a licensing agreement (a "Library Agreement") with MGM Domestic Television Distribution LLC (MGM). The parties entered into a second Library Agreement on May 7, 2015, providing Starz with exclusive exhibition rights to more MGM-owned content. Together, the two Library Agreements provided Starz with the exclusive right to exhibit 585 movies and 176 television series episodes in exchange for about $70 million. More specifically, MGM granted Starz the exclusive right to exhibit those MGM-owned movies and television series episodes on Starz's suite of services within the United States for specified time periods ranging from months to years. For some titles, Starz secured multiple license periods from MGM, resulting in more than 1,000 separate license periods each operating on its own time frame. In addition to the exclusive exhibition rights, Starz received contractual warranties from MGM that it would not exhibit or license to third parties any of the licensed content in violation of Starz's exclusive rights.

3b      6 b3

**Case #6:23-cv-06025-FPG-MWP**

6      STARZ ENTERTAINMENT V. MGM

### 2. *Discovery of MGM's infringement*

In August 2019, a Starz employee discovered that one of the films covered by the licensing agreements, *Bill & Ted's Excellent Adventure*, was available to stream on Amazon Prime Video during Starz's exclusivity period. Starz notified MGM of its discovery, and MGM admitted that this improper license violated Starz's rights. MGM offered to provide additional periods of exclusivity to remedy this violation. At the time, MGM did not inform Starz of any additional potential exclusivity violations.

Starz decided to investigate further, and, by the end of August, discovered that twenty-two additional movies covered by the Library Agreements were available on Amazon Prime Video. MGM acknowledged these violations in September 2019. Starz then sought formal assurances from MGM in October 2019 that the identified titles were not licensed to any other service provider and that MGM licensed no other covered content in violation of the Library Agreements. Instead of those assurances, in November 2019, MGM provided Starz with a list of 136 movies and 108 television series episodes that had been licensed to other service providers (including MGM-owned rival service Epix) in violation of the Library Agreements. Starz continued to conduct its own investigation and subsequently identified nearly 100 additional movies not included on MGM's November list that were licensed to third parties during time periods they were exclusively licensed to Starz.

### B.

Starz sued MGM in May 2020, asserting 340 claims of direct copyright infringement, 340 claims of contributory copyright infringement, 340 claims of vicarious copyright

3/21/23, 11:28 AM
Case 6:23-cv-06025-FPG-MWP    Document 15-3    Filed 04/04/23    Page 84 of 109
PDF.js viewer

3b    7/23

Case #6:23-cv-06025-FPG-MWP

STARZ ENTERTAINMENT V. MGM                7

infringement, one claim of breach of contract, and one claim
of breach of the covenant of good faith and fair dealing. In
July 2020, MGM moved for dismissal under Federal Rule of
Civil Procedure 12(b)(6), arguing that many of Starz's
copyright infringement claims are barred by the Supreme
Court's decision in *Petrella*, which MGM asserts "imposes
a strict bar to collecting any damages for copyright
infringements that occur more than three years prior to the
filing of the complaint."[1]    In a well-reasoned order, the
district court concluded that *Petrella* left unaffected the
discovery rule—that under the Copyright Act there exists "a
three-year damages bar [under § 507(b)] *except* when the
plaintiff reasonably was not aware of the infringements at
the time they occurred."

## II.

The district court had jurisdiction pursuant to 28 U.S.C.
§ 1338, which confers subject matter jurisdiction over
copyright actions. At MGM's request, the district court
certified its order for interlocutory appeal, which we
accepted, vesting us with jurisdiction pursuant to 28 U.S.C.
§ 1292(b).

We review the district court's denial of a motion to
dismiss under Federal Rule of Civil Procedure 12(b)(6) de
novo. *Platt v. Moore*, 15 F.4th 895, 901 (9th Cir. 2021). We
accept all well-pleaded factual allegations contained in the
complaint as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678
(2009), and decide whether the complaint articulates
"enough facts to state a claim to relief that is plausible on its

---

[1] The parties entered into a tolling agreement that made the operative
date of the Complaint for assessing the statute of limitations March 24,
2020.

8        STARZ ENTERTAINMENT V. MGM

face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The district court's interpretations of the Copyright Act are reviewed de novo. *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 665 (9th Cir. 2017).

### III.

#### A.

17 U.S.C. § 507 establishes the statute of limitations under the Copyright Act: "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." The key question we must answer is when does a copyright infringement claim accrue?

A claim ordinarily accrues when the plaintiff has a "complete and present cause of action." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997) (citation omitted). In the copyright context, a claim accrues "when an infringing act occurs," *Petrella*, 572 U.S. at 670, *i.e.,* when the infringer "violates any of the exclusive rights of the copyright owner," *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1080 (9th Cir. 2021) (emphasis omitted) (quoting 17 U.S.C. § 501(a)), although this is not the only time a claim accrues, as explained below.

In *Roley v. New World Pictures, Ltd.*, 19 F.3d 479 (9th Cir. 1994), we addressed the situation of a continuing violation, where the copyright holder, Roley, had witnessed the original screening of a new movie in August 1987 that he claimed, at that time, infringed his screenplay. We held that a "cause of action for copyright infringement accrues when one has knowledge of a violation or is chargeable with such knowledge." *Id.* at 481. But Roley did not file his

3b    9/23

Case #6:23-cv-06025-FPG-MWP

---

STARZ ENTERTAINMENT v. MGM     9

complaint alleging infringement until February 1991. *Id.* at 480. He sought the benefit of the Seventh Circuit's then[2] view of the three-year limitation period, "that so long as any allegedly infringing conduct occurs within the three years preceding the filing of the action, the plaintiff may reach back and sue for damages or other relief for all allegedly infringing acts," beginning when the first infringing act occurred, no matter how long ago. *Id.* at 481 (citing *Taylor v. Meirick*, 712 F.2d 1112, 1118–19 (7th Cir. 1983)). We squarely rejected that theory of recovery for continuing copyright violations, holding that Roley could recover only for infringing acts that occurred within the three years preceding the filing of the copyright infringement lawsuit. *Id.* Thus, as early as 1994, we both recognized the discovery rule in the "specific context of cases where infringement and accrual happen simultaneously," and that when the copyright holder knew of earlier infringing acts, recovery was allowable only for infringing acts occurring within the three-year window before commencing suit.

Our subsequent decision in *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004) (as amended), recognized the latter point—that *Roley* did not create a bar against recovery for acts of infringement that occurred prior to the three-year window. Rather, *Roley* held that a claim accrues at "the moment when the copyright holder 'has knowledge of a violation or is chargeable with such knowledge,'" and therefore "the three-year clock begins upon discovery of the infringement." *Id.* at 706 (quoting

---

[2] At that time, the Seventh Circuit applied the "continuing violation" doctrine to copyright infringement. It has since recognized that the "'continuing violation' doctrine is incompatible with the separate-accrual rule of § 507(b) . . . ." *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 616 (7th Cir. 2014).

3b    10/23
Case #6:23-cv-06025-FPG-MWP

10          STARZ ENTERTAINMENT V. MGM

*Roley,* 19 F.3d at 481).   Therefore, under *Roley,* § 507(b)
does not prohibit the recovery of damages for infringing acts
that occurred outside the three-year window so long as "the
copyright plaintiff was unaware of the infringement, and that
lack of knowledge was reasonable under the circumstances."
*Id.*  We reasoned:

> Without the benefit of tolling in this situation,
> a copyright plaintiff who, through no fault of
> its own, discovers an act of infringement
> more than three years after the infringement
> occurred would be out of luck.  Such a harsh
> rule would distort the tenor of the statute.
> Section 507(b), like all statutes of limitations,
> is primarily intended to promote the timely
> prosecution of grievances and discourage
> needless delay.  It makes little sense, then, to
> bar damages recovery by copyright holders
> who have no knowledge of the infringement
> . . . .

*Id.*  In other words, a claim for copyright infringement may
accrue when the copyright owner discovers, or reasonably
should have discovered, the infringement. *Id.* at 705.

     In addition to first establishing the discovery rule, *Roley*
was important for another reason—while not labeling it as
such, it recognized the "separate accrual" rule.  In examining
whether any actionable conduct occurred in the three years
before Roley filed his complaint, we recognized that the
statute of limitations runs separately for each successive
incident of infringement.   *See Roley,* 19 F.3d at 481.
Although we held that "an action may be brought for all acts
that accrued within the three years preceding the filing of the
suit," in an ironic twist, Roley was unable to adduce any

3b    14/23

Case #6:23-cv-06025-FPG-MWP

STARZ ENTERTAINMENT V. MGM          11

evidence of any infringing act that occurred during that period. *Id.* at 481–82.

Fast forward two decades from *Roley* to *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014). There, the Supreme Court was tasked with determining whether the doctrine of laches could bar claims of infringement that accrued within the three-year window of § 507(b). Paula Petrella, the heir to the author of the 1963 screenplay upon which MGM's 1980 movie *Raging Bull* was based, renewed the copyright in the 1963 screenplay. *Petrella*, 572 U.S. at 673. She became aware that she had a copyright infringement claim against MGM for its continued exploitation of *Raging Bull* at least as early as 1998, but she waited to commence an action until January 6, 2009, when the movie began to show profits. *Id.* at 674–75. However, recognizing that the statute of limitations for copyright claims requires commencement of suit within three years after the claim accrued, 17 U.S.C. § 507(b), Petrella sought damages for only those acts of infringement that occurred on or after January 6, 2006. *Id.* at 674–75. MGM asserted the defense of laches based on Petrella's knowledge of her potential infringement claim since 1998. *Id.* at 675.

The Court held that laches is not a defense to claims for relief for violations that accrue within the three-year limitations window. It first explained that "the separate-accrual rule attends the copyright statute of limitations," such that "each infringing act starts a new limitations period." *Id.* at 671. Thus, in deciding that laches is inapplicable, the Court explained that "the copyright statute of limitations, § 507(b), itself takes account of delay." *Id.* at 677. It continued:

> As earlier observed, a successful plaintiff can
> gain retrospective relief only three years back

Case #6:23-cv-06025-FPG-MWP

12      STARZ ENTERTAINMENT V. MGM

> from the time of suit.  No recovery may be
> had for infringement in earlier years.  Profits
> made in those years remain the defendant's to
> keep.  Brought to bear here, § 507(b) directs
> that MGM's returns on its investment in
> Raging Bull in years outside the three-year
> window (years before 2006) cannot be
> reached by Petrella.  Only by disregarding
> that feature of the statute, and the separate-
> accrual rule attending § 507(b), could the
> Court of Appeals presume that infringing acts
> occurring before [three years prior to filing
> suit] bar all relief, monetary and injunctive,
> for infringement occurring on and after that
> date.

*Id.* (cleaned up).

The discovery rule had no place in the Court's laches
analysis, nor could it.  In the course of discussing the
question of when a claim accrues, the Court stated the
general rule: A copyright claim "'accrue[s]' when an
infringing act occurs," which it labeled "the incident of
injury rule."  *Id.* at 670 (alteration in original).  It then
dropped a footnote, noting that

> [N]ine Courts of Appeals have adopted, as an
> alternative to the incident of injury rule, a
> "discovery rule," which starts the limitations
> period when "the plaintiff discovers, or with
> due diligence should have discovered, the
> injury that forms the basis for the claim."
> *William A Graham Co. v. Haughey*, 568 F.3d
> 425, 433 (3d. Cir. 2009) (internal quotation
> marks omitted).  *See also* 6 W. Patry,

3b                    3-/23
Case #6:23-cv-06025-FPG-MWP

STARZ ENTERTAINMENT V. MGM                    13

> Copyright § 20:19, p. 20–28 (2013) . . . ("The
> overwhelming majority of courts use
> discovery accrual in copyright cases.").

*Id.* at 670 n.4. However, the Court expressly noted that it
had "not passed on the question," and it did not do so in
*Petrella.* *Id.* Nor has it had the occasion to address the
discovery rule since. *See, e.g., SCA Hygiene Prods.
Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct.
954, 962 (2017) (recognizing that the Court has not decided
"whether the Copyright Act's statute of limitations is
governed by [a discovery] rule"). And because the *Petrella*
Court was solely concerned with laches—a doctrine
addressing concerns about delay when plaintiffs know of
their claims, but sleep on their legal rights[3]—it could not
have intended its language to address the situation where a
copyright holder does not know about the infringing act to
which the discovery rule, not the incident of injury rule,
applies. It thus seems fair to draw the conclusion that in
*Petrella*, "the Court acknowledged that the 'incident of
injury' rule it described in the main text of the case is not the
only [accrual] rule that federal courts apply in copyright
infringement cases," *Mitchell v. Capitol Recs., LLC*, 287 F.
Supp. 3d 673, 677 (W.D. Ky. 2017), but said nothing else
about the discovery rule's continued viability.

---

[3] *See* Restatement (Second) of Torts § 939 (1979) (defining laches
as an equitable remedy that may bar relief where there is "delay by the
plaintiff in bringing suit, after he knew or should have known of the tort
. . . if the delay has operated to the prejudice of the defendant or has
weakened the court's facility of administration").

3b    13/23
Case #6:23-cv-06025-FPG-MWP

14     STARZ ENTERTAINMENT V. MGM

### B.

"The overwhelming majority of courts" today use the discovery rule for determining accrual in copyright cases. *See* 6 William F. Patry, *Patry on Copyright* § 20:19 (2013) (collecting cases). Our circuit has continued to apply the discovery rule post *Petrella*. *See Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1047 (9th Cir. 2020) ("[A] copyright infringement claim accrues—and the statute of limitations begins to run—when a party discovers, or reasonably should have discovered, the alleged infringement."); *Media Rts. Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1022 (9th Cir. 2019) (same). But most circuit courts, including ours, have not yet addressed whether *Petrella* imposed a damages bar separate from the statute of limitations, as MGM suggests.

The Second Circuit is the only exception. *See Sohm v. Scholastic Inc.*, 959 F.3d 39 (2d Cir. 2020). There, Sohm, a professional photographer, entered into an agreement with different agencies to issue limited licenses to third parties to use his photographs. *Id.* at 42. In 2004, one of those agencies entered into an agreement with Scholastic, a publisher and distributor of children's books, that established fees for certain print-run ranges of Sohm's photos. *Id.* Some twelve years later, in May 2016, Sohm sued Scholastic for copyright infringement, alleging that Scholastic used his photos in numbers in excess of those contemplated in the monthly invoices governing Scholastic's licenses. *Id.* Scholastic moved for summary judgment, arguing that the incident of injury rule should apply to determine when Sohm's claim accrued and, even if the discovery rule applied, first, Sohm should have discovered the ongoing infringements more than three years before he filed suit, and second, that *Petrella* created a

3b    15/23

Case #6:23-cv-06025-FPG-MWP

STARZ ENTERTAINMENT V. MGM     15

"damages bar" such that damages should be strictly limited to three years from the time the complaint was filed. *See id.* at 44. The district court rejected each of Scholastic's arguments, applied the discovery rule, found Sohm was not on inquiry notice three years before he filed suit, and was thus entitled to damages for infringing acts before the three-year period preceding suit. *See id.*

The Second Circuit affirmed the district court's grant of summary judgment, concluding "that the discovery rule applies for statute of limitations purposes in determining when a copyright infringement claim accrues under the Copyright Act." *Id.* at 50. It explained that "an infringement claim does not 'accrue' until the copyright holder discovers, or with due diligence should have discovered, the infringement," citing its binding precedent in *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120 (2d Cir. 2014). *Sohm*, 959 F.3d at 50. It recognized that the Supreme Court in *Petrella* "specifically noted that it was not passing on the question of the discovery rule," a position that was "reaffirmed" in *SCA Hygiene Products*. *Id.* "Consequently," the Second Circuit found that "in light of the Supreme Court's direct and repeated representations that it has not opined on the propriety of the discovery or injury rules, it would contravene settled principles of *stare decisis* for this Court to depart from its prior holding in *Psihoyos* on the basis of *Petrella*." *Id.*

The Second Circuit next considered whether the district court correctly found that Sohm "did not discover, nor with due diligence should have discovered, Scholastic's purported copyright infringements more than three years prior to when he filed suit." *Id.* It concluded that Scholastic failed to identify any facts or circumstances that would have put Sohm on inquiry notice that Scholastic was infringing its

3b                1/23
Case #6:23-cv-06025-FPG-MWP

16          STARZ ENTERTAINMENT V. MGM

copyrights, reasoning that "Scholastic cannot rely on the passage of time alone to establish that Sohm should have discovered" the infringing acts. *Id.* at 51. It upheld the district court's determination that Sohm's claims accrued within the statute of limitations—that he discovered the earlier acts of infringement within the three-year period before he filed suit. That should have been the end of discussion, but it wasn't.

Scholastic, like MGM here, went on to argue that even if the discovery rule means the pre-three-year window claims timely accrued, *Petrella* created a separate damages bar that limits damages to only those arising from acts of infringement within the three-year window. The Second Circuit agreed, holding that the *Petrella* Court "explicitly delimited damages to the three years prior to the commencement of a copyright infringement action." *Id.* It found that "*Petrella*'s plain language explicitly dissociated the Copyright Act's statute of limitations from its time limit on damages." *Id.* at 52. The Second Circuit reasoned from *Psihoyos* and certain language in *Petrella* that "we must apply the discover[y] rule to determine when a copyright infringement claim accrues, but a three-year lookback period from the time a suit is filed to determine the extent of the relief available." *Id.* Accordingly, the *Sohm* court concluded that "a plaintiff's recovery is limited to damages incurred during the three years prior to filing suit," even where the copyright holder was unaware of the infringing acts, and the district court's contrary conclusion was in error. *Id.*

## C.

MGM asks us to adopt the approach taken by the Second Circuit in *Sohm*, and hold, in light of *Petrella*, that the damages that Starz may recover on its infringement claims

-3b
Case #6:23-cv-06025-FPG-MWP

are strictly limited to damages for the incidents of infringement that occurred during the three-year period before Starz filed suit, without regard to the date of accrual. We disagree that such a limitation on recovery of damages is dictated by *Petrella*. We hold that the discovery rule for accrual allows copyright holders to recover damages for all infringing acts that occurred before they knew or reasonably should have known of the infringing incidents and that the three-year limitations period runs from the date the claim accrued, *i.e.*, from the date when the copyright holder knew or should have known of the infringement.

Applying a separate damages bar based on a three-year "lookback period" that is "explicitly dissociated" from the Copyright Act's statute of limitations in § 507(b) would eviscerate the discovery rule. There is no reason for a discovery rule if damages for infringing acts of which the copyright owner reasonably becomes aware years later are unavailable. This case provides a textbook example of the absurdity of such a rule. The Library Agreements between Starz and MGM covered hundreds of titles under separate time periods, and some of the exclusivity periods ended as early as 2013. Under the approach urged by MGM and adopted in *Sohm*, damages may only be recovered for a 2013 infringement if the complaint is filed within three years of 2013, or by 2016. But here, Starz did not discover *any* infringement until August 2019, and Starz brought suit less than a year later. Thus, while Starz's copyright infringement claim accrued upon discovery in August 2019, and was therefore timely under § 507(b) because the complaint was filed before August 2022, under MGM's theory, that same act of infringement has been nonrecoverable since 2016. As the district court noted, under *Sohm*'s rule, "[t]o the extent the discovery rule 'saved' the claims, it was a pyrrhic victory." Moreover, recognizing a damages bar would

3b

Case #6:23-cv-06025-FPG-MWP

18 STARZ ENTERTAINMENT V. MGM

render the "discovery rule" functionally identical to the "incident of injury" rule. *See* Br. of Amicus Curiae Professor Tyler Ochoa in Supp. of Pl.-Appellee & Affirmance at 13–15. By purporting to apply the discovery rule but imposing a three-year damages bar, *Sohm* is inherently self-contradictory. *See* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.05[B][2][d][ii] (2021) ("But, immediately after nominally reaffirming the discovery rule, *Sohm v. Scholastic* took a hundred-and-eighty degree turn . . . In sum, the practical import of this case is to adopt the injury rule and reject the discovery rule that it had previously upheld."). The overwhelming majority of district courts in discovery rule circuits has rejected the concept of a damages bar in discovery rule cases, as Starz argues.[4]

---

[4] Starz cites in its brief nearly thirty cases that have explicitly or implicitly rejected the notion that *Petrella*, a non-discovery rule case, created a damages bar in cases where the discovery rule applies. *See, e.g., Marrix Photo, Inc. v. Rant Media Network, LLC*, No. CV 19-7270-DMG-AFMx, 2020 WL 8028098, at *4 (C.D. Cal. Nov. 2, 2020); *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 516 F. Supp. 3d 121, 135 (D.N.H. 2021); *Stross v. Hearst Commc'ns, Inc.*, No. SA-18-CV-01039-JKP, 2020 WL 5250769, at *8 (W.D. Tex. Sept. 3, 2020); *Menzel v. Scholastic, Inc.*, No. 17-CV-05499-EMC, 2019 WL 6896145, at *6 (N.D. Cal. Dec. 18, 2019); *Adobe Sys. Inc. v. NA Tech Direct Inc.*, No. 17-cv-05226-YGR, 2019 WL 5579472, at *8 (N.D. Cal. Oct. 29, 2019); *Krasemann v. Scholastic, Inc.*, No. CV-18-08313-PCT-DWL, 2019 WL 3220535, at *7 (D. Ariz. July 17, 2019); *Evox Prods. LLC v. Chrome Data Sols., LP*, No. 3:16-cv-0057-PK, 2018 WL 6059530, at *16 (D. Or. Sept. 6, 2018); *Kelly v. Maricopa Cnty. Sheriff's Off.*, No. CV-15-02572-PHX-GMS, 2017 WL 6054675, at *2 (D. Ariz. Dec. 7, 2017); *Phoenix Techs. Ltd. v. VMware, Inc.*, No. 15-cv-01414-HSG, 2017 WL 1289863, at *7 (N.D. Cal. Jan. 6, 2017); *Yue v. MSC Software Corp.*, No. 15-cv-05526-PJH, 2016 WL 3913001, at *1 (N.D. Cal. July 20, 2016); *Wolf v. Travolta*, 167 F. Supp. 3d 1077, 1092–93 (C.D. Cal. 2016); *UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*, No. CV 14-3466

3b      19/23

**Case #6:23-cv-06025-FPG-MWP**

STARZ ENTERTAINMENT V. MGM    19

The Supreme Court did not create a damages bar separate from the statute of limitations in *Petrella*. The language that MGM relies on in *Petrella* is relevant only to incident of injury rule cases, not to cases where we apply the discovery rule. MGM relies, like the Second Circuit in *Sohm*, on the *Petrella* Court's statement that "the statute 'itself takes account of delay' by limiting damages to the three years prior to when a suit is filed." *Sohm*, 959 F.3d at 52 (quoting *Petrella*, 572 U.S. at 677). This statement is accurate when the incident of injury rule applies because the

MMM (JPRx), 2015 WL 12752881, at *8 (C.D. Cal. Aug. 27, 2015); *Oracle USA, Inc. v. Rimini St., Inc.*, No. 2:10-CV-00106-LRH-PAL, 2015 WL 5089779, at *6 (D. Nev. Aug. 27, 2015); *Richardson v. Kharbouch*, No. 19-C-02321, 2020 WL 1445629, at *6–7 (N.D. Ill. Mar. 25, 2020); *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, 305 F. Supp. 3d 788, 792–94 (N.D. Ohio 2018); *Energy Intel. Grp., Inc. v. CHS McPherson Refinery, Inc.*, 300 F. Supp. 3d 1356, 1371 (D. Kan. 2018); *Krist v. Scholastic, Inc.*, 253 F. Supp. 3d 804, 811–12, 812 n.44 (E.D. Pa. 2017); *Mitchell* 287 F. Supp. 3d at 677–78; *Design Basics, LLC v. McNaughton Co.*, No. 3:17-cv-258, 2017 WL 11068761, at *4–5 (M.D. Pa. Nov. 15, 2017); *Boehm v. Svehla*, No. 15-cv-379-jdp, 2017 WL 4326308, at *8–9 (W.D. Wis. Sept. 27, 2017); *Topline Sols., Inc. v. Sandler Sys., Inc.*, No. ELH-09-3102, 2017 WL 1862445, at *21 (D. Md. May 8, 2017); *Alfa Laval Inc. v. Flowtrend, Inc.*, No. H-14-2597, 2016 WL 2625068, at *5–6 (S.D. Tex. May 9, 2016); *Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, LP*, No. H-14-1903, 2016 WL 1203763, at *4 (S.D. Tex. Mar. 22, 2016); *Raucci v. Candy & Toy Factory*, 145 F. Supp. 3d 440, 448 (E.D. Pa. 2015); *Design Basics LLC v. J & V Roberts Invs., Inc.*, 130 F. Supp. 3d 1266, 1281–82 (E.D. Wis. 2015); *Design Basics LLC v. Campbellsport Bldg. Supply Inc.*, 99 F. Supp. 3d 899, 919 (E.D. Wis. 2015); *Grant Heilman Photography, Inc. v. McGraw-Hill Cos., Inc.*, 28 F. Supp. 3d 399, 410–11 (E.D. Pa. 2014); *Frerck v. Pearson Educ., Inc.*, 63 F. Supp. 3d 882, 887 n.3 (N.D. Ill. 2014); *Beasley v. John Wiley & Sons, Inc.*, 56 F. Supp. 3d 937, 945 n.5 (N.D. Ill. 2014); *Panoramic Stock Images, Ltd. v. McGraw-Hill Glob. Educ. Holdings, LLC*, No. 12 C-9881, 2014 WL 6685454, at *3 (N.D. Ill. Nov. 25, 2014); *Frerck v. John Wiley & Sons, Inc.*, No. 11-cv-2727, 2014 WL 3512991, at *6 n.5 (N.D. Ill. July 14, 2014).

3b    20/23

**Case #6:23-cv-06025-FPG-MWP**

20    STARZ ENTERTAINMENT V. MGM

three-year look-back period from the date of filing suit is
coextensive with the three-year period following the act of
infringement. When accrual is triggered by the act of
infringement, we can accurately describe the statute of
limitations as running forward from the act of infringement
or looking backward from the date the complaint is filed—
either way it is the same exact period of time.

MGM argues that *Petrella*'s "look-back" language
created a three-year damages bar that is determined solely
by the date the complaint is filed even in cases where the
discovery rule applies. But the text of the statute provides
no support for this argument. In *Petrella*, the Court
explained that, in the Copyright Act, Congress provided for
just "two controlling time prescriptions: the copyright term
. . . and § 507(b)'s limitations period." *Petrella*, 572 U.S.
at 672. Section 507(b)'s limitation period is not based on the
date the complaint is filed, but instead limits civil actions to
"three years after the claim accrued." In other words, the
claim under the Copyright Act does not arise—is not even
actionable—until accrual.[5] Nowhere in § 507(b), or
anywhere else in the Copyright Act, is there any reference to
a separate three-year damages bar based on the complaint's
filing date. The Court did not disregard the plain text of the
Copyright Act and invent a third time prescription for
damages in a case where the issue was not before it. Plainly
the Court's look-back language was simply a shorthand for
the statute of limitations laid out in § 507(b) in incident of

---

[5] *See Black's Law Dictionary* (11th ed. 2019) (defining "accrue" as
"[t]o come into existence as an enforceable claim or right; to arise," and
providing the following example: "the plaintiff's cause of action for
silicosis did not accrue until the plaintiff knew or had reason to know of
the disease").

3/21/23, 11:28 AM
Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 98 of 109
PDF.js viewer

3b          2⁄23
Case #6:23-cv-06025-FPG-MWP

STARZ ENTERTAINMENT V. MGM            21

injury cases—where infringement and accrual occur
simultaneously.

Nor does § 504, the provision of the Copyright Act
governing damages, support the imposition of a damages
bar. Rather, § 504 allows recovery for "actual damages . . .
as a result of the infringement," "any profits . . . attributable
to the infringement," 17 U.S.C. § 504(b), or "statutory
damages for *all* infringements involved in the action," *id.*
§ 504(c)(1) (emphasis added). Had Congress intended to
limit recoverable damages or profits to those arising only
from acts of infringement during the three-year period before
suit was commenced, it would have said so, and said so in
§ 504, which sets forth detailed instructions as to the proper
calculation of actual and statutory damages and profits.

Finally, unlike laches which serves to discourage a
plaintiff from knowingly "sleeping upon his rights," where
the discovery rule applies, the plaintiff reasonably does not
know that he is in such a slumber. Adopting a damages bar
would mean that "a copyright plaintiff who, through no fault
of its own, discovers an act of infringement more than three
years after the infringement occurred would be out of luck.
Such a harsh rule would distort the tenor of the statute."
*Polar Bear*, 384 F.3d at 706. "Section 507(b), like all
statutes of limitations, is primarily intended to promote the
timely prosecution of grievances and discourage needless
delay." *Id.* It makes little sense to bar recovery of damages
beyond the three-years before the suit was filed where the
copyright holder did not delay, but acted in accordance with
§ 507(b) by filing his complaint within three years of
discovery. This is particularly true in a case such as this
where the alleged infringer knows of and controls the
infringing acts and the copyright holder has little means of
discovering those acts. This would incentivize violation of

3/21/23, 11:28 AM
Case 6:23-cv-06025-FPG-MWP   Document 15-3   Filed 04/04/23   Page 99 of 109
PDF.js viewer

Case #6:23-cv-06025-FPG-MWP

22          STARZ ENTERTAINMENT V. MGM

the copyright holder's exclusive rights, not protect those
rights, which is the purpose of the Copyright Act itself.[6]  As
amici argue, with the constant evolution of technology,
copyright infringement is now "easier to commit, harder to
detect, and tougher to litigate."  Br. of Amici Curiae The
Authors Guild, Inc. and Other Artists' Rights Organizations
in Sup. Of Pl.-Appellee & Affirmance at 3; *see also William
A. Graham Co. v. Haughey*, 568 F.3d 425, 437 (3d Cir. 2009)
("Technological advances such as personal computing and
the internet have [made] it more difficult for rights holders
to stridently police and protect their copyrights." (internal
quotation marks and citation omitted)).

The district court correctly concluded that "the best read
of *Petrella* is that it did not change *any* law in the Ninth
Circuit pertaining to the discovery rule and the three year
damages bar."  This is because the discovery rule is an
exception to the general incident of injury rule.  When
copyright infringement occurs prior to discovery, a simple
application of the general rule to the three-year statute of
limitations in § 507(b), undertaken by the Court in *Petrella*,
is impossible.  Instead, the three-year limitations period
begins only when the copyright holder knows or should
know of the infringing act.  Neither the text of the Copyright
Act nor *Petrella* imposes a three-year damages bar in a
discovery rule case.

---

[6] *See* 1 Nimmer, *supra*, § 1.02 (explaining that the Copyright Act,
like all copyright laws, serves to promote the progress of science and
other useful arts by providing protection for a limited time of certain
exclusive rights in their works).

3b    23/23

Case #6:23-cv-06025-FPG-MWP

STARZ ENTERTAINMENT V. MGM     23

### D.

The district court correctly applied the discovery rule to conclude that Starz timely filed its claims of copyright infringement. Taking all the facts in the complaint as true, there were no events that occurred that should have placed Starz on notice that MGM was violating its exclusive rights until Starz's employee discovered the movie *Bill & Ted's Excellent Adventure* on Amazon Prime Video in August 2019. And as the district court aptly put it, "When Starz did detect smoke, in the form of *Bill & Ted's Excellent Adventure*, it quickly discovered the fire and promptly sued for all 340 infringements." Because Starz brought its claim within three years after its claim accrued, Starz is not barred from seeking damages for all acts of infringement.

### IV.

We therefore affirm the district court's denial of MGM's motion to dismiss under Rule 12(b)(6).

### AFFIRMED.

casetext    CARA A.I.    Search with keywords, Booleans, or sentences    JX

Help   Sign In   Free Trial

Whitmill v. Warner Bros. Entertainment Inc.

PDF ···Read   Cited Authorities 22

Case #6:23-cv-06025-FPG-MWP

# Whitmill v. Warner Bros. Entertainment Inc.

**MEMORANDUM in Support of Motion re MOTION for Preliminary Injunction**

E.D. Mo.    April 28, 2011

Case: 4:11-cv-00752-CDP   Doc. #: 4   Filed: 04/28/11   Page: 1 of 10 PageID #: 31

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| S. VICTOR WHITMILL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 4:11-cv-752 |
| v. | ) |
| | ) |
| WARNER BROS. ENTERTAINMENT INC., | ) |
| | ) |
| Defendant. | ) |

### PLAINTIFF'S MEMORANDUM IN SUPPORT
### OF HIS MOTION FOR PRELIMINARY INJUNCTION

This is a straightforward case of reckless copyright infringement. Mr. Whitmill is a visual artist. He created what may be the most distinctive tattoo in the nation, namely, the work of art he create and applied onto the upper left side of the face of the former world heavyweight champion boxer Mike Tyson (the "Original Tattoo"). (Photographs of Mr. Whitmill in the process of creating the Original Tattoo and Mr. Tyson viewing the Original Tattoo immediately after it was created are attached as Exhibits 1 and 2 to Verified Complaint.)

Mr. Whitmill has learned that Defendant Warner Bros. Entertainment Inc. is planning to releas a motion picture later this Spring entitled **THE HANGOVER 2** (the "Movie") that features an exact reproduction of the Original Tattoo, but on the face of one of the stars of the Movie (the "Pirated Tattoo"). That the Pirated Tattoo plays an important role in the Movie is underscored by Defendant's prominent and repeated use of the Pirated Tattoo in the various promotional and marketing materials it is using to advertise the Movie. (*See* the poster for the Movie, which is attached as Exhibit 6 to the Verified Complaint.)

These actions of Warner Bros. already infringe Mr. Whitmill's copyright in the Original Tattoo

Whitmill v. Warner Bros. Entertainment Inc.

trial on the merits.

## SUMMARY OF THE PERTINENT FACTS

### The Original Tattoo

The Original Tattoo is an original work of authorship fixed in a tangible medium of expression and thus is a work of visual art protected by copyright. 17 U.S.C. § 102. Mr. Whitmill owns the copyright in the Original Tattoo, as even Mr. Tyson acknowledged in writing at the time Mr. Whitmill created it back in 2003. (*See* release form signed by Mr. Tyson (Exhibit 3 to Verified Complaint)). A copy of Mr. Whitmill's Certificate of Registration of the copyright in the Original Tattoo is attached as Exhibit 5 to the Verified Complaint.

Mr. Whitmill has valued the exclusive rights he possesses in the Original Tattoo. He has *never* created a copy of the Original Tattoo on anyone else and has *never* licensed or otherwise authorized anyone else to make copies of or derivative works based upon the Original Tattoo.

That Mr. Whitmill is the artist who created the Original Tattoo is a fact that has been publicly disseminated over the years by, among others, Mr. Tyson himself, who has stated that fact in interviews that have been published in print, broadcast on television, shown in motion picture theaters, and disseminated on the Internet.

Moreover, Mr. Whitmill himself is easy to locate. Although he now lives and works in rural Missouri, he continues to operate a studio under the name Paradox Studio and maintains a website displaying his works and providing directions to his studio and information on how to contact him and make an appointment.

### The Infringing Tattoo

Mr. Whitmill recently learned that Defendant plans to release the Movie later this Spring and that the Movie prominently features the Pirated Tattoo. The Pirated Tattoo is substantially similar-

2

casetext

Whitmill v. Warner Bros. Entertainment Inc.

Read    Cited Authorities 22

4    3/9

**Case #6:23-cv-06025-FPG-MWP**

Original Tattoo.

Mr. Whitmill has never been asked by Warner Bros. or anyone else for permission for, and has never consented to, the use, reproduction, or creation of a derivative work based on his Original Tattoo, including the Pirated Tattoo. Nor has he ever been asked or agreed to the public display an distribution of a motion picture containing the Pirated Tattoo, or to the use of any of his other exclusive rights in the Original Tattoo under the Copyright Act.

### Potential Violation of Other Rights of Mr. Whitmill

Because he has not seen the Movie, Mr. Whitmill does not yet know whether Warner Bros. has violated other rights of his. However, there appears to be at least a likelihood that the Warner Bros Movie has violated his moral rights under Section 106A of the Copyright Act, 17 U.S.C. § 106A an has committed actionable libel, as follows:

Moral Rights. The Original Tattoo is a work of visual art under Section 106A, which gives Mr. Whitmill the exclusive right "to claim authorship of that work" and "to prevent the use of his nam as the author of the work of visual art in the event of a distortion, mutilation or other modification of the work which would be prejudicial to his or her honor or reputation." Until defendant is required to show the Movie to Mr. Whitmill, he cannot assess whether his moral rights have been violated.

Libel. Mr. Whitmill has worked hard to establish his reputation as a responsible, reliable, and dedicated visual artist who insures the consent and safety of his clients. For example, he refuses to create a tattoo on a client who appears to be inebriated. The news media reports on the Movie strongly suggest that the version of the tattoo artist in the Movie is nearly the polar opposite of Mr Whitmill. For example, the HOLLYWOOD REPORTER issue of October 18, 2010, reported that "the tattoo artist character is 'pivotal' to the plot which features one of the characters going under the

3

 casetext                                                        Sign In   Free Trial

Whitmill v. Warner Bros. Entertainment Inc.                    

2011), reports that the character of the tattoo artist "is described as 'crazy' and 'intense' and 'someone you're afraid to talk to.'"[2] Given that Mr. Whitmill is the artist who created the Original Tattoo, these reports, if accurate, strongly suggest that he could sufferable irreparable damage to his reputation from release of the Movie.

ARGUMENT

Warner Bros. should be enjoined from further copying, distributing, publicly displaying, or otherwise infringing Plaintiff's copyright in his Original Tattoo and/or contributing or inducing others to infringe the same, because Plaintiff is likely to succeed at a trial on the merits of Plaintiff' claims. Plaintiff can clearly demonstrate that he owns a valid copyright and that Warner Bros. is itself copying the original elements of that copyright, and/or inducing and/or contributing to the infringement of that copyright by others.

**I.      All Equitable Considerations Entitle Mr. Whitmill to a Preliminary Injunction.**

In deciding whether to enter a preliminary injunction, courts consider: (i) the probability the movant will succeed on the merits; (ii) the threat of irreparable harm to the movant; (iii) the balance of hardships between the parties; and (iv) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981) *(en banc); see also Coca-Cola Co. v. Purdy,* 382 F.3d 774, 782 (8th Cir. 2004); *Entergy, Ark., Inc. v. Nebraska,* 210 F.3d 887, 898 (8th Cir. 2000); *Aaron v. Target Corp.,* 269 F. Supp. 2d 1162, 1169-70 (E.D. Mo. 2003). "No single factor in itself is dispositive; rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction." *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1179 (8th Cir. 1998). Here, all of the

---

[1] *See* http://www.hollywoodreporter.com/news/mel-gibson-appear-tattoo-artist-31340.

[2] *See* http://www.hollywoodreporter.com/news/why-liam-neesons-cameo-was-176706.

4

casetext        Sign In   Free Trial

Whitmill v. Warner Bros. Entertainment Inc.

Read    Cited Authorities 22

Case #6:23-cv-06025-FPG-MWP

preliminary injunction against Warner Bros.

**II.     Mr. Whitmill Can Establish a Reasonable Likelihood of Success on the Merits of his Copyright Infringement Claim.**

A copyright infringement plaintiff only needs to prove that he owns a valid copyright and that the original elements of the copyrighted work were copied. *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726, 731 (8th Cir. 2006) (quoting *Taylor Corp. v. Four Seasons Greetings, LLC*, *Taylor Corp. II*, 403 F.3d 958, 962-63 (8th Cir. 2005) (internal quotations omitted)); *Moore v. Columbia Pictures Indus., Inc.*, 972 F.2d 939, 941 (8th Cir.1992). "Copying may be established (1) by direct evidence or (2) by showing that the defendants had access to the copyrighted materials and showing that substantial similarity ideas and expression existed between the alleged infringing materials and the copyrighted materials *Id.* (citing *Hartman v. Hallmark Cards, Inc.*, 833 F.2d 177 (8th Cir. 1987)).

**A.     Mr. Whitmill Owns a Valid Copyright in the Original Tattoo He Created.**

The Original Tattoo at issue here is the subject of U.S. Copyright Registration No. VA 1-767-704. Mr. Whitmill created the Original Tattoo while he was applying it to the face of Mr. Tyson.  The Original Tattoo was entitled to copyright protection at that moment of completion. 17 U.S.C. § 102(a) (original work fixed in fixed in tangible medium of expression entitled to copyright protection). The Original Tattoo is "fixed" in that it can be perceived, with or without the aid of a machine, for more than a transitory duration. *See* 17 U.S.C. § 101, 102(a). "[O]riginality requires independent creation plus a modicum of creativity." *Feist Publ'n., Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 346 (1991). This level of creativity and independent creation readily meets the minimal requirements for copyright protection. *See* 1 NIMMER ON COPYRIGHTS § 2.01[B] ("even [the] most commonplace and banal results of independent effort may command copyright

5

casetext                            Ⓢ        Sign In   Free Trial

Whitmill v. Warner Bros. Entertainment Inc.

Read    Cited Authorities  22

copyright.

Mr. Whitmill's ownership is likewise beyond dispute. A copyright is owned by its author at the moment it is created and may only be transferred by a written assignment. Mr. Whitmill is the creator and author of the Original Tattoo and the photograph in Verified Complaint Exhibit 1, shows Mr. Whitmill in the act of creation as he is applying the Original Tattoo on Mr. Tyson.

**B.   Warner Bros. Infringed Mr. Whitmill's Copyright by First Copying the Original Tattoo from Mr. Tyson's Face to Another Actor's Face and then by Repeatedly Copying, Reproducing, and Distributing the Pirated Tattoo in an Effort to Advertise, Promote, and Sell The Hangover 2.**

There is little question that copyright infringement exists here. A party can use direct evidence demonstrate that constituent elements of the original work were copied by the allegedly infringing work. On information and belief, a significant plot element of The Movie involves the creation of the Pirated Tattoo by copying the Original Tattoo from Mr. Tyson to one of the movie's main characters. In other words, the plot of the movie hinges upon the copying of the Original Tattoo.

Even if there were no such direct evidence of copying, "[c]opying may be established . . . by showing that the defendants had access to the copyrighted materials and showing that substantial similarity of ideas and expression existed between the alleged infringing materials and the copyrighted materials." *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726, 731 (8th Cir.2006) (citing *Hartm v. Hallmark Cards, Inc.*, 833 F.2d 117, 120 (8th Cir.1987)). There can be no dispute that Warner Bro has had access to the Original Tattoo, which is one of the most famous tattoos in America. Indeed a Google search for "Tyson face tattoo" turns up over 3 million results, including 493,000 images that tattoo. And, of course, Mr. Tyson has a role in **THE HANGOVER 2**. So, this Court need only examine the substantial similarity between the Original Tattoo and the Pirated Tattoo.

6

 casetext

Whitmill v. Warner Bros. Entertainment Inc.

Case #6:23-cv-06025-FPG-MWP

Read    Cited Authorities 22

 

In examining the substantial similarity issue, *Hartman* instructs the Court to employ a two-step analysis. "First, similarity of ideas is analyzed extrinsically, focusing on objective similarities in the details of the works." *Hartman*, 833 F.2d at 120. The extrinsic test considers "'such objective criteri as the type of artwork involved, the materials used, the subject matter, and the setting for the subject.'" *Rottlund Co.*, 452 F.3d at 731 (quoting *Nelson v. PRN Prods.*, Inc., 873 F.2d 1141, 1143 (8th Cir.1989)). "Second, if there is substantial similarity in ideas, similarity of expression is evaluated using an intrinsic test depending on the response of the ordinary, reasonable person to the forms c expression." *Hartman*, 833 F.2d at 120.

After copying the Original Tattoo to create the Pirated Tattoo, Warner Bros. photographed an filmed the Pirated Tattoo. Based upon the Movie poster, trailers, and reports in the news media, th Movie appears to be based, at least in part, upon the Original Tattoo. As a result, Warner Bros. has created many separate derivative works, including the Movie, Movie trailers, and Movie posters tha

7



Whitmill v. Warner Bros. Entertainment Inc.

Read    Cited Authorities 22

Case #6:23-cv-06025-FPG-MWP

derivative work as "work based upon one or more preexisting works [in form] in which a work may be recast, transformed, or adapted"). Significantly, Warner Bros. apparently (according to its advertisements) intends to distribute the infringing Movie throughout the country beginning May 2, 2011. This would infringe Mr. Whitmill's exclusive right to authorize derivative works. *See Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1373 (2d Cir. 1993) (infringement of exclusive right to make derivative work found where derivative work contains substantial amount of material from copyrighted work).

Even without reviewing the Movie and assessing additional potential claims for libel or violation of Mr. Whitmill's moral rights, he is likely to succeed on the merits of his copyright infringement claim and this justifies granting the requested preliminary injunction.[3]

III.    **Continued Infringement of the Original Tattoo Copyright Will Irreparably Injure Plaintiff.**

"Once the movant has established the likelihood of success on the merits [in a copyright infringement case], irreparable harm is presumed." *West Pub. Co. v. Mead Data Central, Inc.*, 799 F.2d 1219, 1229 (8th Cir. 1986); *DF Inst. Inc. v. Marketshare EDS*, 84 USPQ 2d 1206, 1212 (D. Minn. 2007). A copyright owner "certainly has the right to control the use of its copyrighted materials, and irreparable harm inescapably flows from the denial of that right." *Taylor Corp. II*, 403 F.3d at 968. In addition to this presumption, irreparable harm is established where damages are difficult to measure. *Capitol Records Inc. v. Thomas-Rasset*, 680 F. Supp. 2d 1045, 1060 (D. Minn. 2010).

Mr. Whitmill will suffer irreparable harm unless Warner Bros. is enjoined from infringing the Original Tattoo. So far, Warner Bros. has infringed Mr. Whitmill's copyright through its advertisement and promotion of the movie. Warner Bros.'s planned widespread distribution of the

---

[3] When a movant demonstrates that he is likely to succeed on one of his claims entitling him to injunctive relief, the Court does not need to address the remaining claims. *Metric & Multistandard Components Corp. v. Metric's Inc.*, 635 F.2d 710, 715 (8th Cir. 1980).

8



Read    Cited Authorities 22

adequately compensated with money damages. Mr. Whitmill "certainly has the right to control the

use of its copyrighted materials." *Taylor Corp. II*, 403 F.3d at 968. "The harm [Mr. Whitmill] face[s]

irreparable and monetary damages are inadequate precisely because actual damages are difficult to

Make your practice more effective and efficient with Casetext's legal research suite.

Get a Demo

Pricing

Switch

Big firm

Coverage

SmartCite

Law school

Bar associations

About us

Jobs

Blog

Twitter

Facebook

LinkedIn

Instagram

Help articles

Customer support

Contact sales

Privacy

Terms

© 2023 Casetext Inc.

Casetext, Inc. and Casetext are not a law firm and do not provide legal advice.