UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LETICIA LEE,

                           Plaintiff,                        DECISION AND ORDER

v.                                                 Case # 6:23-cv-06025-FPG

WARNER MEDIA, LLC; HBO HOME
ENTERTAINMENT, INC.; WARNER BROS.
WORLDWIDE TELEVISION DISTRIBUTION
INC.; NBC UNIVERSAL TELEVISION
STUDIO DIGITAL DEVELOPMENT LLC;
CBS BROADCASTING INC.; GRAMMNT NH
PRODUCTIONS,

                               Defendants.
_____

## INTRODUCTION

On November 9, 2022, Plaintiff commenced the present action in the Supreme Court of the State of New York, Ontario County, asserting claims of copyright infringement against Warner Media, LLC, HBO Home Entertainment, Inc., Warner Bros. Worldwide Television Distribution Inc., NBC Universal Television Studio Digital Development LLC, CBS Broadcasting Inc., and Grammnet NH Productions (collectively, the "Defendants"). On November 16, 2022, Plaintiff amended her complaint (as amended, the "Amended Complaint") and served a copy of the Amended Complaint on each Defendant between December 12, 2022 and January 6, 2023. On January 11, 2023, Defendants, together, removed the action to this Court pursuant to 28 U.S.C. §§§ 1331, 1441, and 1446.

The Amended Complaint, which incorporates the alleged infringing works by reference,[1] alleges that Defendants' respective television shows, "Living Single," "Friends," "Sex and the

---

[1] A complete copy of the pilot episode of "Living Single" was provided as Exhibit D. *See* ECF No. 13-2. A complete copy of the pilot episode of *"Friends"* was provided as Exhibit E. *Id*. A complete copy of the pilot episode of "Sex and the City" was provided as Exhibit F. *Id*. A complete copy of the pilot episode of "Girlfriends" is attached as Exhibit G to the Declaration of Elizabeth McNamara. *Id.*

1

City," and "Girlfriends" (collectively, the "Shows") all infringe the copyright she holds in "Girlfriends © 1991," which includes the copyrighted treatment and script of the pilot episode "Sasha Says."[2] ECF No. 1-1 ¶1. In general, Plaintiff's contention is that the Shows copied the concept of having a cast of "urban characters . . . living in one urban building" and everything that flows from that premise. ECF No. 15 at 4.

## LEGAL STANDARD

To establish copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The parties do not dispute that Plaintiff obtained valid copyrights in *Girlfriends © 1991*. Therefore, in order to prevail, Plaintiff must show that Defendants copied *Girlfriends © 1991*. In the absence of direct evidence, copying is proven by showing "(a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works." *Kregos v. Associated Press*, 3 F.3d 656, 662 (2d Cir. 1993).

In determining whether two works are substantially similar, the "underlying issue" is "whether a lay observer would consider the works as a whole substantially similar to one another." *Williams v. Crichton*, 84 F.3d 581, 590 (2d Cir. 1996). The question is whether an "ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010) (*quoting Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001)). A court must "examine the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting of the" works in question. *Williams*, 84 F.3d at 588.

---

[2] A complete copy of the treatment for *Girlfriends © 1991* is attached as Exhibit C to the Declaration of Elizabeth McNamara. *See* ECF No. 13-2.

"[T]he determination of the extent of similarity that will constitute a substantial, and hence infringing, similarity presents one of the most difficult questions in copyright law, and one that is the least susceptible of helpful generalizations." *Gaito Architecture*, 602 F.3d at 63 (quoting *4–13 Nimmer on Copyright* § 13.03 (2009)).

Furthermore, it is "a principle fundamental to copyright law" that "a copyright does not protect an idea, but only the expression of an idea." *Kregos*, 3 F.3d at 663. "Similarly, *scènes à faire*, sequences of events that necessarily result from the choice of a setting or situation, do not enjoy copyright protection." *Williams*, 84 F.3d at 587 (italics in original, internal quotation marks omitted) (*Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986)). The distinction between an idea and its expression is an elusive one. Judge Learned Hand provided the guiding principle to this often-impenetrable inquiry in *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930):

> Upon any work, ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

Professor Zechariah Chafee further defined the boundary between idea and expression, stating that "protection covers the 'pattern' of the work ... the sequence of events and the development of the interplay of characters." Zechariah Chafee, *Reflections on the Law of Copyright*, 45 Colum. L. Rev. 503, 513 (1945); *see generally* 3 Melville B. Nimmer & David Nimmer*, Nimmer on Copyright* § 13.03[A] (1995).

Examples are helpful in applying these abstract principles. In *Mattel, Inc. v. Azrak– Hamway Int'l, Inc.*, 724 F.2d 357, 360 (2d Cir. 1983) (per curiam), the Second Circuit found that a 5½ inch Warlord doll did not infringe upon a 5½ inch Masters of the Universe doll because,

though the dolls looked remarkably similar, the similarities all were attributable to the unprotectible idea of "a superhuman muscleman crouching in what since Neanderthal times has been a traditional fighting pose." They found that protectible expression might only arise from the way the two dolls emphasized the idea, such as by accentuating certain muscle groups instead of others. *Id.*

An example of unprotectible *scènes-à-faire* can be found in *Walker*, 784 F.2d at 50, regarding stories of police work in the Bronx. The Second Circuit said that "[e]lements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about ... policemen in the South Bronx," and thus are unprotectible *scènes-à-faire*. Similarly, "[f]oot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often-recurring themes of police fiction," not in and of themselves entitled to copyright protection. *Id.* As the court said in *Berkic v. Crichton*, 761 F.2d 1289, 1294 (9th Cir. 1985), "[t]he common use of such stock .... merely reminds us that in Hollywood, as in the life of men generally, there is only rarely anything new under the sun."

Therefore, when a court "determine[s] that a work contains both protectible and unprotectible elements, [it] must take care to inquire only whether the protectible elements, standing alone, are substantially similar." *Williams*, 84 F.3d at 588 (internal quotation marks omitted) (citing *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995)).

A court must also "recognize that dissimilarity between some aspects of the works will not automatically relieve the infringer of liability, 'for no copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated.'" *Id.* (quoting *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992)). "It is only where the points of dissimilarity exceed those that are similar

and those similar are—when compared to the original work—of small import quantitatively or qualitatively that a finding of no infringement is appropriate." *Rogers*, 960 F.2d at 308.

Finally, "[t]he question of substantial similarity is by no means exclusively reserved for resolution by a jury" and the Second Circuit has "repeatedly recognized that, in certain circumstances, it is entirely appropriate for a district court to resolve that question as a matter of law, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Gaito Architecture*, 602 F.3d at 63 (internal quotation marks omitted) (quoting *Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983)). Thus, where, as here, the works in question are incorporated by reference in the plaintiff's complaint and attached to a party's motion papers by affidavit, it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation." *Id.* at 64. On such a motion to dismiss, *see* Fed. R. Civ. P. 12(b)(6), a court may consider the documents or works incorporated in the complaint by reference, *see McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007), and these works supersede contrary descriptions of them found in the complaint.

## DISCUSSION

As determination of substantial similarity requires a "detailed examination of the works themselves," *Walker*, 784 F.2d at 49, the Court will begin by summarizing each work at issue.

## I.      Description of the Works at Issue[3]

### a.   *Girlfriends © 1991*

---

[3] Because Plaintiff's only completed episode of *Girlfriends © 1991* is the pilot episode, the Court has only examined the pilot episode of each of the allegedly infringing Shows.

The main characters of *Girlfriends © 1991* are Terri, Monique, and Erika, and are described as "young Afro-American women of the nineties" who "met in college . . . where they studied film and theatre." ECF No. 13-5 at 4. The three have "reunited a few years later under one roof in a brownstone in Brooklyn." *Id.* Terri is described as an animated aspiring actress who works full time as a receptionist and is always borrowing money. *Id.* Monique is described as a former dancer and model turned independent film producer who is practical and believes in structure and calmness. *Id.* Erika is described as a writer, who is spiritual and lives life according to intuition rather than logic or reason. *Id.* She is also given one quirky character flaw—she falls asleep in public all the time. *Id.* There are three secondary characters as well, Bobbi, Robert and Sasha. Bobbi is a gay next-door neighbor who has a collection of various ice cream flavors that he uses to help the three main characters process their emotions. *Id.* Robert is a flirtatious, and homophobic neighborhood mailman. *Id.* Sasha is a tarot card reader and spiritual guide. *Id.*

Plaintiff's treatment also contains plot sketches of the first six episodes of the series where the nuances of these various characters are put into context. In "Sold on Spec," Erika's quirky character flaw—frequent sleeping in public—jeopardizes her big break on the Cosby Show. ECF No. 13-5 at 5. In "In the Red," Terri's impulsivity causes her to purchase singing lessons that she cannot afford, which leads her to borrowing money from Erika that she cannot repay in a subsequent episode sketch. *Id.* at 6. In "Personal Ads," Erika meets a potential romantic partner via a personal ad, but Terri discovers that he is using his proximity to her to steal her ideas for his own work as a writer. When Terri confronts Erika about this, she is unable to accept the news and accuses Terri of being jealous. Bobbi comforts Terri with butter pecan ice cream. *Id.* at 7. In "The Seminar," Terri gives the girls a lesson on how to find men, which they enjoy putting to the test in a night out on the town. *Id.* at 8. In "Interception," Monique assumes administrative duties at her

boyfriend's office while he is away shooting a television commercial. During this time, his office receives a call from a young writer about a script he wants to present to Monique's boyfriend. After listening to the young writer's pitch, she realizes that she wants to produce the movie herself and struggles with the choice of whether she should tell her boyfriend about the script for him to produce or keep it for herself. *Id.* at 9.

"Sasha Says," is the only episode for which the Plaintiff provides a complete script. Plaintiff also identifies Sasha Says as the pilot episode of the series. ECF No. 15-1 at 15. The overarching theme of "Sasha Says" involves Erika's change in attitude toward her roommates after speaking to her spiritual guide, Sasha, because of a writer's block. Sasha encourages her to stop taking care of other people's needs, and take care of herself first. Her roommates notice this change in attitude and are bothered by it. Once Erika approaches them to ask them to pay more of their fair share for the apartment expenses, they are fed up and conspire to take revenge on Sasha. A secondary plot of the episode involves Terri seeking work as an actress and landing a role on a soap opera as a nurse. When she first learns of this, her neighbor Bobbi celebrates with her over ice cream. When later, she and her roommates watch the episode, they are disappointed to see that only the back of her head is shown. Terri also has a crush on the doctor in the show, which is discussed at some length. At the end of the episode, Erika's writer's block is lifted, and she celebrates having published two articles in widely circulated magazines.

### b. Girlfriends

In the pilot episode of *Girlfriends*, Joan Clayton emerges as the main character. She is celebrating her 29th birthday and the fact that she was promoted to junior partner at her law firm. While these occasions should bring much happiness, Joan is, in fact, filled with anxiety. The screen cuts to a thought bubble where Joan speaks directly to the camera to describe the reason for her

anxiety—that she is getting closer to 30 without achieving other personal milestones she set for herself in her romantic life. This self-consciousness causes her to lie about her age to her colleague, William by saying that she is only turning 26.

Her girlfriends throw a party to celebrate her birthday later that evening. At the party, her childhood best friend, Toni Childs, brings a date with her who happens to be Joan's ex-boyfriend, Charles. Although Joan ended her relationship with Charles one year prior because of his reluctance to commit to a long-term relationship headed toward marriage, Joan continued to have strong feelings for Charles. Joan hides this from Toni, pretending that it is okay for Toni to now date Charles, but when Joan learns that Charles is now interested in settling down, she gets angry and starts hurling insults at bother Charles and Toni. During the resulting argument, Joan accuses Toni of betrayal. The other girls, Maya and Lynn, agree with Joan, telling Toni that she should not be dating Joan's ex. Maya even accuses Toni of breaking the black women's code. Toni does not admit any fault and blames Joan for not being more truthful earlier when she had asked it would be okay to bring Charles.

The next day, Toni finally realizes the pain that she inflicted on Joan. Acknowledging that she treasures her relationship with Joan more than her budding relationship with Charles, she ends the relationship with Charles and puts him out of her apartment. Charles leaves Toni and goes straight back to Joan's house where apologizes for how things ended between them one year prior as well as for what happened at her party the night before. However, he does not tell Joan that Toni broke up with him, instead, he seduces Joan and begins kissing her intimately. At this point, Joan does not know that Toni dumped Charles, so she feels self-conscious for doing to Toni what Toni did to her. While Joan and Charles are making out, Toni rings the doorbell. Charles hides from

Toni initially, but Toni soon discovers Charles behind Joan's kitchen counter. Joan and Toni realize that they prefer their friendship with each other and send Charles away.

Interspersed throughout this storyline, we discover that Maya is Joan's trusted, but nosy assistant, who will not do more work than is necessary. Both Joan and Toni have a condescending disposition toward Maya as demonstrated by their constant criticism of her grammar usage, but they each have different approaches. Joan thinks that she is helping Maya, while Toni is highlighting this perceived shortcoming as an insult. At one point during the argument over Charles, Toni even called Maya "low rent," implying that she is poor and from the ghetto. Lynn is Joan's friend from college who was living with Toni at the beginning of the episode, but after Toni put her out, is now living with Joan for what appears to be an indefinite period of time. William is Joan's colleague at the firm.

The episode ends with the girlfriends at dinner celebrating Joan's promotion to partnership and making up for the harsh words previously exchanged among them.

### c. Friends

*Friends* tells the story of six friends in their twenties living in New York City: Ross, Monica, Joey, Rachel, Phoebe and Chandler. In the opening scene, Monica, Chandler, Joey and Phoebe are sitting on a couch in the local coffee shop, Central Perk. Monica discusses her upcoming date with a colleague of hers, Paul, and implies that it will just be dinner and nothing else. Chandler than tells the others about a dream that he had where he was back in high school in the locker unclothed and one of his body parts was a telephone. Ross then comes into the shop looking depressed because his wife left him after realizing that she is a lesbian. While he is sitting looking depressed, Phoebe makes gestures toward his head that she describes as cleaning his aura. This annoys Ross. Joey tries to cheer him up by telling him to go to a strip joint. Shortly thereafter,

Rachel comes running into the coffee shop in a wet wedding dress looking for Monica. Monica recognizes her and brings her into the circle of friends and once there, Rachel describes how she just ran away from the altar because she realized that she was not attracted to her fiancé.

In the next scene, the friends are on the couch watching a soap opera as if it is a live sporting event—in other words, they are talking to the television and celebrating certain event as they unfold on television. Meanwhile, Rachel is on the phone with her father trying to calm him down about her choice to run away from the wedding. The conversation ends with Rachel telling her father that she does not need his money, but she immediately regrets it after he hangs up the phone. Realizing that she might be cut off from her father's money, Rachel begins to hyperventilate. Phoebe tries to help calm her by singing "My Favorite Things" and Joey makes a flirtatious remark that is received as inappropriate.

The flow of the show is interrupted by a short scene where Phoebe sings in the stairwell of the subway. Her song does not make any sense and her pitch is also inaccurate.

The next portion of the show cuts between three settings, Ross's apartment, Monica's date with Paul, Rachel at home on the phone. In Ross's apartment, the guys are putting together furniture, but complain about the confusing instructions. The furniture does not come out looking right. Their conversation centers on Ross's situation of having just been dumped where he expresses concern that he will never have another chance at love. Joey encourages Ross that he has many options because women are like ice cream flavors, there are many different types that he should take this newfound liberty to try out the many different types. He is sad because he does not think that he will ever have the courage to ask another woman out again. He looks longingly out of the window. The scene then cuts to Rachel sitting in the window at home looking sad. During the boys' conversation she had been on the phone calling her ex-fiancé numerous times to leave a

very long voicemail that required calling back numerous times in order to complete the message. Meanwhile, Monica was on a date with Paul where he shares with her that he has not been able to perform sexually since his wife left him. It is later discovered that this is a lie, but this lie had the intended effect of inducing Monica to sleep with him and making her feel like she was special because she was able to get him to perform.

In the coffee shop the next day, the friends are laughing about Monica being duped by Paul and Rachel comes in celebrating the fact that she purchased really expensive boots on sale. When asked how she paid for them, she admitted that it was with her father's credit card. The friends then take her back home where they encourage her to cut her dad's credit cards. She struggles at first, but then succeeds.

Monica, Ross and Rachel are then sitting in the living room where Rachel discover Paul's watch. Monica stomps on his watch on her way back into her bedroom. When Ross and Rachel are alone, he sheepishly asks her if it would be alright if one day he asks her to go out on a date. She says yes. And Ross leaves the apartment feeling hopeful.

The next day, the friends are in Central Perk and discuss Joey's butt that appeared on television. Rachel is now working at the coffee shop, but not tending to her duties. Phoebe tells another story that is irrelevant.

### d. Sex and the City

*Sex and the City* is a sitcom based on the book by Candace Bushnell. The pilot episode begins by telling the story of an English journalist who comes to New York City and meets a man at an art gallery who sweeps her off her feet. After an intense period of courting and signaling deep commitment, he suddenly stops responding to her calls and messages. This story serves as the launchpad for the rest of the episode where the narrator, Carrie Bradshaw, describes what it is like

to date men in New York City. Through her narration and documentary style interviews (where the speaker talks directly to the camera) with the remaining characters in the show, the audience is introduced to the other main characters of the show: Samantha Jones, Miranda Hobbes, and Charlotte York. These women are wildly successful in their professional lives, but through dialogue the audience learns that they are unhappily unsuccessful in their personal lives because, much like the English journalist at the beginning of the episode, none have been able to find a satisfying, committed romantic partner. The four women meet to discuss their romantic disappointments over lunch and Samantha tells the other women that they should "have sex like a man," which she describes as having sex without emotional attachment. The rest of the episode explores how these women attempt to implement this approach. The episode ends with mixed results, including Samantha, who is disappointed when the man she meets at a party tells her that she cannot stay overnight after they have sex.

> e. *Living Single*

*Living Single* tells the story of four young, single, African American women living in New York city, Khadijah James, Regine Hunter, Synclaire James, and Maxine Shaw. Khadijah is an entrepreneur who owns *Flavor* magazine. Synclaire, who is Khadijah's cousin, works at Flavor as the secretary and lives with Khadijah in her house. Regine, who is a childhood friend of Khadijah's, also lives in her house and it is unclear from the pilot episode whether Regine has a profession other than dating wealthy men and expecting them to take care of her. Maxine is an attorney and in her first appearance on the show, she comes into Khadijah's house to celebrate a legal victory she had in a divorce case. The other women celebrate with her because she helped her client, the woman in the divorce, take most of her ex-husband's assets. Also appearing in this episode are two neighbors, Kyle and Overton. Overton is a handyman who has a childlike crush on Synclaire, and

Kyle works on Wall Street and has romantic tension with Maxine that manifests in combative, yet flirtatious, communication.

There are two main storylines in this first episode. First, Khadijah is on the hunt for a cover story for her magazine, *Flavor*. Although she had lined up an interview with Maya Angelou for the cover story, because of an oversight by her absent-minded secretary, Synclaire, the interview questions were never sent, and Maya had to pull out of the doing the interview. Throughout the episode, Khadijah hustles to find a replacement, calling everyone she knows for another celebrity cover story. Meanwhile, Regine happily boasting about her new beau, who is a wealthy business owner in town and takes her on fancy dates in his stretch limousine. Through happenstance, the other women discover that Regine's new beau is in fact married, and when they tell Regine, she is unable to break ties with him until he stands her up for a date. The other women try to comfort Regine by telling her that she does not need a man. After witnessing Regine's affair with a married man, Khadijah has the idea to write a cover story about women who date married men. The story is wildly popular and that issue of *Flavor* sells out at all the newsstands.

## II.   Analysis and Comparison

After performing a detailed examination of *Girlfriends © 1991* and the pilot episodes of each of the Shows, this Court concludes that no ordinary lay observer could find them substantially similar beyond the level of generalized, or otherwise unprotectible, ideas.

At the most general level, *Girlfriends © 1991* and the Shows are about young professionals struggling to manage the challenges arising from the simultaneous pursuit of career, friendship, and romance in an urban environment. However, in moving onto the next level of specificity, the differences in total concept and feel, theme, characters, plot, sequence, pace, setting and characters begin to multiply, and the initial general similarity is rendered wholly insignificant.

First, the total concept and feel of the works are profoundly different. In *Girlfriends ©
1991*, the characters are all African American women who met in college while studying film and
theatre and now all live in the same brownstone. By contrast, both *Sex and the City* and *Friends*,
have an entirely white cast, none of whom met in college, and Joey is the only character between
those two shows who has a connection to film and theatre. The women in *Sex and the City* are
affluent, successful, and in their thirties, while the women in *Girlfriends © 1991* are in their
twenties at the beginning of their careers and often make financial sacrifices. While five of the six
characters in *Living Single* all live in the same building, none of them studied film or theatre in
college. They also did not all meet in college. Synclair is Khadijah's cousin and Regine is a
childhood friend. Their chosen careers are also very different as Maxine is a successful lawyer.

Turning to specific similarities in the theme, setting, characters, time sequence, plot and
pace, the Court also finds that the Shows are not substantially similar to *Girlfriends © 1991*. Any
similarity in the theme of the Shows and *Girlfriends © 1991* relates to the unprotectible idea of a
television show about interpersonal relationships. Once one goes beyond this level of abstraction,
the similarity in theme disappears. *Girlfriends © 1991* involves a group of young women trying to
have careers in the arts and supporting each other through the highs and lows of that pursuit. The
male characters in that show play very insignificant supporting roles—Bobbi sole contribution is
his ice cream and Robert simply delivers the mail. By contrast, in *Living Single* each woman is
pursuing a different kind of career, one is even building a business, and the men in the show play
more prominent roles that help define the female characters. For example, Maxine's domineering
attitude toward men is central to her character and this would not be defined so boldly but for
Kyle's role in the show creating romantic tension with her character. The careers of the women in
*Sex and the City* are also not the central focus, rather these women are trying to pursue romance

and their high-powered careers are used to boldly illustrate the cost of that pursuit. As for *Friends*, the depiction of gender is not so one-sided, as the cast is even split between men and women and the story highlights the challenges of dating and friendship from both perspectives. Also, as with *Sex and the City* and *Living Single*, the careers of the characters in *Friends* are not a central focus. Finally, in *Girlfriends*, even though the show has an ensemble of characters, the interpersonal stories are less about a group of friends and more about one person, Joan, and how the various people in her life interact with her and with each other as they face life's challenges. In fact, it is the only show in the entire group that has a clear main character starting in the pilot episode.

Plaintiff argues that the setting of *Girlfriends © 1991* and the setting of *Living Single* and *Friends* are substantially similar. For *Living Single*, it is the fact that most of the characters in *Living Single* live in the same brownstone in New York City—some of them in the same apartment. For *Friends*, Plaintiff alleges that it is the use of Central Perk café as the place where the characters congregate.[4] However, neither of these similarities are protectible. Rather, they are *scènes-à-faire*, that flow quite naturally from a general plot involving young urban characters in New York City. *See Monbo v. Nathan*, 623 F. Supp. 3d 56, 90 (E.D.N.Y. 2022) (quoting *Abdin v. CBS Broadcasting Inc.*, 971 F.3d 57, 67 (2d Cir. 2020) (quoting *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976)) (*scènes-à-faire* are "sequences of events which necessarily follow from a common theme," and "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic."). Unless one is as wealthy as the characters in *Sex and the City* are implied to be, having roommates is a fact of life in New York

---

[4] Plaintiff does not allege that she scripted a café into her copyrighted material, but rather that this is an element of her personal life that the producers of *Friends* appropriated. For this reason alone, it is not copyrightable. *See Burns v. Imagine Films Ent., Inc.*, 165 F.R.D. 381, 393 (W.D.N.Y. 1996) ("Both historical and biographical or autobiographical facts cannot be claimed as copyright.").

City. Moreover, a television show chronicling the lives of young urban characters in New York that does not involve such characters congregating in a café would be as unbelievable as a white Christmas in Alabama.

Plaintiff also contends that her character Terri is substantially similar to Maya in *Girlfriends*, Synclair in *Living Single* and Phoebe in *Friends*. Her position is that Terri is an "irresponsible receptionist," and that this character trait is copied in those other characters. As an initial matter, this asserted similarity is an insufficient basis upon which to rest a claim of substantially similar characters because it only captures the character's profession and nothing else about their patterns of behavior and motivations. To determine whether a film misappropriates characters, courts must consider the "totality of their attributes and traits as well as the extent to which the defendants' characters capture the total concept and feel" of figures in Plaintiff's work. *Walker*, 784 F.2d at 50 (internal quotation marks omitted). When one looks beyond these superficial similarities of the characters' employment, many differences emerge, including the motivations for the characters, the skills and credentials of the characters, and their interpersonal relationships.

First, while Maya is a receptionist, she is not as irresponsible as Terri. Terri is a receptionist only as a means to becoming an actress and therefore does not take it seriously. Further, she is irresponsible because she cannot successfully manage her own personal budget and personal affairs. Maya, on the other hand, is a career receptionist and shares the responsibility of her household with her husband. In the first episode, Maya is portrayed as not doing more work than necessary, but she is nevertheless dependable for her employer. While Maya is of limited means, there is no indication that she lives irresponsibly outside her means, spending money frivolously, as Terri does. The comparison to Phoebe is simply inaccurate because Phoebe is not a receptionist

at all and also does not appear to live life irresponsibly. Meanwhile, even though Synclair is not a stellar receptionist, her shortcomings as a receptionist do not stem from her distaste for the position as in Terri's case. Rather, Synclair is enthusiastic about her role and tries to please Khadijah as best she can. Moreover, both Synclair and Maya have close personal relationships with their bosses—Synclair is her boss's cousin and Maya's boss is a close personal friend—and that creates a unique interpersonal dynamic that is absent from *Girlfriends © 1991*, as Terri has no close personal relationship with any of her colleagues.

An examination of the time sequence, pace, and plot of the Shows in comparison to *Girlfriends © 1991* also does not reveal any infringement. Plaintiff alleges similarities among various plot elements such as (a) references to a soap opera, (b) references to ice cream, (c) friends that cannot pay money back, (d) dating via personal ads, and (e) spiritual guides. Not only are these alleged similarities "too generalized an abstraction" from what Plaintiff wrote to be protected, *Monbo v. Nathan*, 623 F. Supp. 3d 56, 96 (E.D.N.Y. 2022), *reconsideration denied*, No. 18-CV-5930, 2022 WL 4134455 (E.D.N.Y. Sept. 11, 2022), but they are all *scenes-à-faire* as well. Further, the context in which these plot elements manifest in Plaintiff's work and the Shows are so completely different as to be unrecognizable.

In "Sasha Says," Terri lands a supporting role in a soap opera as a nurse whose face is never seen in the episode. ECF No. 15-1 at 29. Landing this role marks the beginning of Terri's journey as a character in *Girlfriends © 1991*. However, in *Friends*, the soap opera is merely a background setting during a scene where all the friends are hanging out in the apartment while Rachel is on the phone having a conversation with her father. This soap opera simply creates the at-home feeling of the scene while Rachel's conversation is the central story of the plot at that point of the episode. There is also a stray reference to Joey's appearance on a soap opera episode at the end of that

episode, but this is also very insignificant and can be disposed of without losing the plot of that episode. None of the other shows incorporate any reference to a soap opera in the pilot episode.

The use of ice cream is also different in each show. In *Girlfriends © 1991*, Bobbi uses ice cream to help his friends process their emotions and each flavor correlates to a different emotion. In the "Sasha Says" episode, Bobbi uses ice cream to help Terri celebrate the role that she landed on the soap opera. In *Friends*, ice cream has no specific motivic use. In the first episode of *Friends*, Joey uses ice cream as a problematic metaphor for women, saying that "there's lots of flavors out there" for Ross to explore to help him find hope in his divorce.  The use of ice cream in a storyline, even when used in connection with processing emotions, is too abstract of an idea to be protected by copyright. The same applies to insolvent friends who cannot pay back borrowed money, online dating, and spiritual guides. These ideas are so generic that a discussion of how they manifest differently in each show is unnecessary.

Even though many of these elements are present in some or all of the shows, the actual plot of each pilot episode for each show is completely different, setting up a season of episode that each go in their own unique direction.

While at the most abstract level, all these works concern urban professionals navigating career, friendship, and love in a city, the shows "are not similar in mood, details or characterization," and, indeed, differ substantially in nearly every relevant way. *Reyher v. Children's Television Workshop*, 553 F.2d 87, 92 (2d Cir. 1976). Accordingly, this Court holds that a lay observer would not find substantial similarities between the protectible material of *Girlfriends © 1991* and the Shows, and to the extent that there are any similarities, those similarities are not protectible.

**CONCLUSION**

18

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint, ECF No. 13 is GRANTED. Plaintiff's Complaint is DISMISSED. The Clerk of Court is respectfully directed to enter judgment and close this case.

IT IS SO ORDERED.

Dated:  November 28, 2023
       Rochester, New York

                                       _____
                                       HON. FRANK P. GERACI, JR.
                                       United States District Judge
                                       Western District of New York